**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RYAN AVENARIUS, RODNEY E. JAEGER, JAMES CORDES, and PREMIER PRODUCE CO., INC. on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>    vs.<br><br>EATON CORPORATION; DAIMLER TRUCKS NORTH AMERICA LLC; FREIGHTLINER LLC; NAVISTAR INTERNATIONAL CORP.; INTERNATIONAL TRUCK AND ENGINE CORP.; PACCAR INC.; KENWORTH TRUCK CO.; PETERBILT MOTORS CO.; VOLVO TRUCKS NORTH AMERICA; and MACK TRUCKS, INC.,<br><br>          Defendants. | Civil Action No.: 11-00009-SLR<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, Ryan Avenarius, Rodney E. Jaeger, James Cordes, and Premier Produce Co.,

Inc. bring this action, by and through their undersigned counsel, on behalf of themselves and on

behalf of a Class (defined below) of purchasers that purchased, in the United States, Class 8

Truck Transmissions (described below) <u>indirectly</u> from Defendants, and plead as follows:

**NATURE OF CLAIM**

1.      This case arises out of a conspiracy wherein Original Equipment Manufacturer

("OEM") defendants Daimler Trucks North America LLC ("Daimler Trucks"); Freightliner LLC

("Freightliner"); Navistar International Corp. ("Navistar"); International Truck and Engine Corp.

("International"); PACCAR Inc. ("PACCAR"); Kenworth Truck Co. ("Kenworth"); Peterbilt

Motors Co. ("Peterbilt"); Volvo Trucks North America ("Volvo"); and Mack Trucks, Inc.

("Mack") (collectively the "OEM Defendants") conspired with defendant Eaton Corp. ("Eaton")

(Eaton and the OEM Defendants collectively "Defendants") to maintain and enhance the monopoly power of Eaton in the Class 8 Truck Transmissions Market during the period from October 1, 2002 to the present (the "Class Period").

2.     Defendants accomplished this goal through the implementation of a series of exclusive dealing arrangements among and between Eaton and the OEM Defendants.  The exclusive dealing agreements were put in place by Defendants in order to foreclose the Class 8 Truck Transmissions Market from Eaton's competitors, including Eaton's biggest competitor, ZF Meritor.  As set forth more fully below, Defendants' illegal, anticompetitive conspiracy was highly successful in eliminating competition in the market for Class 8 Truck Transmissions, thereby allowing Eaton to maintain and enhance its monopoly power.

3.     Defendants' conspiracy effectively eliminated any meaningful competition in the United States market for Class 8 Truck Transmissions.  Indeed, market foreclosure was the intended result of Defendants' conspiracy.  Eaton's Manager of OEM Sales and Marketing, has acknowledged the primary purpose of the exclusive dealing conspiracy was to harm the transmission business of Eaton's primary competitor, ZF Meritor.  In addition, the OEMs themselves acknowledged the success of the conspiracy.  For instance, Greg Sharp, a purchasing agent for defendant Freightliner LLC, touted the success of the conspiracy, writing, in June 2002, that "[w]e have already killed Meritor's transmission business.  It is just a matter of time now before they close the doors."

4.     As a result of the conspiracy between Eaton and the OEMs, Plaintiffs and the Class were injured in their business and property by paying more for Class 8 Truck Transmissions than they otherwise would have paid in the absence of Defendants' unlawful, exclusionary conduct.

5.     On October 30, 2009, a jury determined that Eaton's exclusivity agreements with

2

the OEM Defendants constituted a contract, combination, or conspiracy that unreasonably restrained trade, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation,* Civil Action No. 06-623-SLR (D. Del.).

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"), under 28 U.S.C. § 1332(d)(2), because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interest and costs, and this matter is a class action in which some Class members are citizens of a state different than those states of which Defendants are citizens.

7.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1404(a), as this action was transferred, by agreement of the parties, from the District of Kansas on January 4, 2011.  In addition, the related action *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation,* Civil Action No. 06-623-SLR (D. Del.), was tried, and is still pending, in this District.

8.     The Court has personal jurisdiction over all Defendants because five of the Defendants are incorporated in the State of Delaware ("Delaware Defendants") and the remaining defendants knowingly, intentionally, and willfully conspired and engaged in the illicit, anticompetitive conduct (described herein) with the Delaware Defendants.  In addition, the Court has personal jurisdiction over Defendants because Defendants received substantial compensation and profits from the indirect sales of Class 8 Truck Transmissions in the District of Kansas, the district from which this action was voluntarily transferred by agreement of all parties.

## THE PARTIES

### Plaintiffs

9.      Plaintiff, Ryan Avenarius ("Iowa Plaintiff"), is an individual and resident of the State of Iowa.  Mr. Avenarius indirectly purchased Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers, in the State of Iowa, during the Class Period.

10.      Plaintiff, Rodney E. Jaeger ("Wisconsin Plaintiff"), is an individual and resident of the State of Iowa.  Mr. Jaeger indirectly purchased Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers, in the State of Wisconsin, during the Class Period.

11.      Plaintiff, James Cordes ("Michigan Plaintiff"), is an individual and resident of the State of Michigan.  Mr. Cordes indirectly purchased Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers, in the State of Michigan, during the Class Period.

12.      Plaintiff, Premier Produce Co., Inc. ("California Plaintiff"), is a California corporation, with its principle place of business in Chula Vista, California.  Premier Produce indirectly purchased Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers, in the State of California, during the Class Period.

### Defendants

13.      Defendant Eaton is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Troy, Michigan.  During all relevant times, Eaton manufactured Class 8 Truck Transmissions in the United States and marketed and indirectly sold Class 8 Truck Transmissions in the United States.

14.    Defendant Daimler Trucks North America LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Portland, Oregon.  During all relevant times, Daimler Trucks manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the Freightliner Trucks, Sterling Trucks, and Western Star Trucks brands, in the United States.  In addition to Daimler Trucks, Freightliner Trucks (Freightliner LLC) has also been named as a defendant.  According to its website (freightlinertrucks.com), "Freightliner Trucks is a division of Daimler Trucks North America LLC."

15.    Defendant Navistar International Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Warrenville, Illinois.  During all relevant times, Navistar manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the brand of its subsidiary, International Truck and Engine Corporation, in the United States.

16.    Defendant International Truck and Engine Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Warrenville, Illinois.  During all relevant times, International manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.

17.    Defendant PACCAR, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Bellevue, Washington.  During all relevant times, PACCAR manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the Kenworth and

Peterbilt brands, in the United States.

18.    Defendant Kenworth Truck Company is a subsidiary of PACCAR, organized and existing under the laws of the State of Ohio, with its principal place of business in Kirkland, Washington.  During all relevant times, Kenworth manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.

19.    Defendant Peterbilt Motors Company is an assumed name for PACCAR, with its principal place of business in Denton, Texas.  During all relevant times, Peterbilt manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.

20.    Defendant Volvo Trucks North America, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Greensboro, North Carolina.  During all relevant times, Volvo Trucks manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, under the Volvo and Mack brands (collectively, "Volvo/Mack"), in the United States.

21.    Defendant Mack Trucks, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in Greensboro, North Carolina. During all relevant times, Mack manufactured Class 8 trucks in the United States and marketed and indirectly sold Class 8 trucks, containing Class 8 Truck Transmissions, in the United States.

## FACTS

## BACKGROUND

### Truck Transmissions

22.     A transmission or gearbox sends power from a vehicle's engine to its drive wheels. When equipped with the proper transmission, the engine produces sufficient torque (*i.e.*, the force used to turn the engine crankshaft) to accelerate and maintain a vehicle's speed.  Torque is measured in foot-pounds ("ft-lbs"), and a transmission's capacity to accommodate torque is referred to as its "torque rating."

23.     The switching of gears may be performed manually (by the driver) or automatically, depending on the type of transmission.  To change gears using a conventional stick-shift manual transmission, the driver typically must depress the clutch pedal and move a shift lever to the desired gear.  In a vehicle with a conventional automatic transmission, the driver of the vehicle does not have to change gears; the transmission uses hydraulics to select the gears automatically.  A vehicle with a conventional manual transmission has three pedals (*i.e.*, an accelerator, brake, and clutch) while a vehicle with a conventional automatic transmission has two pedals (accelerator and brake only).

24.     "Automated manuals" are manual transmissions with clutches that have been automated with actuators and electronic controls to perform operations normally performed by the driver's feet.  A fully automated manual transmission has two pedals (accelerator and brake) with an electronically controlled clutch.  The driver can drive in either automated or manual mode.  In manual mode, the driver uses a stick-shift to initiate shifts between gears, and an on-board computer operates the pedal-less clutch and controls the engine to allow for pedal-less gear-shifting.

**Class 8 Heavy Duty Trucks**

25.     There are eight recognized classes of vehicles which use different transmissions. Class 8 trucks, also known as heavy-duty trucks, are the heaviest, weighing over 33,000 pounds. Unlike Class 8 Truck Transmissions, the transmissions used in Class 1 through Class 7 vehicles are not built to withstand the high torque generated by the diesel engines that power heavy-duty trucks, and are therefore not reasonably substitutable with Class 8 trucks.

26.     Examples of Class 8 trucks include tractor trailers, large moving and long-haul delivery vehicles, and heavy construction vehicles such as dump trucks and cement trucks.

27.     In the Class 8 truck manufacturing industry, OEMs purchase Class 8 transmissions from suppliers (*i.e.*, Eaton, ZF Meritor, etc.) and then provide them as alternative options to Class 8 truck purchasers, much like an automobile purchaser chooses among options when buying a new car.  In buying Class 8 trucks, the buyer chooses among various components/options from the OEM's "databooks."  As with purchasing a car, certain components are "standard" in the databooks, while others are considered upgrades, usually offered at an increased price.

**Class 8 Truck Transmissions Market**

**Eaton**

28.     Since the late-1950s, Eaton has dominated the market for Class 8 Truck Transmissions in North America.  In 1989, however, Meritor Transmission Corporation ("MERITOR") began selling Class 8 Truck Transmissions in competition with Eaton.  By 1999, MERITOR built its market share to over 16 percent.

**ZF Meritor**

29.      In 1999, to further improve its competitive position, MERITOR entered into a joint

8

venture with ZF Friedrichshafen AG, a European manufacturer of heavy duty transmissions.
The joint venture, named ZF Meritor, used its collective expertise to develop and market the
industry's first fully automated, two-pedal (accelerator and brake only, no clutch pedal) manual
Class 8 Truck Transmission.  The successful launch of this revolutionary transmission increased
ZF Meritor's sales volume and positioned it to expand its transmission offerings to serve a wider
variety of heavy duty truck applications.  Eaton was cognizant of ZF Meritor's growing
penetration into the Class 8 Truck Transmissions Market, as evidenced by a PowerPoint
presentation created in approximately 2000, wherein Eaton noted that its dominant market
"Position is at Risk" and that ZF Meritor was viewed as a "Serious Competitor" and a "real
threat."

### Flagging Market and Defendants' Conspiracy

30.    In 2000, the market for Class 8 trucks experienced a substantial downturn, causing
a significant reduction in sales volume among the OEMs and other market participants, including
Eaton and ZF Meritor.  For example, from 2000 to 2002, Eaton lost almost two-thirds of its
market volume for heavy-duty transmissions.  It is axiomatic that in a competitive market, under
these circumstances, Eaton would have made an effort to increase its market share by reducing
prices on its existing products or work to develop superior Class 8 transmissions.  Similarly,
OEMs would have taken advantage of the downturn by forcing Eaton and ZF Meritor into a
pricing war for the OEMs' business.

31.    Instead of responding in a competitive manor, however, Eaton and the OEMs
hatched a plan to eliminate competition in the market for Class 8 Truck Transmissions, while at
the same time stabilizing and fix prices for Class 8 Truck Transmissions.  The OEMs, each of
whom held substantial bargaining power over Eaton, at least while ZF Meritor remained a

meaningful competitor, were the driving force behind the conspiracy. Indeed, according to at least two sales managers at Eaton, the OEMs approached Eaton concerning the anticompetitive, exclusive dealing arrangement.

**Market Specifics**

32.    In fiscal year 2005, over 325,000 new Class 8 Truck Transmissions were sold, and revenues from these sales exceeded $1 billion.

33.    Class 8 Truck Transmissions can be subdivided into three product categories: linehaul, vocational, and specialty. Purchasers of Class 8 Truck Transmissions intend to use them for a particular vehicle (*i.e.*, linehaul, vocational, or specialty) and cannot substitute a transmission intended for a different vehicle type.

34.    Approximately 70 percent of Class 8 Truck Transmissions are used in linehaul trucks ("Linehaul Transmissions"). Linehaul trucks are designed to carry freight long distances, travel 60,000 miles or more a year, and operate mostly on highways or other paved surfaces. Linehaul trucks are used to haul, among other things, box trailers, curtain siders, refrigerated trailers, tankers, flat beds, and car-carrying trailers.

35.    About 26 percent of Class 8 Truck Transmissions are used in vocational trucks. Class 8 Transmissions used for vocational applications ("Vocational Transmissions") are found in heavy-duty trucks operating in rugged performance environments. Vocational transmissions are predominately found in heavy-duty construction vehicles, which need great versatility to operate in on-road and off-road environments.

36.    The remainder of Class 8 Truck Transmissions, about 4 percent, are sold for specialty trucks. Class 8 Truck Transmissions used for specialty applications ("Specialty Transmissions") are primarily used in "stop and start" vehicles, such as garbage, fire, and short-

haul delivery trucks.

37.    As noted above, the Class 8 truck OEMs purchase Class 8 Truck Transmissions and incorporate those transmissions into the trucks they indirectly sell to truck buyers, such as Plaintiffs, through authorized sales agents/dealers.

38.    When selecting components for a new truck purchase, truck buyers refer to OEM product databooks which list an OEM's component offerings, including transmissions.  For each component, one brand will be listed as "standard," while others may be listed as optional. Optional transmissions are usually priced at a mark-up above the price of the standard transmission.

39.    When a transmission is excluded from an OEM's databooks and not listed as an option, the transmission manufacturer's ability to sell the transmission is severely diminished, if not completely eliminated.  When not listed as an option, an unlisted transmission, if available at all, is always priced at a substantially higher cost.

40.    In addition to competing for databook positioning to increase demand for its transmissions, a transmission manufacturer may try to generate downstream sales by enticing the truck buyer to order a particular transmission from an OEM, with monetary incentives such as discounts or competitive equalization payments (*i.e.*, payments to customers to meet a competitor's price or "equalize" the price), as well as non-monetary incentives such as demonstrations of product superiority and value.  When a manufacturer's transmission is excluded from the OEM databooks, however, this type of marketing becomes considerably more costly and far less effective.

41.    There are substantial barriers to entry into the Class 8 Truck Transmissions Market. A new entrant into the market faces high sunk and fixed costs to bring competitive products to

market.  They have little-to-no ability to license the intellectual property needed for transmission

design and development, and have to spend substantial amounts of money to validate the

reliability and other attributes of their products, which can take upwards of a year or more.  They

would also have to make intensive and sustained investments in transmission marketing,

warranty programs, demonstrations, sales, and service if they hope to persuade customers to

purchase or switch to their transmissions.  Finally, entrants would need sustained sales of

transmissions in order to earn enough market-share to be able to recoup the substantial entry

costs.

## EATON'S MONOPOLY POSITION FOR CLASS 8 TRUCK TRANSMISSIONS

42.     Beginning with its purchase of the Fuller Manufacturing Company in 1958, Eaton

has been the dominant and most widely-known heavy-duty manual transmission manufacturer in

the United States and, indeed, all of North America.

43.     By the late-1980s, Eaton held at least an 80 percent market share and the standard

position in the databooks for nearly every truck model at each of the OEMs in the submarkets for

Class 8 Linehaul and Vocational Truck Transmissions.

44.     Based on sales of all Class 8 Truck Transmissions (linehaul, vocational, and

specialty combined), Eaton has at least 90 percent of the market.  The other Class 8 Truck

Transmissions manufacturers in the United States market are Allison Transmission (a division of

General Motors) and Volvo/Mack, which produces transmissions only for its own line of trucks.

45.     Eaton has had monopoly power in the Class 8 Truck Transmissions Market

throughout the Class Period, and its current market share is upwards of 90 percent.  Eaton has

described itself as "solidly entrenched" in the Class 8 Truck Transmission marketplace.

## THE CONSOLIDATION OF THE HEAVY DUTY TRUCK MARKET

46.    In 1996, there existed seven OEMs which manufactured heavy-duty trucks.  The
OEMs included Freightliner, PACCAR, International (via Navistar), Volvo, Mack, Sterling, and
Western Star.

47.    Over the next six years, following a series of acquisitions, that number was reduced
to four, with only Freightliner, PACCAR, International, and Volvo/Mack surviving
consolidation.

48.    The four remaining OEMs each have substantial market share.  According to
testimony provided in open court, their market share was nearly evenly divided, with Freightliner
and PACCAR possessing slightly larger shares and International and Volvo/Mack possessing
slightly smaller shares.

49.    The OEMs have significant power over the price of truck components.

50.    Each of the remaining OEM's gained additional market power as the number of
OEMs decreased.  Eaton was aware of the significance of the fact as evidenced by an internal
Eaton presentation, which stated, in part: "OEM's will grow business as they control more of the
total transaction costs . . . .  As production requirements grow, OEM's gain leverage."

### ZF Meritor

51.    In the late-1990s, MERITOR grew at a sufficient pace that, left unchecked, would
have eroded Eaton's dominant position.

52.    MERITOR (through its predecessor, Rockwell International Corporation), which
first began to manufacture and sell Class 8 Linehaul Truck Transmissions in 1989 was, by 1992,
able to gain roughly 14 percent of sales in the Class 8 Linehaul Transmissions submarket.
MERITOR had achieved additional growth after it obtained "standard" position on certain

13

Freightliner truck models and availability in databooks at all the OEMs.

53. In 1996, MERITOR developed an engine synchronized shift ("ESS") system, which automatically synchronized engine revolutions to road speed. The innovation made manual shifting easier, essentially eliminating the need to use the clutch pedal except for stopping and starting. In the same period, Eaton offered some transmission automation through its Top-2 and AutoSelect products. The Eaton and MERITOR technologies represented the first generation of Class 8 Truck Transmission automation in North America. MERITOR's introduction of ESS benefited consumers by, among other things, bringing competition to these automated products.

54. By 1999, MERITOR's share of transmission sales for Class 8 Linehaul Transmissions had surpassed 20 percent. In an attempt to further enhance its position in the market, MERITOR entered into a joint venture with ZF Friedrichshafen AG to form ZF Meritor, in June 1999. ZF Friedrichshafen AG brought to the venture its expertise in transmission technology. The combination of ZF Friedrichshafen AG and MERITOR's marketing and service teams, distribution and manufacturing capabilities, and North American presence created a formidable competitor to Eaton.

55. In August 1999, building upon MERITOR's existing relationship with Freightliner, ZF Meritor entered into a non-exclusive, short-term supply agreement with Freightliner, the largest Class 8 truck OEM in the United States. At Freightliner, ZF Meritor secured "standard" position on, among other models, Freightliner's popular Class 8 Century and Sterling's "Aeromax" truck models. The agreement did not require Freightliner to remove Eaton transmissions from the Freightliner databooks or charge customers a price penalty for selecting optional Eaton transmissions. The agreement was to run through 2001 and could be extended by the parties. ZF Meritor expected to achieve a high volume of transmission sales on Freightliner

14

trucks.

56.     ZF Meritor transmissions were listed in the databooks as a competitively priced option at the other OEMs.

57.     In November 1999, ZF Meritor further advanced its competitive position by introducing North America's first two-pedal, fully automated manual Class 8 Truck Transmission, called "FreedomLine."   Based on ZF's "Astronic" automated manual transmission, the FreedomLine beat Eaton's two-pedal offering (the UltraShift) to market by nearly three years.

58.     The FreedomLine represented the third generation in automated transmission technology for Class 8 trucks in North America.  First-generation and second-generation technology required the use of a foot-operated, clutch pedal, thereby necessitating a three-pedal configuration.  The FreedomLine did not require a clutch pedal; it operated with only accelerator and brake pedals.

59.     The superior efficiencies and value of the third-generation technology were numerous, ranging from improved fuel economy to enhanced driver safety, instruction, and retention, to less drive train wear, a quieter ride, and higher resale values.

60.     ZF Meritor's release of the FreedomLine put Eaton's dominant market position at serious risk.  Eaton did not have a two-pedal offering, and predictions in the heavy duty truck industry were that automated manual transmissions, including third-generation technology, would gain significant share among Class 8 Truck Transmission users.  Automated manual transmissions did, in fact, gain significant market share.  By 2005, the market share had reached 12 to 15 percent, with Eaton itself predicting additional growth of 1 to 2 percent each year.

61.     The emergence of ZF Meritor, with its "standard" positioning at Freightliner, its

optional, competitively priced position at the other OEMs, its existing customer base upon which to build, and its introduction of the FreedomLine transmission (particularly in the absence of a two-pedal Eaton transmission) created a substantial competitive threat to Eaton's market dominance.

## EATON CONSPIRES WITH THE OEMs TO MAINTAIN AND EXPAND EATON'S MONOPOLY POWER

62.   In 2000, the OEMs faced shrinking profits due to what has been described as a "collapse" of the heavy-duty trucking industry characterized by markedly slow truck sales. Faced with increasing competitive pressure in the market for Class 8 Truck Transmissions, Eaton along with the OEMs began to look for any possible means to improve their financial outlook. Defendants created a scheme whereby each of the OEMs would enter into a *de facto* exclusive dealing agreement with Eaton, which would provide over 90 percent of each OEM's Class 8 transmission needs.  In exchange, the OEMs would list Eaton's transmissions as "standard" in their databooks.  In order to maintain Eaton's 90+ percent market share, each OEM would either remove comparable ZF Meritor transmissions from the databooks or offer the ZF Meritor transmissions as high-cost options despite the fact that the ZF Meritor transmissions were often substantially less expensive.  In return, Eaton would provide the OEMs with hefty "rebates" once market share targets were met by each OEM.  Of course, these "rebates" were nothing more than the OEMs' share of monopoly rents derived from Class 8 truck consumers, such as Plaintiffs, whom were paying supra-competitive prices for Eaton transmissions through Class 8 truck purchases.

63.   As early as June 21, 2000, Eaton recognized that due to "[c]onsolidation, globalization & profit pressure" there was increased "[p]ressure on vertically integrated OEMs" which allowed "new partnerships to emerge."  Indeed, Eaton also recognized that its "[p]osition

[was] at Risk" because ZF Meritor had become "a [s]erious [c]ompetitor."

64.     The OEMs approached Eaton with an idea to foreclose its competitors, specifically

ZF Meritor, from the Class 8 Truck Transmissions Market.  According to Ken Davis, the

President of Eaton's Americas Vehicle Group, Freightliner approached Eaton and "their proposal

to us was that they wanted to reduce the number of suppliers."  According to Eaton's John Buck,

the OEMs "were executing the strategy that they were going to have long-term supply

agreements with their big suppliers and we [Eaton] either played or we lost."  This sentiment was

echoed by Eaton's James Sweetnam who testified that the OEMs "had approached [Eaton]"

regarding the long-term exclusive dealing agreements ("LTAs").

65.     An internal power point presentation titled "LTA Update," dated October 16, 2000,

described Defendants' strategy as more than a series of "Contracts," and instead sought to build

"Partnerships."  According to this presentation, "[a] Partnership is defined as a business

relationship wherein both parties agree to assist one another in growing their business more

profitably."  The presentation went on to explain how the "Partnership" would function: "We

agree to establish a working team, which will be charged with developing and growing the

business opportunities for both companies."  The power point further discussed LTAs generally,

stating that they provide a "Competitive Advantage in the Market" through "Databook Position."

66.     Defendants' strategy was facilitated by the LTAs, *de facto* exclusive contracts

between and among Eaton and the OEM Defendants, which expanded or extended prior supply

agreements with provisions designed to deliberately foreclose competition.  The OEMs knew

that if they agreed to make Eaton their exclusive supplier, there would be no room in the Class 8

Linehaul and Vocational Transmission market, in the United States, for any significant

competitors.

67. The LTAs contained lucrative bundled rebate and share penetration payments that the OEMs could achieve by diverting purchasers of transmissions to Eaton transmissions, and which therefore provided a mechanism by which Eaton could share monopoly rents with its OEM co-conspirators. By the LTAs, the OEMs agreed to exclude transmissions manufactured by Eaton's competitors or to penalize customers with higher prices or other punitive measures if those customers selected a competitor's transmission over an Eaton transmission. Eaton and the OEMs agreed that the OEMs would refuse to offer competing transmissions, or dissuade customers from purchasing them, despite customer demand. Ultimately, the agreements between and among Eaton and the OEMs to foreclose competition in the market for Class 8 Truck Transmissions in the United States were highly effective. Indeed, Defendants' anticompetitive, illegal conspiracy described herein caused the only viable competitor at the time, ZF Meritor, to be foreclosed from over 90 percent of sales in the Class 8 Linehaul Transmissions submarket and from 100 percent of sales in the Class 8 Vocational Transmissions submarket.

68. The OEMs shared in the illicit monopoly rents that they and Eaton consequently extracted from the Indirect Purchaser Class (defined below), including, without limitation, through payments in the form of so-called bundled loyalty "rebates." The "rebates" were highly lucrative to the OEMs, with each OEM receiving millions of dollars in these shared monopoly rents. Meanwhile, Plaintiffs and the other members of the Class paid substantial overcharges in the form of supra-competitive prices for Class 8 Truck Transmissions, through their purchases of Class 8 trucks, resulting from the diminution in competition caused by the LTAs and Defendants' other exclusionary conduct alleged herein.

69. In addition to the large rebate provisions contained in the agreements with all the OEMs, two OEMs, Freightliner and PACCAR, negotiated clauses into their LTAs that ensured

18

Eaton would not give other OEMs more favorable pricing, regardless of actual cost.

70.    When ZF Meritor learned about the conspiracy among Eaton and the OEMs, it approached the OEMs with competitive offers for Class 8 Truck Transmissions.  The OEMs responded that they could not negotiate with ZF Meritor because of their restrictive agreements with Eaton.  According to Dennis Kline, Vice President of Global sales at ZF Meritor, "I went to each and every one of them [the OEMs].  I tried to understand.  My understanding was almost to a man, it was a very, worrisome-type of situation.  And what they were explaining to me, and we came to learn, was there were very, very restrictive agreements in place."  Kline continued, "[m]y understanding was that customer by customer, they had accepted deals that were going to exclude us from the marketplace that had very, very rich payoffs if they did that. . . .  Each and every one of those OEMs, my understanding was that they struck new deals and that those deals were going to put us in a situation where we could not attain market share.  And our competitor, again, as I described yesterday, in a word that nobody liked, was, our competitor was going to wind up, again, with a monopoly."

71.    The OEMs uniformly refused to even consider lower-cost-counter-proposals from ZF Meritor.  For example, according to Kline's testimony, ZF Meritor made multiple price discount offers to Volvo/Mack during numerous meetings, all of which were rejected.

72.    The agreements between and among Eaton and Freightliner, Volvo/Mack, PACCAR, and International, or alternately the single, overarching agreement among Eaton and the OEMs, ensured that Eaton maintained more than a 90 percent share in the Market for Class 8 Truck Transmissions, virtually guaranteeing that no competitor to Eaton would ever be able to gain sufficient market share to support entry into, or expansion of, sales in the Class 8 Truck Transmissions Market.

73.    As a direct and proximate result of the conspiracy (or conspiracies) complained of herein, Eaton's only competitor, ZF Meritor, lost a substantial share in the Market for Class 8 Truck Transmissions, curtailed much of its operations, and subsequently filed a lawsuit against Eaton based on the conduct alleged herein.  In that lawsuit, the jury found Eaton's exclusivity agreements with the OEMs constituted a contract, combination, or conspiracy that unreasonably restrained trade in violation of Federal law.  *See ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation,* Civil Action No. 06-623-SLR (D. Del.).

**Eaton and Freightliner**

74.    Following the downturn in the market for Class 8 trucks in or around 2000, Freightliner approached Eaton regarding an exclusive dealing arrangement.  In fact, Freightliner was integral in implementing the conspiracy.  According to Eaton's James Sweetnam, Freightliner "looked at their own supply base, I think they made a decision that they want to try and single source, or put most of it into one supplier and see how best they can do."

75.    The agreement was mutually desired.  According to internal documents from Eaton, Eaton and Freightliner's agreement to maintain and expand Eaton's monopoly power "Resulted from desire of *both companies* to form [a] cohesive partnership."

76.    Eaton and Freightliner consummated their illicit agreement, effective November 1, 2000.  The purpose and effect of the Eaton/Freightliner contract was to ensure that Eaton secured all, or virtually all, of Freightliner's transmission business, to the exclusion of any meaningful competition.  The effective exclusion of competition was accomplished by providing Freightliner with substantial penetration incentives and bundled rebates, in exchange for Freightliner's agreement to purchase virtually all of their Class 8 Truck Transmission needs from Eaton and commit other exclusionary acts, including placing Eaton in standard position in Freightliner's

databooks and displacing ZF Meritor (and all other competitors) from that position.  Further, to assure that ZF Meritor (and all other competitors) would starve in the market, in July 2003, Eaton and Freightliner amended their 2000 LTA for the third time.  The amendment extended the LTA through 2010 and added a sliding scale rebate formula that did not allow for rebates if Eaton's share of sales to Freightliner fell below a specified level.

77.    Freightliner promised to purchase at least 92 percent of its Class 8 Truck Transmission needs from Eaton in exchange for millions of dollars in shared monopoly rents couched as "rebates," as well as additional incentives, from Eaton.  Freightliner entered into this agreement despite the fact that it had previously awarded ZF Meritor standard positioning in its databooks.

78.    Eaton and Freightliner designed their conspiracy to ensure mutual compliance. Freightliner's right to a share in the monopoly rents was formalized as "rebates" and Eaton was legally obligated to pay under the contract so long as Freightliner met the agreed upon penetration goals.  Likewise, because Eaton was Freightliner's sole supplier of Vocational Transmissions, Eaton felt secure that Freightliner would not abandon the conspiracy.  The agreement included sizable rebates on Eaton's Vocational Transmissions, but linked those rebates to Freightliner's purchase of Linehaul Transmissions from Eaton.

79.    Eaton and Freightliner agreed that Freightliner would replace ZF Meritor with Eaton as the "standard" position in all Freightliner's databooks.  Further, Eaton and Freightliner agreed that ZF Meritor's transmissions would initially be listed at a penalty in the Freightliner databooks (*i.e.*, at prices above comparable Eaton transmissions, even though ZF Meritor's transmissions were often less expensive) and would be excluded from the databooks altogether beginning in late-2001 or early-2002.  Freightliner understood that excluding ZF Meritor from its

databooks would serve as a powerful means of eliminating the only threat to Eaton's monopoly

in the Class 8 Truck Transmissions Market.  Moreover, by eliminating Eaton's competition from

its databooks, Freightliner made it highly unlikely that its Class 8 truck buyers would select

Class 8 Truck Transmissions from any manufacturer other that Eaton.

80.    ZF Meritor attempted to save its Freightliner business by offering discounts and

other incentives on its Linehaul Transmissions.  Freightliner regarded ZF Meritor's products to

be of high quality.  Indeed, in 2000 and 2002, Freightliner awarded ZF Meritor its Master of

Quality Award.  Freightliner did not award Eaton similar accolades.  Nevertheless, despite the

award and proposed discounts, ZF Meritor could not persuade Freightliner to offer its

transmissions.

81.    Dennis Kline, Vice President of Global Sales at ZF Meritor, met with Freightliner

executives, including Jim Thomas, Ted Southworth, and Greg Sharp, in 2000, to discuss keeping

ZF Meritor listed in Freightliner's databooks.  Thomas informed Kline that Freightliner intended

to "go with Eaton," and that Meritor should not fight the decision and compete for their business.

According to Kline, Thomas "explained . . . that the magnitude of the money was very

significant and specifically an amount of money that they were looking at was in excess of $100

million."

82.    Freightliner further and intentionally facilitated the scheme to maintain and enhance

Eaton's monopoly in several other ways.  For example, Eaton assisted Freightliner by identifying

truck fleets that could be converted to Eaton transmissions.  Additionally, Freightliner informed

Eaton that it had stopped all engineering activity on the FreedomLine and other Meritor

products.  If these methods did not work to dissuade specific customers from ZF Meritor's

offerings, Freightliner arbitrarily priced ZF Meritor transmissions $200 above comparable Eaton products.

83.     This anticompetitive conduct had the purpose and effect of precluding ZF Meritor from competing effectively in the Class 8 Truck Transmissions Market.  According to Kline, Freightliner admitted, during the meeting in 2000, that "Eaton's strategy was to kill Meritor ZF's (sic) transmission business."

84.     Freightliner shared Eaton's strategy.  According to an e-mail from Greg Sharp at Freightliner, "[w]e have already killed Meritor's transmissions business.  It is only a matter of time before they close the doors."

85.     Freightliner regularly corresponded with Eaton to reaffirm its commitment to the conspiracy.  For example, on December 19, 2003, Greg Sharp, at Freightliner, e-mailed Matthew Sturdy, a sales manager at Eaton, to confirm that "[a]s you have requested we will remove the FreedomLine transmission from all data books effective with the next release, which is scheduled today for January 27th."

86.     Freightliner's agreement with Eaton harmed competition and injured consumers in the United States.  Among other things, removal of ZF Meritor transmissions from the Freightliner databooks and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to those products.  Freightliner benefited from the impaired consumer access, as Eaton allowed Freightliner to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

87.     Eaton and Freightliner's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for Freightliner's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the Class 8

Truck Transmission market.  As a direct and proximate result of the Eaton/Freightliner anticompetitive agreement and Defendants' other exclusionary acts, ZF Meritor's sales to Freightliner (and its subsidiaries, Sterling Trucks and Western Star Trucks) declined substantially.  Shortly before consummation of the Eaton/Freightliner contract, for the fourth quarter of fiscal year 2000, ZF Meritor's penetration at Freightliner and Sterling Trucks stood at around 23 percent and 17 percent, respectively.  By the end of fiscal year 2005, ZF Meritor's share of transmission sales to Freightliner and Sterling Trucks had fallen to roughly 4 percent and 3 percent, respectively.

### **Eaton and International**

88.    Eaton and International entered into a long-term *de facto* exclusive contract, or LTA, effective July 1, 2001.

89.    Internal Executive Summaries from Eaton recognize that this agreement was entirely mutual in nature as both parties shared the common goal of eradicating competition, including ZF Meritor, from the marketplace.  According to internal documents dated December 17, 2001, "International and Eaton have jointly developed a strategy to combat the Meritor strategy."

90.    Under the contract, International would receive maximum incentives after Eaton's transmissions sales penetration at International reached 87 percent, and possibly as high as 95 percent, by 2005, the last year of the initial agreement.  International also agreed to exclude ZF Meritor from its databooks on new truck models, and to prohibit International's Diamond Spec warranty from covering new truck models equipped with ZF Meritor, rather than Eaton, transmissions.

91.    International took other steps to ensure Eaton maintained its monopoly position, as well.  For example, according to an e-mail from Steve McKeeby, Sales Manager at International Truck and Engine, International "[a]rtificially penalized Meritor transmissions in the databook as of April 2003."

92.    The Eaton/International "partnership" was so close that on February 8, 2005, the two companies held an "Eaton/International celebration Dinner" at Magnum's Steakhouse in Lombard, Illinois.  On the agenda for this dinner was discussion of the soon-to-expire initial LTA between the two companies.  A key aspect of the discussions involved trying "to understand some out of the box ideas that might benefit all of us for the future."

93.    In 2005, the original Eaton/International LTA expired, but during the negotiation of a new LTA, Eaton and International agreed to continue their relationship under the general guidelines of the previous agreement.  In February 2007, after an extended negotiation, Eaton and International entered into a new LTA.  In the new agreement, International agreed to remove the FreedomLine from its databooks and exclusively market Eaton's automated manual transmissions.

94.    International's agreement with Eaton harmed competition and injured consumers in the United States.  Among other things, the imposition of price penalties on ZF Meritor transmissions, and the removal of ZF Meritor transmissions from the International databooks, impaired consumer access to ZF Meritor's competing products.  International benefited from the impaired consumer access, as Eaton allowed International to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

95.    Eaton and International's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for

International's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market. As a direct and foreseeable result of the Eaton/International anticompetitive agreement, ZF Meritor's penetration at International declined substantially.  Around the consummation of the Eaton/International contract, for the fourth quarter of fiscal year 2000, ZF Meritor's penetration at International was about 13 percent.  By the end of fiscal year 2005, Meritor's share of transmission sales to International had fallen to 2 percent.  As a result, for new International truck models, ZF Meritor transmissions would not be engineered into the vehicle platform. Indeed, the transmissions simply would not be available on those vehicles, even as an unpublished option.

### Eaton and PACCAR

96.    While ZF Meritor had enjoyed some success in selling to PACCAR because of a pre-existing supply relationship, Eaton and PACCAR modified and extended Eaton's supply agreement with PACCAR to prevent ZF Meritor's growth at PACCAR.  The July 1, 2000 LTA between Eaton and PACCAR, a seven-year agreement, offered maximum transmission rebates to PACCAR if Eaton's share of sales of Linehaul and Vocational transmissions (and other components) to PACCAR reached 95 percent.  Since PACCAR was the first OEM (through Peterbilt) to release ZF Meritor's FreedomLine to customers, PACCAR's agreement with Eaton had a particularly negative effect on competition.

97.    PACCAR understood that the agreement was anticompetitive.  According to an e-mail dated September 20, 2002, from Thomas A. Lundahl, Vice President of Purchasing at PACCAR, to Eaton's James Sweetnam, the 95 percent penetration agreement meant that PACCAR agreed to forego better-quality, lower-priced transmissions which created a "non-competitive situation."

26

98.     PACCAR imposed price penalties on ZF Meritor transmissions to encourage truck buyers to choose Eaton transmissions and, in 2005, PACCAR's Peterbilt division announced that ZF Meritor transmissions would no longer be available on new truck orders.

99.     In return for sharing monopoly rents with PACCAR, Eaton agreed to pay PACCAR a one-time lump sum signing incentive of $1 million.

100.    When PACCAR feared not meeting the agreed-upon penetration target due to customer preference for ZF Meritor's competing FreedomLine product, John Buck Jr., at Eaton, offered to set up a fund with all the missed rebate money that could be used to facilitate marketing efforts to increase PACCAR's sales of Eaton transmissions.

101.    In June 2007, with the initial Eaton/PACCAR LTA nearing expiration, Eaton and PACCAR agreed that their current business relationship, established by the LTA, would continue after the expiration date on the same terms and conditions.

102.    PACCAR's agreement with Eaton, and its other anticompetitive acts as alleged herein, harmed competition and injured consumers in the United States.  Among other things, removal of ZF Meritor transmissions from PACCAR's databooks and the imposition of price penalties on ZF Meritor transmissions impaired consumer access to ZF Meritor's products. PACCAR benefited from the impaired consumer access, as Eaton allowed PACCAR to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

103.    Eaton and PACCAR's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for PACCAR's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market.  As a direct and foreseeable result of the Eaton/PACCAR anticompetitive agreement, ZF Meritor's

share of transmission sales at PACCAR consistently languished around 5 percent and fell to less than 1 percent in fiscal year 2005.

### **Eaton and Volvo/Mack**

104.  In the Spring and Summer of 2002, ZF Meritor attempted to form a commercial partnership with Volvo/Mack for the manufacture, marketing, and sale of Linehaul and Vocational Transmissions.  Such a partnership was a ZF Meritor priority, given the illicit agreements between Eaton and the other OEMs.  ZF Meritor offered substantial price reductions, year-over-year cost-downs (*i.e.*, price decreases), and the opportunity for Volvo/Mack to obtain a full line of private brand transmissions.

105.  ZF Meritor's attempts to recruit Volvo/Mack's business, however, were in vain. According to an e-mail on November 27, 2000, from Christopher Konkel at Eaton, Volvo/Mack made it clear that it intended to join Eaton and the other OEMs in their anticompetitive conspiracy, stating that: "Volvo has delayed any action on the Freedom line (sic) in support of Eaton."

106.  Volvo/Mack's conduct was formalized in a five-year contract between Eaton and Volvo/Mack on October 1, 2002, despite Meritor's attempts to enter into an agreement with Volvo/Mack.  The agreement contained Linehaul and Vocational Transmission penetration incentives that granted maximum rebates to Volvo/Mack if Volvo/Mack limited ZF Meritor's sales to 15 percent of Volvo/Mack's Linehaul and Vocational Transmission purchases.  Eaton and Volvo/Mack further diminished ZF Meritor's opportunity for sales at Volvo/Mack by agreeing that Volvo/Mack would price ZF Meritor transmissions at an arbitrary penalty rate over Eaton transmissions.

107.   Eaton and Volvo/Mack held a Steering Committee meeting in September 2003 to review the success of their LTA.  Attendees at the review meeting included Antonio Lopes and Louya David from Volvo/Mack, as well as Tom Grimm, an Eaton Sales Manager for Volvo/Mack.  According to the presentation from this meeting, all participants felt that the LTA had been successful.  Since instituting the agreement, Volvo/Mack had increased their percentage of Eaton transmission purchases to 75 percent.

108.   In late-2007, Eaton and Volvo/Mack agreed to a new LTA.  Like the 2002 LTA, the new agreement contained benefits triggered by limiting the share of sales that Eaton's competitors attained at Volvo/Mack.

109.   Unlike other OEMs, Volvo/Mack actually manufactures its own line of Class 8 Truck Transmissions solely for their own product lines.  In order to ensure that Eaton continued to monopolize this market and thereby ensure its continued receipt of the lucrative rebates and market share incentives from Eaton pursuant to the LTA — Volvo/Mack agreed to price its own transmissions at a premium above Eaton's products.  Volvo/Mack transmissions, as a result of their agreement, actually lost market share to Eaton's transmissions.  Such conduct was in Volvo/Mack's economic interests only because of Volvo/Mack's agreement to promote and share in the financial benefits of Eaton's monopoly.

110.   Volvo/Mack acknowledged that its agreements with Eaton had harmed competition.  According to an e-mail from Linsolas Bruno, at Volvo, to Khalifa Sandrine, Louya David, and Callens Dominique (also Volvo employees), Eaton's LTA with Volvo/Mack "has been very well respected and very successfull (sic) for Eaton.  We just killed Arvin Meritor (sic) transmission business with this contract.  ArM (sic) sued Eaton, for unfair practises (sic), having such market share clauses in their contracts with all OEMs.  Eaton succeeded to eliminate their only and last

competitor in the [market].  This is just an unvaluable (sic) upside for Eaton (be now in a monopolistic situation.!)."

111.  The agreement between Eaton and Volvo/Mack harmed competition and injured consumers in the United States.  Among other things, the imposition of price penalties on ZF Meritor transmissions impaired consumer access to ZF Meritor's products.  Volvo/Mack benefited from the impaired consumer access, as Eaton allowed Volvo/Mack to share in the monopoly rents that it was able to extract from Plaintiffs and the other members of the Class.

112.  Eaton and Volvo/Mack's conspiracy worked.  The conspiracy reduced competition in the market for Class 8 Truck Transmissions, eliminating Eaton's only viable competitor for Volvo/Mack's transmission needs, ZF Meritor, and expanding Eaton's monopoly in the market. As a direct and foreseeable result of the anticompetitive agreement between Eaton and Volvo/Mack, ZF Meritor's penetration at Volvo/Mack declined.  ZF Meritor's share of transmission sales to Volvo and Mack fell from an estimated 24 percent and 6 percent, respectively, in the fourth quarter of fiscal year 2002, around the time of the Eaton-Volvo/Mack transaction, to approximately 11 percent and 2 percent, respectively, by the end of fiscal year 2003.

## ANTITCOMPETITIVE EFFECTS OF THE CONSPIRACY

113.  The conspiracy (or conspiracies) between and among Eaton and the OEMs were designed so that the OEMs would qualify for rebates, and thus share in the monopoly rents, provided they diverted both current and future purchasers of competing transmissions to Eaton. Defendants employed a variety of strategies to accomplish this goal including, *inter alia*, agreeing to have the OEMs:

      (a)     eliminate competing transmissions from databook listings;

(b)      arbitrarily reduce the residual values to be paid for trucks sold with competing transmissions;

(c)      impose artificial pricing penalties upon heavy-duty truck purchasers that selected non-Eaton Class 8 Truck Transmissions;

(d)      exclude trucks containing non-Eaton Class 8 Truck Transmissions from warranty programs;

(e)      notify customers that competing transmissions were not available, even though they were available; and

(f)      delay and disrupt the release and sale of competing transmissions.

114.  The contracts, combinations, or conspiracies between and among Eaton and the OEMs materially increased the already artificially inflated prices of Eaton transmissions, to the detriment of Plaintiffs and the other members of the Class.

115.  Defendants' anticompetitive conduct — including the LTAs between Eaton and the OEMs, employment of bundled rebates, lucrative share penetration incentives, databook and other exclusions, and punitive pricing on competing transmissions — had the practical effect of precluding competitors from selling Class 8 Linehaul and Vocational Truck Transmissions to the OEMs and into the market.

116.  With its potential share of sales of Class 8 Linehaul and Vocational Truck Transmissions to the OEMs limited to less than 10 percent, and no ability to increase its sales because of Defendants' exclusionary conduct, the ZF Meritor joint venture was dissolved.

117.  MERITOR nonetheless tried to remain a supplier of Class 8 Truck Transmissions to the OEMs, and became a sales agent for ZF Friedrichshafen AG to ensure continued customer access to the FreedomLine.  Defendants' continued anticompetitive conduct, however, led to still

further declines in MERITOR's sales.  By the end of fiscal year 2005, MERITOR's sales of

transmissions at the four OEMs, including sales of the FreedomLine, had continued to tumble.

MERITOR, other than marketing the FreedomLine, exited the manual transmission business in

2007.  Although MERITOR once held a share of roughly 22 percent of the relevant market, that

share dwindled to around 4 percent in 2006.  MERITOR now markets only a small number of

automated manuals and, since 2007, no longer markets any non-automated manual

transmissions.

118.  The foregoing anticompetitive conduct by Eaton and the OEMs has directly and

proximately harmed competition by limiting consumer choice, eliminating competitive checks

on pricing, suppressing innovation, and foreclosing the market for Class 8 Truck Transmissions

in the United States.  Defendants' acts have served to exclude competition from the market for

Linehaul Transmissions, and ZF Meritor has been deterred from undertaking investments in

technology and products that would have threatened Eaton's monopoly in the market for

Vocational Transmissions.

119.  The foregoing anticompetitive conduct by Defendants has caused antitrust injury to

Plaintiffs and the other members of the Class by foreclosing competition for Class 8 Truck

Transmissions and artificially inflating the prices of such transmissions.

120.  In contrast to the harm Defendants' conduct has caused Plaintiffs and the other

members of the Class, Eaton's business, which relies heavily on transmission sales, has amassed

record profits.  Since the start of Defendants' anticompetitive conduct, Eaton's operating profits

from its sales of Class 8 Truck Transmissions have increased from $90 million in 2002, to a high

of $453 million in 2005, and $315 million in 2008.  At the same time, Eaton's operating margins

have increased from 7.7 percent in 2002, to a high of 19.8 percent in 2005, and 14 percent in 2008.

121.  The foregoing anticompetitive conduct by Defendants, and the resultant injuries, occurred throughout the Class Period, and continues to date, as Eaton and the OEMs still operate under existing or renewed *de facto* exclusive dealing contracts, and continue to engage in other conspiratorial behavior in furtherance of the conspiracy or conspiracies to foreclose competition in the Market for Class 8 Truck Transmissions.

## INJURY TO PLAINTIFFS AND THE OTHER MEMBERS OF THE CLASS

122.  The activities described above have been engaged in by Defendants for the purpose of effecting an unlawful agreement to fix, raise, maintain, or stabilize prices for Class 8 Truck Transmissions sold in the United States.

123.  At all relevant times, Eaton had monopoly or market power in the market for Class 8 Truck Transmissions because it had the power to maintain the price of such transmissions at supra-competitive levels profitably, without losing substantial sales.

124.  In response to a small but significant, other-than-temporary increase in price from a competitive level, substitution by purchasers of Class 8 Truck Transmissions to other products would not be significant.

125.  Class 8 Truck Transmissions do not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than Class 8 Truck Transmissions.

126.  Because of the unique characteristics and specific applications for Class 8 Truck Transmissions, Class 8 Truck Transmissions are differentiated from all other products.

127.   Defendants need only control Class 8 Truck Transmissions, and no other products, to raise or maintain the price of Class 8 Truck Transmissions profitably at supra-competitive levels.

128.   Defendants sold Class 8 Truck Transmissions at prices well in excess of marginal costs and competitive prices and enjoyed healthy profit margins.

129.   Defendants had, and exercised, the power to exclude competition for Class 8 Truck Transmissions.

130.   As a direct and proximate result of the contract, combination, and conspiracy alleged herein, and the monopoly power of Eaton maintained and enhanced by Defendants, Plaintiffs and other members of the Class are, were, and continue to be damaged in their business or property in that they paid supra-competitive prices for Class 8 Truck Transmissions during the Class Period.

## THE PASS THROUGH OF OVERCHARGES TO CLASS 8 TRUCK PURCHASERS

131.   Defendants' conspiracy to fix, raise, or maintain the price of Class 8 Truck Transmissions at artificial levels resulted in harm to Plaintiffs and the other members of the Class because it resulted in them paying higher prices for Class 8 Truck Transmissions than they would have in the absence of Defendants' conspiracy.

132.   Class 8 truck buyers, like Plaintiffs, select a particular Class 8 Truck Transmission for the Class 8 truck purchased.  Moreover, when a Class 8 Truck Transmission is purchased for inclusion in the buyer's Class 8 truck, the transmission is a distinct, physically-discrete element of the Class 8 truck that is identifiable by a specific, discrete part or model number that permits tracing.  Thus, a Class 8 Truck Transmission follows a traceable physical chain from Defendants to the indirect purchasers of Class 8 Truck Transmissions.  Tracing can help show that changes

in the prices paid by direct purchasers of Class 8 Truck Transmissions affect prices paid by

indirect purchasers of the Class 8 Truck Transmissions, or, more broadly, Class 8 trucks.

133.   As a result, the inflated prices of Class 8 Truck Transmissions resulting from

Defendants' conspiracy have been passed on to Plaintiffs and the other members of the

Class.

134.   A Class 8 Truck Transmission makes up a substantial component of the cost of a

Class 8 truck.  The retail price of a Class 8 truck is determined, in significant part, by the cost

of the Class 8 Truck Transmission it contains.

135.   Microeconomic theory teaches that the only situations in which precisely zero pass

through would be expected are if an industry faced a perfectly elastic demand for its product

(*i.e.*, the price was fixed, with demand dropping to zero with an infinitesimal price increase, and

expanding infinitely if price were to drop infinitesimally), or if supply was perfectly inelastic

(*i.e.*, if even a very large increase in price for a product was incapable of stimulating additional

supply).  Both of these possibilities are generally considered implausible by economists, and are

not even mentioned in some discussions of the subject.  Either scenario is at odds with the nature

of the Class 8 truck industry.

136.   Thus, Plaintiffs and the other members of the Class have been forced to pay supra-

competitive prices for Class 8 Truck Transmission and, more broadly, Class 8 trucks, as a result

of Defendants' conspiracy alleged herein.

## **FRAUDULENT CONCEALMENT**

137.   Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every

allegation in the preceding paragraphs of this Complaint.

138.   Plaintiffs and the other members of the Class did not discover, and could not have discovered through the exercise of reasonable due diligence, Defendants' anticompetitive and conspiratorial conduct alleged herein, or the existence of the causes of action alleged herein, at any time prior to October 5, 2006, when ZF Meritor filed an antitrust lawsuit against Eaton. Even then, assuming Plaintiffs and the members of the Class would have been monitoring court filings in various federal courts and understood their implications, Eaton denied the claims asserted in the lawsuit by ZF Meritor, and Plaintiff's and other members of the Class did not have access to the same inside information that ZF Meritor had.

139.   Because Defendants did not disclose the existence or nature of their anticompetitive conduct to Plaintiffs and the other members of the Class, Plaintiffs and the other members of the Class could not have reasonably become aware of Defendants' unlawful conduct alleged herein at any time prior to October 5, 2006 or well after that, and certainly could not have known that they were paying artificially high prices for Class 8 Truck Transmissions as a result of Defendants' conduct.

140.   Defendants' affirmative acts alleged herein, including acts in furtherance of the conspiracy or conspiracies, were wrongfully concealed and carried out in a manner that precluded detection.

141.   Defendants formally entered into the conspiracy or conspiracies by, among other things, signing and agreeing to the terms of the LTAs.  In addition to their exclusive dealing language, the LTAs also contained strict confidentiality language that actively and effectively concealed the anticompetitive nature of Defendants' conduct from Plaintiffs and the other members of the Class.

142.   Defendants fraudulently concealed their participation in the conspiracy or conspiracies alleged herein by entering into *de facto* exclusive dealing contracts and then engaging in actions to ensure that the contracts succeeded in eliminating competition from the Class 8 Truck Transmissions Market.  These affirmative actions included, without limitation, ensuring that ZF Meritor transmissions did not appear in databooks and falsely informing customers that ZF Meritor transmissions were not available.  Defendants' actions were also self-concealing in that they pushed customers away from competing transmissions but never disclosed to the customers that their actions were part of a conspiracy or conspiracies to eliminate competition from the Class 8 Transmissions Market.

143.   Because of such fraudulent concealment and the inherently self-concealing nature of the actions forming this conspiracy or conspiracies, Plaintiffs and the other members of the Class could not have discovered the existence of this conspiracy or conspiracies, and the elements of the causes of action alleged herein, until long after the filing of ZF Meritor's action against Eaton.

144.   Although Plaintiffs exercised all reasonable and due diligence, Plaintiffs had no knowledge of Defendants' unlawful self-concealing anticompetitive conduct, and could not have discovered Defendants' agreements and conspiracies, and the existence of the causes of action alleged herein, at any time prior to October 5, 2006, by the exercise of due diligence, because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of their agreements and conspiracies.

145.   None of the facts or information available to Plaintiffs and the other members of the Class prior to October 5, 2006, if investigated with reasonable due diligence, could or would

have led to the discovery of the conspiracies and anticompetitive conduct alleged herein prior to

October 5, 2006.

146.  As a result of Defendants' fraudulent concealment of their conspiracy (or

conspiracies), Plaintiffs assert the tolling of the applicable statute of limitations affecting

Plaintiffs' right of action.

147.  In addition, Defendants' illegal conspiratorial conduct and the harm it caused, as

alleged herein, occurred continuously throughout the Class Period, and continues to the present,

including the fact that Defendants continue to abide by the terms of their operative LTAs and

ensure that competitors' transmissions do not appear in the OEM Defendants' databooks.

## CLASS ALLEGATIONS

148.  Plaintiffs bring this action on behalf of themselves and as a class action under Rules

23(a), (b)(1), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All persons or entities that indirectly purchased, in the United
> States, Eaton Class 8 Truck Transmissions from Defendants
> ("Indirect Purchaser Class" or "Class") beginning October 1, 2002
> and continuing until the present ("Class Period").  Excluded from
> the Class are: (i) Defendants and their parent companies,
> subsidiaries, affiliates, officers, directors, employees, legal
> representatives, heirs, assigns, and co-conspirators; and (ii) any
> judges presiding over this action and the members of his/her
> immediate family and judicial staff, and any juror assigned to this
> action.

149.  The state specific subclasses, out of which the Indirect Purchaser Class is

constituted, and on whose behalf Plaintiffs bring this action as a class action pursuant to Rule 23

of the Federal Rules of Civil Procedure, are defined as follows:[1]

> a)     "Arizona State Subclass":
>
> All persons and entities in Arizona who purchased Eaton Class 8 Truck
> Transmissions indirectly from any Defendant at any time from October 1,
> 2002, through the present.  Excluded from the Subclass are Defendants,

---

[1] Each of the states listed in this paragraph will hereinafter be collectively referred to as the
"Indirect Purchaser States."

their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

b)      "Arkansas State Subclass":

All persons and entities in Arkansas who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

c)      "California State Subclass":

All persons and entities in California who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

d)      "District of Colombia Subclass":

All persons and entities in the District of Columbia who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

e)      "Florida State Subclass":

All persons and entities in Florida who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

f)      "Hawaii State Subclass":

All persons and entities in Hawaii who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

g)      "Iowa State Subclass":

All persons and entities in Iowa who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants,

their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

h)      "Kansas State Subclass":

All persons and entities in Kansas who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

i)      "Maine State Subclass":

All persons and entities in Maine who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

j)      "Massachusetts State Subclass":

All persons and entities in Massachusetts who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

k)      "Michigan State Subclass":

All persons and entities in Michigan who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

l)      "Minnesota State Subclass":

All persons and entities in Minnesota who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

m)      "Nebraska State Subclass":

All persons and entities in Nebraska who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants

their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

n)      "Nevada State Subclass":

All persons and entities in Nevada who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

o)      "New Hampshire State Subclass":

All persons and entities in New Hampshire who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

p)      "New Mexico State Subclass":

All persons and entities in New Mexico who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

q)      "New York State Subclass":

All persons and entities in New York who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

r)      "North Carolina State Subclass":

All persons and entities in North Carolina who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

s)      "North Dakota State Subclass":

All persons and entities in North Dakota who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from

October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

t)      "South Dakota State Subclass":

All persons and entities in South Dakota who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

u)      "Tennessee State Subclass":

All persons and entities in Tennessee who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

v)      "Vermont State Subclass":

All persons and entities in Vermont who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

w)      "West Virginia State Subclass":

All persons and entities in West Virginia who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

x)      "Wisconsin State Subclass":

All persons and entities in Wisconsin who purchased Eaton Class 8 Truck Transmissions indirectly from any Defendant at any time from October 1, 2002, through the present.  Excluded from the Subclass are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, Federal governmental entities, and instrumentalities of the Federal government.

150.   Fed. R. Civ. P. 23(a)(1)—Numerosity.  Plaintiffs do not know the exact

number of members in the Class or each state subclass because such information is in

42

Defendants' (or their sales agents/dealers) exclusive control.  Plaintiffs believe, however, that due to the nature of the trade and commerce involved, there are (at least) thousands of members in each state subclass (and consequently the Class) such that joinder of all members is impracticable.  Furthermore, the members of the Class and each state subclass are readily identifiable from information and records in the possession of Defendants or their authorized sales agents/dealers.

151.   Fed. R. Civ. P. 23(a)(3)—Typicality.  Plaintiffs' claims are typical of the claims of the other members of the Class.  Plaintiffs and all members of the Class purchased Class 8 Truck Transmissions in the United States at inflated prices resulting from Defendants' conduct.  Defendants' wrongful conduct damaged Plaintiffs and all members of the Class, *i.e.*, they paid increased prices for Class 8 Truck Transmissions when they indirectly purchased the Class 8 Truck Transmissions from one or more of Defendants' authorized sales agents/dealers.  All members of the Class were damaged by the same wrongful conduct by Defendants, and the relief sought is common to all members of the Class.

152.   Fed. R. Civ. P. 23(a)(2) and 23(b)(3)—Commonality and Predominance. Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual members of the Class or each state subclass because Defendants have acted upon grounds generally applicable to the Class.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Among those common questions of law or fact are:

(a)     whether Defendants engaged in a contract, combination, or conspiracy to restrain trade in, exclude competition in, or monopolize the United States market,

and the Indirect Purchaser State submarkets, for Class 8 Truck Transmissions;

(b)     whether Defendants conspired to unreasonably restrain trade and maintain prices for Class 8 Truck Transmissions sold in the United States, and the Indirect Purchaser State submarkets, at supra-competitive levels by foreclosing the market for Class 8 Truck Transmissions in the United States and in the Indirect Purchaser State submarkets;

(c)     the existence and duration of the illegal conduct alleged herein;

(d)     whether Defendants concealed their unlawful activities;

(e)     whether Defendants' anticompetitive conduct resulted in diminished competition for Class 8 Truck Transmissions in the United States and in the Indirect Purchaser State submarkets;

(f)     whether Defendants' anticompetitive conduct caused prices for Class 8 Truck Transmissions to be higher than they would have been in the absence of Defendants' conduct;

(g)     whether Plaintiffs and the other members of the Class were injured by Defendants' conduct alleged herein and, if so, the appropriate class-wide measure of damages;

(h)     whether Defendants' conduct violated the antitrust and unfair competition laws of the Indirect Purchaser States; and

(i)     whether Defendants unjustly enriched themselves at the expense of the members of the Class.

These common questions of law or fact predominate over any questions affecting only individual members.  Plaintiffs know of no class members interested in individually

controlling the prosecution of separate actions.  Plaintiffs know of no other pending

indirect purchaser litigation concerning this controversy set forth herein.  The Court is as

desirable as any other Federal court for the concentration of this litigation.  The instant

case will be eminently manageable as a class action.  Plaintiffs know of no difficulty to be

encountered in the maintenance of this action that would preclude its maintenance as a

class action.

153.   Fed. R. Civ. P. 23(a)(4)—Adequacy.  Plaintiffs will fairly and adequately

protect the interests of the other members of the Class because they have no interests that

are antagonistic to, or that conflict with, those of any other member of the Class.  Plaintiffs

are committed to the vigorous prosecution of this action and have retained competent

counsel experienced in litigation of this nature to represent Plaintiffs and the Class.

154.   Fed. R. Civ. P. 23(b)(1).  The prosecution of separate actions by individual

members of the Class would create the risk of inconsistent or varying adjudications with

respect to individual members of the Class, which would establish incompatible standards of

conduct for Defendants.

155.   Fed. R. Civ. P. 23(b)(3)—Superiority.  This class action is the superior method

for the fair and efficient adjudication of this controversy.  Class treatment will permit a

large number of similarly situated persons or entities to prosecute their claims in a single

forum simultaneously, efficiently, and without the unnecessary duplication of evidence,

effort, and expense that numerous individual actions would produce.  The damages

sustained by individual members of the Class, although meaningful, do not rise to the level

where it is economically rational to prosecute separate complex actions against these well-

financed corporate Defendants.

## COUNT I

## FOR VIOLATIONS OF STATE ANTITRUST LAWS

156.  Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

157.  Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Eaton Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the state antitrust statutes listed below:

A.      Violation of the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq.*

158.  As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Arizona; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Arizona State Subclass members were deprived of free and open competition; (4) Arizona State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Arizona State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

159.  Defendants conspired to eliminate competition for, and fix the prices of, Eaton Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests,

Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

160.   Arizona State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

161.   Defendants' conduct is a substantial factor of the Arizona State Subclass's loss. The loss was a direct and proximate result of Defendants' conspiracy.  Arizona State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

162.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1401 *et seq*., and Arizona State Subclass members, accordingly, seek damages and injunctive relief pursuant to A.R.S. § 44-1408.

B.     Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq*.

163.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the California Cartwright Act, Cal. Bus. & Prof Code §§ 16700 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout California; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) California State Subclass members

were deprived of free and open competition; (4) California State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) California State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

164.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

165.   California State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

166.   Defendants' conduct is a substantial factor of the California State Subclass's loss. The loss was a direct and proximate result of Defendants' conspiracy.  California State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

167.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 *et seq.*, and California State Subclass members, accordingly, seek damages and injunctive relief pursuant to Cal. Bus. & Prof. Code § 16750.

C.    Violation of District of Columbia Law, DC Code §§ 28-4501 *et seq.*

168.   As set forth herein, Defendants created, operated, aided, or abetted a trust,

combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing,

controlling, or maintaining prices in violation of District of Columbia Law, DC Code §§ 28-4501

*et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck

Transmissions price competition was restrained, suppressed, and eliminated throughout the

District of Columbia; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed,

maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) the

District of Columbia Subclass members were deprived of free and open competition; (4) the

District of Columbia Subclass members relied on Defendants' false representation that the price

of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) the

District of Columbia Subclass members paid supra-competitive, artificially inflated prices for

Eaton Class 8 Truck Transmissions.

169.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton

Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level

officials, and avoided the unnecessary creation of documents.  United by their common interests,

Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to

preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8

Truck Transmissions.

170.   The District of Columbia Subclass members suffered an ascertainable loss of

money or property from the supra-competitive, artificially inflated prices.

171.   Defendants' conduct is a substantial factor of the District of Columbia Subclass's

49

loss.  The loss was a direct and proximate result of Defendants' conspiracy.  The District of

Columbia Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because Defendants fixed prices after Defendants

precluded free and unrestricted competition.

172.  Defendants created, operated, aided, or abetted a trust of Class 8 Truck

Transmissions by excluding competition and fixing, controlling, or maintaining prices in

violation of District of Columbia Law, DC Code §§ 28-4501 *et seq.*, and the District of

Columbia Subclass members, accordingly, seek damages and injunctive relief pursuant to DC

Code § 28-4508.

D.    Violation of Iowa Competition Law, I.C.A. §§ 553.1 *et seq.*

173.  As set forth herein, Defendants created, operated, aided, or abetted a trust,

combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing,

controlling, or maintaining prices in Violation of Iowa Competition Law, I.C.A. §§ 553.1 *et seq.*

Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions

price competition was restrained, suppressed, and eliminated throughout Iowa; (2) the price of

Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially

high levels throughout Iowa; (3) Iowa State Subclass members were deprived of free and open

competition; (4) Iowa State Subclass members relied on Defendants' false representation that the

price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Iowa

State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8

Truck Transmissions.

174.  Defendants conspired to eliminate competition for, and fix the prices of, Eaton

Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents. United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition. With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

175. Iowa State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

176. Defendants' conduct is a substantial factor of the Iowa State Subclass's loss. The loss was a direct and proximate result of Defendants' conspiracy. Iowa State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

177. Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by eliminating competition and fixing, controlling, or maintaining prices in violation of the Iowa Competition Law, I.C.A. §§ 553.1 *et seq.*, and Iowa State Subclass members, accordingly, seek damages and injunctive relief pursuant to I.C.A. § 553.1.

E.     Violation of Kansas Law, K.S.A. §§ 50-101 *et seq.*

178. As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of K.S.A. §§ 50-101 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Kansas; (2) the price of Plasma Derivative Protein Therapies was raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Kansas State Subclass members were deprived of free and open

51

competition; (4) Kansas State Subclass members relied on Defendants' false representation  that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Kansas State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

179.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.   With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

180.   Kansas State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

181.   Defendants' conduct is a substantial factor of the Kansas State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy.  Kansas State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

182.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of K.S.A. §§ 50-101 *et seq.*, and Kansas State Subclass members, accordingly, seek damages and injunctive relief pursuant to K.S.A. § 50-161.

F.     Violation of Maine Law, 10 M.R.S.A. §§ 1101 *et seq.*

183.   As set forth herein, Defendants created, operated, aided, or abetted a trust,

combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing,

controlling, or maintaining prices in violation of 10 M.R.S.A. §§ 1101 *et seq.*  Defendants'

unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price

competition was restrained, suppressed, and eliminated throughout Maine; (2) the price of Eaton

Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high

levels throughout Maine; (3) Maine State Subclass members were deprived of free and open

competition; (4) Maine State Subclass members relied on Defendants' false representation that

the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5)

Maine State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class

8 Truck Transmissions.

184.   Defendants conspired fix the prices of Eaton Class 8 Truck Transmissions.

Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and

conversations in secret, confined the plan to a small group of high-level officials, and avoided

the unnecessary creation of documents.  United by their common interests, Defendants colluded

to substantially limit, lessen, and exclude competition.  With the ability to preclude free and

unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

185.   Maine State Subclass members suffered an ascertainable loss of money or property

from the supra-competitive, artificially inflated prices.

186.   Defendants' conduct is a substantial factor of the Maine State Subclass's loss.  The

loss was a direct and proximate result of Defendants' willful monopoly and conspiracy.  Maine

State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive,

artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

187.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the Maine Antitrust Act, 10 M.R.S.A. §§ 1101 *et seq.*, and Maine State Subclass members, accordingly, seek damages and injunctive relief pursuant to 10 M.R.S.A. § 1104.

G.    Violation of the Michigan Antitrust Reform Act, M.C.L.A. §§ 445.771 *et seq.*

188.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the Michigan Antitrust Reform Act, M.C.L.A. §§ 445.771 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Michigan; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Michigan State Subclass members were deprived of free and open competition; (4) Michigan State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Michigan State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

189.   Defendants conspired to fix the prices of the Eaton Class 8 Truck Transmissions. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and

unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

190.   Michigan State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

191.   Defendants' conduct is a substantial factor of the Michigan State Subclass's loss. The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy. Michigan State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

192.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the Michigan Antitrust Reform Act, M.C.L.A. §§ 445.771 *et seq.*, and Michigan State Subclass members, accordingly, seek damages and injunctive relief pursuant to M.C.L.A. § 445.778.

H.     Violation of the Minnesota Antitrust Law of 1971, M.S.A. §§ 325D.49 *et seq*.

193.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the Minnesota Antitrust Law of 1971, M.S.A. §§ 325D.49 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Minnesota State Subclass members were deprived of free and open competition; (4) Minnesota State Subclass members relied on Defendants' false representation that the price of Plasma-Derivative Protein Therapy

was a product of a free and fair market; and (5) Minnesota State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

194.   Defendants conspired to fix the prices of the Eaton Class 8 Truck Transmissions. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

195.   Minnesota State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

196.   Defendants' conduct is a substantial factor of the Minnesota State Subclass's loss. The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy. Minnesota State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

197.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the Minnesota Antitrust Law of 1971, M.S.A. §§ 325D.49 *et seq*., and Minnesota State Subclass members, accordingly, seek damages pursuant to M.S.A. § 325D.57 and injunctive relief pursuant to M.S.A. § 325D.58.

I.   Violation of Nebraska Law, Neb. Rev. St. §§ 59-801 *et seq*.

198.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing,

controlling, or maintaining prices in violation of Neb. Rev. St. §§ 59-801 *et seq*.  Defendants'

unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price

competition was restrained, suppressed, and eliminated throughout Nebraska; (2) the price of

Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially

high levels throughout Nebraska; (3) Nebraska State Subclass members were deprived of free

and open competition; (4) Nebraska State Subclass members relied on Defendants' false

representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and

fair market; and (5) Nebraska State Subclass members paid supra-competitive, artificially

inflated prices for Eaton Class 8 Truck Transmissions.

199.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton

Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level

officials, and avoided the unnecessary creation of documents.  United by their common interests,

Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to

preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8

Truck Transmissions.

200.   Nebraska State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

201.   Defendants' conduct is a substantial factor of the Nebraska State Subclass's loss.

The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy.

Nebraska State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because Defendants fixed prices after Defendants

precluded free and unrestricted competition.

202.  Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of Neb. Rev. St. §§ 59-801 *et seq.*, and Nebraska State Subclass members, accordingly, seek damages pursuant to Neb. Rev. St. § 59-831 and injunctive relief pursuant to Neb. Rev. St. § 59-814.

J.      Violation of the Nevada Unfair Trade Practice Act, N.R.S. §§ 598A.010 *et seq.*

203.  As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the Nevada Unfair Trade Practice Act, N.R.S. §§ 598A.010 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Nevada; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Nevada State Subclass members were deprived of free and open competition; (4) Nevada State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Nevada State Subclass members paid supra competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

204.  Defendants conspired fix the prices of Eaton Class 8 Truck Transmissions. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

205.  Nevada State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

206.  Defendants' conduct is a substantial factor of the Nevada State Subclass's loss. The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy. Nevada State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

207.  Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the Nevada Unfair Trade Practice Act, N.R.S. §§ 598A.010 *et seq*., and Nevada State Subclass members, accordingly, seek damages and injunctive relief pursuant to N.R.S. § 598A.210.

K.      Violation of the New Mexico Antitrust Act, N.M.S.A. §§ 57-1-1 *et seq*.

208.  As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the New Mexico Antitrust Act, N.M.S.A. §§ 57-1-1 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) New Mexico State Subclass members were deprived of free and open competition; (4) New Mexico State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) New Mexico State Subclass members paid supra-

competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

209.   Defendants conspired fix the prices of Eaton Class 8 Truck Transmissions. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.   United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.   With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

210.   New Mexico State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

211.   Defendants' conduct is a substantial factor of the New Mexico State Subclass's loss.   The loss was a direct and proximate result of Defendants' willful monopoly and price fixing conspiracy.   New Mexico State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

212.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the New Mexico Antitrust Act, N.M.S.A. §§ 57-1-1 *et seq*., and New Mexico State Subclass members, accordingly, seek damages and injunctive relief pursuant to N.M.S.A. § 57-1-3.

L.     Violation of North Carolina Law, N.C.G.S.A. §§ 75-1 *et seq*.

213.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of N.C.G.S.A. §§ 75-1 *et seq*.   Defendants'

unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price

competition was restrained, suppressed, and eliminated throughout North Carolina; (2) the price

of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially

high levels throughout North Carolina; (3) North Carolina State Subclass members were

deprived of free and open competition; (4) North Carolina State Subclass members relied on

Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a

product of a free and fair market; and (5) North Carolina State Subclass members paid supra-

competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

214.  Defendants conspired to eliminate competition for, and fix the prices of, Eaton

Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level

officials, and avoided the unnecessary creation of documents.  United by their common interests,

Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to

preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8

Truck Transmissions.

215.  North Carolina State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

216.  Defendants' conduct is a substantial factor of the North Carolina State Subclass's

loss.  The loss was a direct and proximate result of Defendants' willful monopoly and

conspiracy.  North Carolina State Subclass members purchased Eaton Class 8 Truck

Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices

after Defendants precluded free and unrestricted competition.

217.  Defendants created, operated, aided, or abetted a trust of Class 8 Truck

Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of N.C.G.S.A. §§ 75-1 *et seq.*, and North Carolina State Subclass members, accordingly, seek damages pursuant to N.C.G.S.A. § 75-16 and injunctive relief pursuant to N.C.G.S.A. § 75-14.

M.   Violation of North Dakota Law, NDCC §§ 51-08.1-01 *et seq.*

218.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of NDCC § 51-08.1- 01 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) North Dakota State Subclass members were deprived of free and open competition; (4) North Dakota State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) North Dakota State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

219.   Defendants conspired fix the prices of Eaton Class 8 Truck Transmissions. Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

220.   North Dakota State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

221.  Defendants' conduct is a substantial factor of the North Dakota State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy.  North Dakota State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

222.  Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of NDCC §§ 51-08.1-01 *et seq*., and North Dakota State Subclass members, accordingly, seek damages and injunctive relief pursuant to NDCC § 51-08.1-08.

N.  Violation of South Dakota Law, SDCL §§ 37-1-3.1 *et seq.*

223.  As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of SDCL §§ 37-1-3.1 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) South Dakota State Subclass members were deprived of free and open competition; (4) South Dakota State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) South Dakota State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

224.  Defendants conspired to eliminate competition for, and fix the prices of, Eaton

Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level

officials, and avoided the unnecessary creation of documents.  United by their common interests,

Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to

preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8

Truck Transmissions.

225.   South Dakota State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

226.   Defendants' conduct is a substantial factor of the South Dakota State Subclass's

loss.  The loss was a direct and proximate result of Defendants' willful monopoly and

conspiracy.  South Dakota State Subclass members purchased Eaton Class 8 Truck

Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices

after Defendants precluded free and unrestricted competition.

227.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck

Transmissions by excluding competition and fixing, controlling, or maintaining prices in

violation of SDCL 3 §§ 37-1-3.1 *et seq*., and South Dakota State Subclass members, accordingly,

seek damages and injunctive relief pursuant to SDCL § 37-1-14.3.

O.     Violation of the Tennessee Antitrust Act, Tenn. Code §§ 47-25-101 *et seq*.

228.   As set forth herein, Defendants created, operated, aided, or abetted a trust,

combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing,

controlling, or maintaining prices in violation of the Tennessee Antitrust Act, Tenn. Code §§ 47-

25-101 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck

Transmissions price competition was restrained, suppressed, and eliminated throughout

Tennessee; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and 12 stabilized at artificially high levels throughout Tennessee; (3) Tennessee State Subclass members were deprived of free and open competition; (4) Tennessee State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Tennessee State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

229.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

230.   Tennessee State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

231.   Defendants conduct is a substantial factor of the Tennessee State Subclass's loss. The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy. Tennessee State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

232.   Defendants created, operated, aided, or abetted a trust of Eaton Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the Tennessee Antitrust Act, Tenn. Code §§ 47-25-101 *et seq*., and Tennessee State

Subclass members, accordingly, seek damages and injunctive relief pursuant to Tenn. Code § 47-25-109.

P.      Violation of Vermont Law, 9 V.S.A. §§ 2451 *et seq.*

233.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combine, or monopoly of Class 8 Truck Transmissions by fixing, controlling, or maintaining prices in violation of 9 V.S.A. §§ 2451 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Vermont; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Vermont State Subclass members were deprived of free and open competition; (4) Vermont State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Vermont State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

234.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy, conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

235.   Vermont State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

236.   Defendants' conduct is a substantial factor of the Vermont State Subclass's loss.

The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy. Vermont State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

237.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of 9 V.S.A. §§ 2451 *et seq.*, and Vermont State Subclass members, accordingly, seek damages pursuant to 9 V.S.A. § 2465.

Q.     Violation of the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1 *et seq.*

238.   As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) West Virginia State Subclass members were deprived of free and open competition; (4) West Virginia State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) West Virginia State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

239.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level officials, and avoided the unnecessary creation of documents.  United by their common interests, Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8 Truck Transmissions.

240.  West Virginia State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

241.  Defendants' conduct is a substantial factor of the West Virginia State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy.  West Virginia State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because Defendants fixed prices after Defendants precluded free and unrestricted competition.

242.  Defendants created, operated, aided, or abetted a trust of Class 8 Truck Transmissions by excluding competition and fixing, controlling, or maintaining prices in violation of the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1 *et seq*., and West Virginia State Subclass members, accordingly, seek damages pursuant to W. Va. Code § 47-18-9 and injunctive relief pursuant to W. Va. Code § 47-18-8.

R.     Violation of Wisconsin Law, W.S.A. §4 133.01 *et seq*.

243.  As set forth herein, Defendants created, operated, aided, or abetted a trust, combination, or monopoly of Class 8 Truck Transmissions by restraining competition and fixing, controlling, or maintaining prices in violation of W.S.A. §§ 133.01 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) the price of Eaton Class 8

68

Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels

throughout Wisconsin; (3) Wisconsin State Subclass members were deprived of free and open

competition; (4) Wisconsin State Subclass members relied on Defendants' false representation

that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and

(5) Wisconsin State Subclass members paid supra-competitive, artificially inflated prices for

Eaton Class 8 Truck Transmissions.

244.   Defendants conspired to eliminate competition for, and fix the prices of, Eaton

Class 8 Truck Transmissions.  Defendants agreed not to divulge the existence of the conspiracy,

conducted meetings and conversations in secret, confined the plan to a small group of high-level

officials, and avoided the unnecessary creation of documents.  United by their common interests,

Defendants colluded to substantially limit, lessen, and exclude competition.  With the ability to

preclude free and unrestricted competition, Defendants increased the price of Eaton Class 8

Truck Transmissions.

245.   Wisconsin State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

246.   Defendants' conduct is a substantial factor of the Wisconsin State Subclass's loss.

The loss was a direct and proximate result of Defendants' willful monopoly and conspiracy.

Wisconsin State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because Defendants fixed prices after Defendants

precluded free and unrestricted competition.

247.   Defendants created, operated, aided, or abetted a trust of Class 8 Truck

Transmissions by excluding competition and fixing, controlling, or maintaining prices in

violation of W.S.A. §§ 133.01 *et seq*., and Wisconsin State Subclass members, accordingly, seek

damages pursuant to W.S.A. § 133.018 and injunctive relief pursuant to W.S.A. § 133.016.

## COUNT II

### FOR VIOLATIONS OF STATE UNFAIR COMPETITION LAWS

248.   Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

249.   Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the state unfair competition statutes listed below:

A.      Violation of the Arkansas Consumer Protection Act, Ark. Code §§ 4-88-101 *et seq.*

250.   As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Arkansas Consumer Protection Act, Ark. Code §§ 4-88-101 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Arkansas State Subclass members were deprived of free and open competition; (4) Arkansas State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Arkansas State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

251.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled Arkansas State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal

conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to

divulge the existence of the conspiracy, conducting meetings and conversations in secret,

confining the plan to a small group of high-level officials, and avoiding the unnecessary creation

of documents.

252.  Defendants engaged in deceptive and unconscionable conduct to secure economic

benefits from Arkansas State Subclass members.  Arkansas State Subclass members were not

aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.

There was a gross disparity of bargaining power between the parties with respect to the price of

Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and

Arkansas State Subclass members had no power to negotiate.  Defendants' actions, therefore,

suppressed competition, which resulted in unconscionably higher prices for purchasers and

increased benefits for Defendants.

253.  Arkansas State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

254.  Defendants' conduct is a substantial factor of the Arkansas State Subclass's loss.

The loss was a direct and proximate result of Defendants' willful and deceptive conduct.

Arkansas State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because they reasonably relied on the false pretense,

which Defendants created, that the price was a product of a free and fair market.

255.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or

deceptive acts or practices in violation of the Arkansas Consumer Protection Act, Ark. Code §§

4-88-101 *et seq*., and Arkansas State Subclass members, accordingly, seek damages and

injunctive relief pursuant to Ark. Code § 4-88-113(f).

B.      Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200
        *et seq.*

256.   As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout California; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) California State Subclass members were deprived of free and open competition; (4) California State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) California State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

257.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled California State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

258.   Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from California State Subclass members.  California State Subclass members were not

aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.

There was a gross disparity of bargaining power between the parties with respect to the price of

Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and

California State Subclass members had no power to negotiate.  Defendants' actions, therefore,

suppressed competition, which resulted in unconscionably higher prices for purchasers and

increased benefits for Defendants.

259.  California State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

260.  Defendants' conduct is a substantial factor of the California State Subclass's loss.

The loss was a direct and proximate result of Defendants' willful and deceptive conduct.

California State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because they reasonably relied on the false pretense,

which Defendants created, that the price was a product of a free and fair market.

261.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or

deceptive acts or practices in violation of the California Unfair Competition Law, Cal. Bus. &

Prof. Code §§ 17200 *et seq*., and California State Subclass members, accordingly, seek damages

and injunctive relief pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*

C.     Violation of District of Columbia Law, DC Code §§ 28-3901 *et seq.*

262.  As set forth herein, Defendants engaged in unfair methods of competition or

unconscionable, unfair, or deceptive acts or practices in violation of DC Code §§ 28-3901 *et seq.*

Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions

price competition was restrained, suppressed, and eliminated throughout the District of

Columbia; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and

stabilized at artificially high levels throughout the District of Columbia; (3) District of Columbia Subclass members were deprived of free and open competition; (4) District of Columbia Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) District of Columbia Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

263.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled District of Columbia Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

264.   Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from District of Columbia Subclass members.  District of Columbia Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and District of Columbia Subclass members had no power to negotiate. Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

265.  District of Columbia Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

266.  Defendants' conduct is a substantial factor of the District of Columbia Subclass's loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct. District of Columbia Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the false pretense, which Defendants created, that the price was a product of a free and fair market.

267.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of DC Code §§ 28-3901, *et seq*., and District of Columbia Subclass members, accordingly, seek damages and injunctive relief pursuant to DC Code § 28-3905.

D.    Violation of the Florida Deceptive & Unfair Trade Practices Act, F.S.A. §§ 501.201 *et seq.*

268.  As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Florida Deceptive & Unfair Trade Practices Act, F.S.A. §§ 501.201 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Florida; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida State Subclass members were deprived of free and open competition; (4) Florida State Subclass members relied on Defendants' false representations that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Florida State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

269.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled Florida State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

270.   Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from Florida State Subclass members.  Florida State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and Florida State Subclass members had no power to negotiate.  Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

271.   Florida State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

272.   Defendants' conduct is a substantial factor of the Florida State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct.  Florida State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the pretense, which Defendants

created, that the price was a product of a free and fair market.

273.   Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Florida Deceptive & Unfair Trade Practices Act, F.S.A. §§ 501.201, *et seq*., and Florida State Subclass members, accordingly, seek damages and injunctive relief pursuant to F.S.A. § 501.211.

E.      Violation of Hawaii Law, Hawaii Rev. Stat. § 480-2.

274.   As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of Hawaii Law, Hawaii Rev. Stat. § 480-2.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Hawaii State Subclass members were deprived of free and open competition; (4) Hawaii State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Hawaii State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

275.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled Hawaii State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation

of documents.

276.  Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from Hawaii State Subclass members.  Hawaii State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and Hawaii State Subclass members had no power to negotiate.  Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

277.  Hawaii State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

278.  Defendants' conduct is a substantial factor of the Hawaii State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct.  Hawaii State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the pretense, which Defendants created, that the price was a product of a free and fair market.

279.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in of Hawaii Law, Hawaii Rev. Stat. § 480-2, and Hawaii State Subclass members, accordingly, seek damages and injunctive relief pursuant to Hawaii Rev. Stat. § 480-2.

F.     Violation of Massachusetts Law, M.G.L.A. 93A §§ 1 *et seq.*

280.  As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of M.G.L.A. 93A §§ 1 *et seq.*

Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Massachusetts State Subclass members were deprived of free and open competition; (4) Massachusetts State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Massachusetts State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

281.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled Massachusetts State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

282.   Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from Massachusetts State Subclass members.  Massachusetts State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and Massachusetts State Subclass members had no power to negotiate.  Defendants'

actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

283. Massachusetts State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

284. Defendants' conduct is a substantial factor of the Massachusetts State Subclass's loss. The loss was a direct and proximate result of Defendants' willful and deceptive conduct. Massachusetts State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the false pretense, which Defendants created, that the price was a product of a free and fair market.

285. Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of M.G.L.A. 93A §§ 1 *et seq.*, and Massachusetts State Subclass members, accordingly, seek damages and injunctive relief pursuant to M.G.L.A. 93A§9.

G.    Violation of the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601 *et seq.*

286. As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Nebraska State Subclass members were deprived of free and open competition; (4) Nebraska State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Nebraska

State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

287.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled Nebraska State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

288.   Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from Nebraska State Subclass members.  Nebraska State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and Nebraska State Subclass members had no power to negotiate.  Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

289.   Nebraska State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

290.   Defendants' conduct is a substantial factor of the Nebraska State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct.

Nebraska State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the pretense, which Defendants created, that the price was a product of a free and fair market.

291.   Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601 *et seq.*, and Nebraska State Subclass members, accordingly, seek damages and injunctive relief pursuant to Neb. Rev. St. §§ 59-1609.

H.   <u>Violation of the Nevada Consumer Protection Act, Nevada. Rev. St. §§ 598.0903 *et seq.*</u>

292.   As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Nevada Consumer Protection Act, Nevada. Rev. St. §§ 598.0903 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Nevada; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Nevada State Subclass members were deprived of free and open competition; (4) Nevada State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Nevada State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

293.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled Nevada State Subclass members by creating the

illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy. Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

294. Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from Nevada State Subclass members. Nevada State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions. Defendants had the sole power to set that price and Nevada State Subclass members had no power to negotiate. Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

295. Nevada State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

296. Defendants' conduct is a substantial factor of the Nevada State Subclass's loss. The loss was a direct and proximate result of Defendants' willful and deceptive conduct. Nevada State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the pretense, which Defendants created, that the price was a product of a free and fair market.

297. Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the Nevada Consumer Protection Act, Nevada. Rev. St. §§ 598.0903 *et seq*., and Nevada State Subclass members, accordingly, seek damages and

injunctive relief pursuant to Nevada. Rev. St. § 598.0993.

I.      Violation of the New Hampshire Consumer Protection Act, NH Rev. St. §§ 358-A:1
        *et seq.*

298.    As set forth herein, Defendants engaged in unfair methods of competition or
unconscionable, unfair, or deceptive acts or practices in of the New Hampshire Consumer
Protection Act, NH Rev. St. §§ 358-A:1 *et seq*.  Defendants' unlawful conduct had the following
effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and
eliminated throughout New Hampshire; (2) the price of Eaton Class 8 Truck Transmissions was
raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3)
New Hampshire State Subclass members were deprived of free and open competition; (4) New
Hampshire State Subclass members relied on Defendants' false representation that the price of
Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) New
Hampshire State Subclass members paid supra-competitive, artificially inflated prices for Eaton
Class 8 Truck Transmissions.

299.    Defendants knowingly and willfully engaged in deceptive and unconscionable
conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose
material information and important facts regarding the competition for Eaton Class 8 Truck
Transmissions.  Defendants knowingly misled New Hampshire State Subclass members by
creating the illusion of competitive pricing controlled by market forces, rather than Defendants'
illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to
divulge the existence of the conspiracy, conducting meetings and conversations in secret,
confining the plan to a small group of high-level officials, and avoiding the unnecessary creation
of documents.

300.    Defendants engaged in deceptive and unconscionable conduct to secure economic

benefits from New Hampshire State Subclass members.  New Hampshire State Subclass

members were not aware of Defendants' conspiracy or that they were being unfairly and illegally

overcharged.  There was a gross disparity of bargaining power between the parties with respect

to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that

price and New Hampshire State Subclass members had no power to negotiate.  Defendants'

actions, therefore, suppressed competition, which resulted in unconscionably higher prices for

purchasers and increased benefits for Defendants.

301.  New Hampshire State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

302.  Defendants' conduct is a substantial factor of the New Hampshire State Subclass's

loss.   The loss was a direct and proximate result of Defendants' willful and deceptive conduct.

New Hampshire State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because they reasonably relied on the pretense, which

Defendants created, that the price was a product of a free and fair market.

303.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or

deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, NH

Rev. St. §§ 358-A:1 *et seq*., and New Hampshire State Subclass members, accordingly, seek

damages and injunctive relief pursuant to NH Rev. St. §§ 358-A:1 *et seq*.

J.     Violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1
       *et seq.*

304.  As set forth herein, Defendants engaged in unfair methods of competition or

unconscionable, unfair, or deceptive acts or practices in violation of the New Mexico Unfair

Practices Act, N.M. Stat. Ann. §§ 57-12-1 *et seq*.  Defendants' unlawful conduct had the

following effects: (1) the Class 8 Truck Transmissions price competition was restrained,

suppressed, and eliminated throughout New Mexico; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) New Mexico State Subclass members were deprived of free and open competition; (4) New Mexico State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) New Mexico State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

305.   Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating a monopoly in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled New Mexico State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

306.   Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from New Mexico State Subclass members.  New Mexico State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and New Mexico State Subclass members had no power to negotiate.  Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and

increased benefits for Defendants.

307.  New Mexico State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

308.  Defendants' conduct is a substantial factor of the New Mexico State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct. New Mexico State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the false pretense, which Defendants created; that the price was a product of a free and fair market.

309.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1 *et seq*., and New Mexico State Subclass members, accordingly, seek damages and injunctive relief pursuant to N.M. Stat. Ann. § 57-12-10.

K.     Violation of New York Law, N.Y. Gen. Bus. Law § 349 *et seq.*

310.  As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349 *et seq*.  Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout New York; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) New York State Subclass members were deprived of free and open competition; (4) New York State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) New York State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

311.  Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy.  Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions.  Defendants knowingly misled New York State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy.  Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

312.  Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from New York State Subclass members.  New York State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and New York State Subclass members had no power to negotiate.  Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

313.  New York State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

314.  Defendants' conduct is a substantial factor of the New York State Subclass's loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct.  New York State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the pretense, which

Defendants created, that the price was a product of a free and fair market.

315. Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of N.Y. Gen. B. Law §§ 349 *et seq*., and New York State Subclass members, accordingly, seek damages and injunctive relief pursuant to N.Y. Gen. Bus. Law § 349.

L.     Violation of North Carolina Law, NC Gen. Stat. §§ 75-1.1 *et seq*.

316. As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of North Carolina Law, NC Gen. Stat. §§ 75-1.1 *et seq*. Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) North Carolina State Subclass members were deprived of free and open competition; (4) North Carolina State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) North Carolina State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

317. Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy. Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions. Defendants knowingly misled North Carolina State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy. Defendants deceptively concealed their unlawful activities by agreeing not to

divulge the existence of the conspiracy, conducting meetings and conversations in secret,

confining the plan to a small group of high-level officials, and avoiding the unnecessary creation

of documents.

318.   Defendants engaged in deceptive and unconscionable conduct to secure economic

benefits from North Carolina State Subclass members.  North Carolina State Subclass members

were not aware of Defendants' conspiracy or that they were being unfairly and illegally

overcharged.  There was a gross disparity of bargaining power between the parties with respect

to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that

price and North Carolina State Subclass members had no power to negotiate.  Defendants'

actions, therefore, suppressed competition, which resulted in unconscionably higher prices for

purchasers and increased benefits for Defendants.

319.   North Carolina State Subclass members suffered an ascertainable loss of money or

property from the supra-competitive, artificially inflated prices.

320.   Defendants' conduct is a substantial factor of the North Carolina State Subclass's

loss.  The loss was a direct and proximate result of Defendants' willful and deceptive conduct.

North Carolina State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-

competitive, artificially inflated prices because they reasonably relied on the pretense, which

Defendants created, that the price was a product of a free and fair market.

321.   Defendants engaged in unfair methods of competition or unconscionable, unfair, or

deceptive acts or practices in violation of North Carolina Law, NC Gen. Stat. §§ 75-1.1 *et seq*.,

and North Carolina State Subclass members, accordingly, seek damages and injunctive relief

pursuant to NC Gen. Stat. §§ 75-1.1 *et seq.*

M.    <u>Violation of Vermont Law, Vermont Stat. 9 §§ 2451 *et seq.*</u>

322.    As set forth herein, Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of Vermont Law, Vermont Stat. 9 §§ 2451 *et seq.* Defendants' unlawful conduct had the following effects: (1) the Class 8 Truck Transmissions price competition was restrained, suppressed, and eliminated throughout Vermont; (2) the price of Eaton Class 8 Truck Transmissions was raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Vermont State Subclass members were deprived of free and open competition; (4) Vermont State Subclass members relied on Defendants' false representation that the price of Eaton Class 8 Truck Transmissions was a product of a free and fair market; and (5) Vermont State Subclass members paid supra-competitive, artificially inflated prices for Eaton Class 8 Truck Transmissions.

323.    Defendants knowingly and willfully engaged in deceptive and unconscionable conduct by creating and participating in the conspiracy. Defendants knowingly failed to disclose material information and important facts regarding the competition for Eaton Class 8 Truck Transmissions. Defendants knowingly misled Vermont State Subclass members by creating the illusion of competitive pricing controlled by market forces, rather than Defendants' illegal conspiracy. Defendants deceptively concealed their unlawful activities by agreeing not to divulge the existence of the conspiracy, conducting meetings and conversations in secret, confining the plan to a small group of high-level officials, and avoiding the unnecessary creation of documents.

324.    Defendants engaged in deceptive and unconscionable conduct to secure economic benefits from Vermont State Subclass members. Vermont State Subclass members were not aware of Defendants' conspiracy or that they were being unfairly and illegally overcharged.

There was a gross disparity of bargaining power between the parties with respect to the price of Eaton Class 8 Truck Transmissions.  Defendants had the sole power to set that price and Vermont State Subclass members had no power to negotiate.  Defendants' actions, therefore, suppressed competition, which resulted in unconscionably higher prices for purchasers and increased benefits for Defendants.

325.  Vermont State Subclass members suffered an ascertainable loss of money or property from the supra-competitive, artificially inflated prices.

326.  Defendants' conduct is a substantial factor of the Vermont State Subclass's loss. The loss was a direct and proximate result of Defendants' willful and deceptive conduct. Vermont State Subclass members purchased Eaton Class 8 Truck Transmissions at supra-competitive, artificially inflated prices because they reasonably relied on the pretense, which Defendants created, that the price was a product of a free and fair market.

327.  Defendants engaged in unfair methods of competition or unconscionable, unfair, or deceptive acts or practices in violation of Vermont Law, Vermont Stat. 9 §§ 2451 *et seq.*, and Vermont State Subclass members, accordingly, seek damages and injunctive relief pursuant to Vermont Stat. 9 §§ 2451 *et seq.*

## COUNT III

## FOR UNJUST ENRICHMENT

328.  Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

329.  Defendants have benefited from unlawful acts through the overpayments and increased profits for Class 8 Truck Transmissions paid by Plaintiffs and the other members of the Class.

330.  It would be inequitable for Defendants to retain the benefits resulting from these overpayments, which were conferred by Plaintiffs and the other members of the Class.

331.  Plaintiffs and the other members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiffs and the other members of the Class may make claims of a pro-rata basis for restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

(a)      Certifying that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as lead counsel for the Class;

(b)      Directing that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the members of the Class;

(c)      Awarding Plaintiffs and the other members of the Class their full monetary damages to be proven at trial, trebled, plus attorneys' fees;

(d)      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest on their damages at the maximum legal or equitable rate; and

(e)      Awarding Plaintiffs and the other members of the Class such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  February 4, 2011

Respectfully Submitted,

BIFFERATO LLC

/s/ *Kevin G. Collins*
Ian Connor Bifferato (#3273)
Matthew Denn (#2985)
Thomas F. Driscoll III (#4703)
Kevin G. Collins (#5149)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 225-7600
Facsimile: (302) 254-5383
cbifferato@bifferato.com
mdenn@bifferato.com
tdriscoll@bifferato.com
kcollins@bifferato.com

Brian P. Murray
Lee Albert
Benjamin D. Bianco
Murray, Frank & Sailer LLP
275 Madison Avenue, Suite 801
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892
bmurray@murrayfrank.com
lalbert@murrayfrank.com
bbianco@murrayfrank.com

Joseph R. Gunderson
Gunderson, Sharp & Walke, LLP
321 E. Walnut Street, Suite 300
Des Moines, IA  50309
Telephone: (515) 288-0219
Facsimile (515) 288-0328
jgunderson@midwest-law.com

Rex A. Sharp
Barbara C. Frankland
Gunderson, Sharp & Walke, LLP
5301 W. 75th Street
Prairie Village, KS 66208
Telephone: (913) 901-0500
Facsimile: (913) 901-0419
rsharp@midwest-law.com
bfrankland@midwest-law.com

*Counsel for Plaintiffs*

94