## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RYAN AVENARIUS, RODNEY E. JAEGER, JAMES CORDES, and PREMIER PRODUCE CO., INC., on behalf of the themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EATON CORPORATION, DAIMLER TRUCKS NORTH AMERICA LLC, FREIGHTLINER LLC, NAVISTAR INTERNATIONAL CORPORATION, INTERNATIONAL TRUCK AND ENGINE CORPORATION, PACCAR INC., KENWORTH TRUCK COMPANY, PETERBILT MOTORS COMPANY, VOLVO TRUCKS NORTH AMERICA and MACK TRUCKS, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civ. No. 11-09-SLR |

Ian Connor Bifferato, Esquire and Kevin G. Collins, Esquire of Bifferato LLC, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Lee Albert, Esquire and Benjamin D. Bianco, Esquire of Murray, Frank & Sailer LLP; Rex A. Sharp, Esquire and Barbara C. Frankland, Esquire of Gunderson, Sharp & Walke, LLP.

Donald E. Reid, Esquire of Morris Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Defendant Eaton Corporation. Of Counsel: Joseph A. Ostoyich, Esquire, Erik Koons, Esquire, and William C. Lavery, Esquire of Baker Botts, LLP.

Richard L. Horwitz, Esquire and W. Harding Drane, Jr., Esquire of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendants Daimler Trucks North America LLC ) (f/k/a Freightliner LLC). Of Counsel: Daniel L. Goldberg, Esquire, Gregory F. Wells, Esquire and Daniel S. Savrin, Esquire of Bingham McCutchen, LLP.

Kelly E. Farnan, Esquire and Lisa A. Schmidt, Esquire of Richards, Layton & Finger, PA, Wilmington, Delaware. Counsel for Defendant Navistar International Corporation (f/k/a International Truck and Engine Corporation). Of Counsel: Andrew Paul Bautista,

Esquire, Daniel E. Laytin, Esquire, James H. Mutchnik, Esquire and Leslie S.
Garthwaite, Esquire of Kirkland & Ellis, LLP.

Francis DiGiovanni, Esquire and Dana Kathryn Severance, Esquire of Connolly, Bove,
Lodge & Hutz, Wilmington, Delaware. Counsel for Defendants Kenworth Truck
Company, Paccar Inc., and Peterbilt Motors Company. Of Counsel: Carrie M.
Anderson, Esquire, James, C. Egan, Jr., Esquire and Richard R. Cook, Esquire of Weil,
Gotshal & Manges, LLP.

M. Duncan Grant, Esquire of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for
Defendants Mack Trucks Inc and Volvo Trucks North America. Of Counsel: Daniel J.
Boland, Esquire and Jeremy Heep, Esquire of Pepper Hamilton LLP.

**MEMORANDUM OPINION**

Dated: October 16, 2012
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On October 4, 2010, in the District of Kansas, plaintiffs Ryan Avenarius

("Avenarius"), Rodney E. Jaeger ("Jaeger"), James Cordes ("Cordes") and Premier

Produce Co. ("Premier") (collectively "plaintiffs") filed an antitrust class action complaint

against various defendants, including Eaton Corporation ("Eaton"), Daimler Trucks

North America LLC, Freightliner LLC, Navistar International Corporation, International

Truck and Engine Corporation, PACCAR, Inc., Kenworth Truck Company, Peterbilt

Motors Company, Volvo Trucks North America and Mack Trucks, Inc. (collectively,

"defendants"). (D.I. 1) The case was transferred to this District given its relation to *ZF*

*Meritor LLC v. Eaton Corp.*, Civ. No. 06-623-SLR (D. Del.) and *Wallach v. Eaton Corp.*,

Civ. No. 10-260-SLR (D. Del.). Plaintiffs then filed an amended complaint on February

4, 2011. (D.I. 34) The amended complaint asserts the following counts: 1) violation of

18 state antitrust laws (for the following states: AZ; CA; DC; IA; KS; ME; MI; MN; NE;

NV; NM; NC; ND; SD; TN; VT; WV and WI); 2) violation of 13 state unfair competition

laws (for the following states: AR; CA; DC; FL; HI; MA; NE; NV; NH; NM; NY; NC; VT);

and 3) unjust enrichment.[1]

The court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). For the following

reasons, the court grants in part and denies in part defendants' motions.

## II. BACKGROUND

### A. The Parties

Plaintiffs are purchasers of Class 8 trucks and, therefore, indirect purchasers of

---

[1] Plaintiffs make claims in a total of 24 states.

Class 8 transmissions. (D.I. 34 at ¶¶ 9-12) Avenarius is an Iowa resident who purchased a truck in Iowa; Jaeger is an Iowa resident who purchased a truck in Wisconsin; Cordes is a Michigan resident who purchased a truck in Michigan; and Premier is a California-based corporation that purchased a truck in California. (Id.)

Defendants are involved in the manufacture and sale of Class 8 trucks. Eaton manufactures transmissions for Class 8 trucks. (Id. at ¶ 13) The remaining defendants (Daimler Trucks North America LLC, Freightliner LLC, Navistar International Corporation, International Truck and Engine Corporation, Paccar, Inc., Kenworth Truck Company, Peterbilt Motors Company, Volvo Trucks North America and Mack Trucks, Inc.), referred to as Original Equipment Manufacturers ("OEMs"), manufacture and sell Class 8 trucks. (Id. at ¶¶ 14-21) In order to assemble and sell Class 8 trucks, OEMs purchase component parts, such as transmissions, from suppliers, such as Eaton. (Id. at ¶ 27)

## B. Class 8 Trucks and Transmissions

There are eight recognized classes of vehicles, with Class 8 trucks being the heaviest. (Id. at ¶ 25) Examples of Class 8 heavy duty trucks include the cement truck, dump truck, and long-distance freighter. (Id. at ¶ 26) The purchase of Class 8 trucks is unique in the sense that buyers can essentially build a truck to their desired specifications. (Id. at ¶ 27) When purchasing a Class 8 truck, buyers can consult OEM "databooks," which list an OEM's standard and non-standard component offerings[2] and

---

[2]  A databook is a term of art used in the trucking industry. It represents the truck broken down to its core components and provides customers with standard and non-standard component options. (D.I. 34 at ¶ 27) A transmission is an example of a component part that exists in a databook. (Id.)

2

designate the specific components they desire in their trucks. (*Id.*)

## C. Plaintiffs' Allegations

Plaintiffs contend that Eaton has been the dominant and most widely recognized American manufacturer of Class 8 transmissions, holding a near monopoly in the market since the 1950s. (*Id.* at ¶¶ 28; 42-45) In the 1990s, ZF Meritor established itself as a viable competitor to Eaton, producing desirable, competitive and innovative transmissions. (*Id.* at ¶¶ 28-29; 51-61) In response to this competition from ZF Meritor and a significant downturn in the Class 8 truck market which occurred in late 1999-early 2000, plaintiffs allege that Eaton and the OEMs conspired to put ZF Meritor out of business, thereby expanding Eaton's monopoly and permitting all defendants to share in the profits resulting from this monopoly. (*Id.* at ¶ 62)

This conspiracy was allegedly achieved by Eaton entering into Long Term Agreements ("LTAs") in the early 2000s with each of the four OEMs.[3] (*Id.* at ¶¶ 62-68). While each Eaton-OEM LTA was separately negotiated and thus distinct, the LTAs shared a similar purpose and features. (*Id.* at ¶¶ 74-112) Each LTA contained a provision whereby the OEMs would receive sizable and lucrative rebates from Eaton assuming the OEMs utilized a certain percentage of Eaton transmissions annually. (*Id.*) For example, under the Freightliner-Eaton LTA, Freightliner was required to purchase 92% of its Class 8 transmission needs from Eaton in order to receive the specified rebates. (*Id.* at ¶ 77) Aside from tying percentage requirements to rebates, the LTAs included other provisions designed to minimize ZF Meritor's market share. Examples of

---

[3] A series of mergers in the mid-1990's reduced to four the number of OEMs purchasing Class 8 transmissions. (D.I. 34 at ¶¶ 46-48).

3

these provisions include eliminating ZF Meritor transmissions from databooks or

removing them from the standard position, excluding non-Eaton transmissions from

warranty programs and imposing price penalties for selection of a ZF Meritor

transmission. (*Id.* at ¶¶ 74-113) In essence, plaintiffs argue that the LTAs were defacto

exclusive dealing contracts and the OEMs all agreed with each other to enter into these

agreements in order to eliminate ZF Meritor and share in the profits of Eaton's

monopoly. (*Id.* at ¶ 62; 66) In the end, plaintiffs allege that defendants' conspiracy was

successful as the LTAs greatly diminished ZF Meritor's market share in the Class 8

transmission field and left it no opportunity for growth. (*Id.* at ¶¶ 115-117) In the face of

these economic realities, ZF Meritor's market share declined to an insignificant level.

(*Id.*) Plaintiffs ultimately contend that they had to pay higher prices for transmissions

and, in turn, for Class 8 trucks, as a result of defendants' actions. (*Id.* at ¶¶ 4; 114)

## III. STANDARD

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the

court must accept all factual allegations in a complaint as true and take them in the light

most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher

v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public

record, orders, exhibits attached to the complaint, and documents incorporated into the

complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d

Cir. 1994). A complaint must contain "a short and plain statement of the claim showing

that the pleader is entitled to relief, in order to give the defendant fair notice of what the

4

. . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id*. Furthermore, "[w]hen there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id*.

## IV. DISCUSSION

### A. Standing

Standing requires: "(1) an injury-in-fact . . . ; (2) a causal connection between the injury and the conduct complained of; and (3) that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007). Plaintiffs do not reside in or claim to have bought trucks in twenty of the states in which they make claims (namely, AZ; AR; DC; FL; HI; KS; ME; MA; MN; NE; NV; NH; NM; NY; NC; ND; SD; TN; VT; WV);[4] given this, defendants argue that plaintiffs lack standing to sue in those

---

[4] As discussed, the named plaintiffs are residents of Iowa, Michigan and California; they purchased trucks in those three states and Wisconsin.

jurisdictions. (D.I. 47 at 19; D.I. 49 at 19) Defendants specifically contend that courts "routinely dismiss indirect plaintiffs' efforts to sue under state laws beyond those implicated by their own alleged injury." (D.I. 49 at 20) Defendants cite a variety of cases in support of this position. Plaintiffs, in response, cite a variety of cases in which courts deferred standing decisions until after class certification concerns have been evaluated.[5] (D.I. 54 at 25)

Courts "generally address challenges to standing as a threshold matter[;]" however, in class actions "the Supreme Court has crafted an exception to this general rule: Courts may evaluate class certification issues before Article III standing concerns if the former are 'logically antecedent' to the latter." *In re Chocolate Confectionary Antitrust Litigation*, 602 F. Supp. 2d 538, 579 (M.D. Pa. 2009) *(citing Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831 (1999)). "Unsurprisingly, this [exception] engendered some disagreement among federal courts as to when certification issues are 'logically antecedent' to standing." *Blessing*, 756 F. Supp. 2d at 451. While the Supreme Court and Third Circuit are yet to describe "the precise circumstances under which class certification logically takes precedence over standing," the court, as it has in the past,[6] finds that class certification is logically antecedent to standing considerations. *Chocolate Confectionary*, 602 F. Supp. 2d at 579.

_____

[5] "The reason that named plaintiffs in a proposed class action bring claims under [antitrust and] consumer protection laws of states where they do not reside is that it allows them to preserve those claims in anticipation of eventually being joined by class members who do reside in the states for which claims have been asserted." *Blessing v. Sirius XM Radio Inc.*, 756 F. Supp. 2d 445, 452 (S.D.N.Y. 2010)

[6] *See U.S. v. Dentsply Int'l., Inc.*, 2001 WL 624807, at *13 (D. Del. Mar. 30, 2001).

6

Defendants also argue that the named plaintiffs have suffered no injuries and, therefore, lack standing. (D.I. 47 at 20) For the reasons discussed more fully below, the court disagrees.

## B. Antitrust Claims[7]

Defendants make a variety of arguments with respect to the legal insufficiency of plaintiffs' antitrust claims. Each is addressed below:

### 1. Antitrust injury

To establish antitrust injury, a plaintiff must show: (1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff that flows from that which makes the defendant's acts unlawful. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977); *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3rd Cir. 2010). Failure to properly plead antitrust injury will result in plaintiffs lacking the requisite standing to sue. *Gulfstream II Associates, Inc. v. Gulfsteam Areospace Corp.*, 995 F.2d 425, 429 (3rd Cir. 1993). Defendants argue that neither prong exists. (D.I. 49 at 12)

Prong one of the above test can be satisfied by pleading any one of several types of harm. A "decrease in competition" is one type of harm the antitrust laws were intended to prevent. *Gulfstream*, 995 F.2d at 429. Another is the payment of higher consumer prices as a result of monopolistic activity or anticompetitive conduct. *Harrison Aire, Inc. v. Aerostar Int'l Inc.*, 423 F.3d 374 (3rd Cir. 2005); *In re DDAVP*

---

[7] The parties agree that the relevant state antitrust laws are interpreted in accordance with federal antitrust law; the court reviews the parties' arguments accordingly.

7

*Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 688 (2nd Cir. 2009). Prong two is

generally satisfied by alleging that plaintiff is a "competitor or consumer in the relevant

market." *Gulfstream*, 995 F.2d at 429. The second prong can also be satisfied by

showing a "'significant causal connection' such that the harm to the plaintiff can be said

to be 'inextricably intertwined' with the antitrust conspiracy." *Id.* (quoting *Blue Shield v.

McCready*, 457 U.S. 456, 484 (1982)).

In the present case, plaintiffs identify themselves as consumers[8] of Class 8

transmissions (D.I. 34 at ¶¶ 9-12; 27), thereby satisfying prong two, and claim a

decrease in competition (*id.* at e.g. ¶¶ 2-3; 67-68; 115; 118), satisfying prong one.

Plaintiffs have also alleged, several times and in several different ways, that they paid

higher prices for Class 8 transmissions than they would have had to pay if no

conspiracy had existed.[9] (*Id.* at e.g. ¶¶ 3-4; 62; 68; 114)

## 2. Conspiracy

---

[8] While plaintiffs admittedly received the transmissions as component parts of the Class 8 trucks they purchased, plaintiffs are consumers in the sense that they could choose which specific type of transmissions they wanted installed in their trucks. (D.I. 34 at ¶ 27)

[9] Defendant Eaton objects to the sufficiency of this latter type of injury. (D.I. 49 at 13) Specifically, Eaton argues that 1) the rebates resulted in lower priced transmissions, and 2) even if they didn't, the OEMs "significant control" over the pricing of truck and truck components forecloses any argument that the overcharge flowed from Eaton (as opposed to an OEMs' independent decision). (*Id.* at 13) While the decrease in competition is an injury that flows to the consumer and, therefore, higher prices are not the sole type of injury alleged, the court nevertheless responds in brief. With respect to argument one, the complaint does not allege that transmission prices were lowered. *See infra*, pg 11. With respect to argument two, even if the OEMs set the ultimate price, that does not mean that the ultimate overcharge was not inextricably intertwined with the conspiracy.

8

An agreement, or conspiracy, under federal antitrust laws is said to exist when "there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d at 99 (citing *Twombly*, 550 U.S. at 553). "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two," but allegations of direct evidence, that are adequately detailed, are sufficient alone. *Id.* When alleging the existence of an agreement based on circumstantial evidence, a plaintiff may not plead mere parallel conduct or conclusory allegations of agreement. *Twombly*, 550 U.S. at 556-57. Instead, "when allegations of parallel conduct are set out in order to make a [federal antitrust] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. To place them in such a context, courts have required the pleading of certain "plus factors." *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 321 (3rd Cir. 2010). While there is no finite set of plus factors, one recognized, and important, plus factor is parallel action that is contrary to self interest. *Id.* at 321-23. Ultimately, however, plus factors are simply circumstances in which the inference of independent action is less likely than that of concerted action. *Id.* at 323.

In the present case, plaintiffs have alleged the existence of a single rimmed hub-and-spoke conspiracy, in which Eaton individually agreed to work with each OEM and the OEMs in turn agreed to work together. (D.I. 54 at 20) Defendants contend that the existence of such a horizontal conspiracy against the OEMs has not been sufficiently

9

pled.[10] (D.I. 47 at 13; D. I. 49 at 16) Contrary to defendants' assertions, the court finds that sufficient parallel conduct and plus factors have been set forth in the amended complaint. The complaint alleges that Eaton and each OEM negotiated and put into place similar LTAs that provided for lucrative rebates in exchange for meeting shared penetration goals; the LTAs also contained other provisions that minimized ZF Meritor's market share. See section II.C, supra. According to the complaint, it was the OEMs that approached Eaton to set up these LTAs. (D.I. 34 at ¶ 64) Aside from this parallel conduct, plaintiffs allege the existence of a plus factor. Contrary to their self interest, the OEMs' parallel action essentially resulted in the installation of a monopolist (Eaton) in their supply chain and the elimination of a supplier with desirable products. Further, the complaint alleges that the OEMs "uniformly refused" to adopt "lower-cost-counter-proposals from ZF Meritor." (Id. ¶ 71) Passing up such a potential competitive advantage suggests that the OEMs agreed among themselves to enter into the LTAs and eliminate ZF Meritor in contravention of their own self interests in exchange for a share in the profits from the resulting monopoly.

Defendants argue that a horizontal conspiracy among the OEMs, even if sufficiently pled, would make no economic sense and, therefore, be implausible. (D.I. 47 at 11) In this regard, defendants contend that it would make no sense for the OEMs to install a monopolist - here Eaton - in their supply chain. (Id.) While defendants, and

---

[10] While plaintiffs plead the existence of individual Eaton-OEM conspiracies in the alternative and defendants also make arguments premised on the assumption that plaintiffs have failed to plead a rimmed conspiracy, the court will not address these alternative theories and arguments since it finds that a single overarching (rimmed hub-and-spoke) conspiracy has been sufficiently pled.

the cases they cite, correctly point out that it would not ordinarily make sense (in the long term) to install a monopolist in a supply chain, under the facts pled, the OEMs benefitted economically, in the form of rebates, making it economically practicable (at least in the short term).[11] Accordingly, at this point, prior to discovery, the court will not dismiss the case for lack of plausibility. Defendants also assert that the OEMs, by receiving rebates, acquired the transmissions for lower prices and, thus, charged less when they sold them to consumers. (D.I. 47 at 12) Contrary to defendants' position, however, plaintiffs have alleged that the OEMs received rebates after meeting **annual** percentage targets; therefore, any savings from these rebates were not passed through to the consumers on their individual transmission purchases. (D.I. 54 at 18 (citing D.I. 34 at ¶ 62))

### 3. Specific intent

Specific intent "means an intent which goes beyond the mere intent to do the act. In other words, the defendant must have intended to achieve an illegal monopoly." *Hess II*, 602 F.3d at 257 (citations and quotations omitted). Specific intent may be shown through direct, i.e., "smoking gun," evidence or can be shown through circumstantial evidence. *Advo v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3rd Cir. 1995).

Both Eaton and the OEMs argue that plaintiffs have failed to plead the requisite intent required of them. The court disagrees. The complaint explains that Eaton employees acknowledged that Eaton's goal was to put ZF Meritor out of business.

---

[11] Moreover, as the complaint explains, defendants were used to operating with one supplier (i.e., Eaton).

11

*(See e.g.* D.I. 34 at ¶¶ 3; 83) Similarly, the complaint details that OEM employees admitted sharing Eaton's goal of monopoly power or, at the least, acknowledged committing to the common scheme. *(Id.* at ¶¶ 84; 89; 97; 110); *see also ZF Meritor, LLC v. Eaton Corp.*, 769 F. Supp. 2d 684, 698 (D. Del. 2011).

## C. Consumer Protection Claims

Defendants raise a variety of arguments with respect to plaintiffs' state consumer protection claims. (D.I. 47 at 24-34) In particular, however, defendants argue that "plaintiffs' boilerplate consumer protection allegations cannot satisfy the Rule 8(a) requirements as articulated by *Twombly* and *Iqbal*." *(Id.* at 27) The court agrees. While Fed. R. Civ. P. 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," this standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Plaintiffs' state consumer protection claims contain essentially identical allegations, save for citations to state statutes. (D.I. 34 at ¶¶ 158-247) The complaint does not contain specific reference to the various state standards under which the claims are made or tailor facts to suit the "**significant** differences among States' consumer protection laws." *Thompson v. Jiffy Lube Int'l Inc.*, 250 F.R.D. 607, 625 (D. Kan. 2008) (emphasis in original); *(see also* D.I. 47 at 24-34). While the court acknowledges that the early part of the complaint contains a more detailed fact discussion which, conceivably, would temper a more formulaic recitation of a specific

count, the allegations in the consumer protection section of the complaint do not clearly
relate back the introductory fact section.[12] Ultimately, as defendants explain, plaintiffs'
"formulaic recitations, unhinged from the facts actually alleged and from the elements of
the causes of action, are exactly the type of allegations that *Twombly* and *Iqbal* reject."
(D.I. 47 at 29) In other words, plaintiffs' generalized recitations, which are unhinged
from the precise statutory basis for the claims, does not provide defendants with the
type of notice required. Because more was required of plaintiffs, defendants' motion to
dismiss the state consumer protection claims is granted; however, plaintiffs are granted
leave to amend these claims consistent with this opinion.[13]

## D. Unjust Enrichment Claims

Defendants set forth a variety of arguments in an attempt to have plaintiffs'
unjust enrichment claims dismissed. Defendants initially argue that plaintiffs have failed
to identify which state unjust enrichment laws they are proceeding on and this defect is
fatal. (*See* D.I. 47 at 35 and D.I. 49 at 22 (citing *In re Wellbutrin XL Antitrust Litigation*,
260 F.R.D. 143, 167 (E.D. Pa. 2009) ("The plaintiffs fail to link their [unjust enrichment]
claim to the law of any particular state. As a result of this deficiency, the plaintiffs fail to

---

[12] For instance, the consumer protection portion of the complaint references
secret high level meetings among defendants, false or misleading statements made to
buyers, a disparity in bargaining power between plaintiffs and defendants, and plaintiffs'
inability to negotiate pricing. (*See e.g.*, D.I. 34 at ¶¶ 252-252) The introductory facts
section, however, does not discuss these facts which evidently would be relevant or
critical to state-based consumer protection claims.

[13] Because the court grants the motion on the overall nature of the allegations, it
does not opine on defendants' more specific consumer protection contentions. Once
plaintiffs amend, defendants are free to re-raise their more specific arguments and it
should be easier for defendants and the court to address these issues at that point in
time.

13

state a cause of action under their third [unjust enrichment] count.")) Plaintiffs disagree, noting that the complaint identifies 24 jurisdictions in the class (D.I. 34 at ¶ 149) and the unjust enrichment provisions of the complaint refer to that "Class." (Id. at 329-331)

The unjust enrichment section of the complaint arguably limits plaintiffs' claims to those 24 jurisdictions; however, that was, understandably, not certain from defendants' perspective. While the unjust enrichment section of the complaint refers back to "the Class," as defendants point out, "the Class" is not unambiguously limited to those 24 jurisdictions; the complaint identifies 24 "state specific subclasses," (D.I. 34 at ¶ 149), but also claims to "bring this action on behalf of . . . [a]ll persons or entities that indirectly purchased, in the United States, Eaton Class 8 Truck Transmissions" (id. at 148). Defendants' lack of certainty was manifest in their motion to dismiss and respective briefs which more generally objected to plaintiffs' unjust enrichment claims. Generic pleading and generic responsive briefing is inappropriate given that states analyze unjust enrichment claims differently. See, e.g., In re Flonase Antitrust Litigation, 610 F. Supp. 2d 409, 419 (E.D. Pa. 2009). Accordingly, defendants' motion to dismiss plaintiffs' unjust enrichment claims is granted for failure to sufficiently identify those jurisdictions under which it brings its claims. Plaintiffs, however, are granted leave to amend consistent with this opinion.[14] Chocolate Confectionary, 602 F. Supp. 2d at 587.

_____

[14] Assuming plaintiffs wish to bring claims under the 24 jurisdictions they identify in their brief, their amended complaint should clearly indicate as much. Defendants, assuming they re-file a motion to dismiss, are expected to make arguments tailored to the varied state unjust enrichment standards under which plaintiffs make claims for relief.

14

### E. Statute of Limitations

Defendants contend, based upon plaintiffs' failure to plead the existence of a

specific truck purchase, that plaintiffs' claims are time-barred by the applicable state

statutes of limitation. (D.I. 49 at 24) Instead of listing specific purchases in their

complaint and the dates on which those purchases occurred, plaintiffs generally allege

that they purchased one or more trucks from one or more of the defendants during the

class period asserted (October 1, 2002 - the present). (D.I. 34 at ¶¶ 9-12; 148)

Contrary to defendants' position, plaintiffs are not required to plead sufficient

facts so as to avoid an affirmative defense. As the Third Circuit explained in *Bethel v.*

*Jendoco Construction Corp.*, 570 F.2d 1168 (3rd Cir. 1978):

> Under Fed.R.Civ.P. 8(c), the statute of limitations constitutes an affirmative defense to an action. Under the law of this and other circuits, however, the limitations defense may be raised on a motion under Rule 12(b)(6), but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. If the bar is not apparent on the face of the complaint, then it may not afford the basis for dismissal of the complaint under Rule 12(b)(6).

*Id.* at 1174 (citations and quotations omitted). Since plaintiffs' generalized allegations

regarding purchase do not necessarily place them outside of the applicable statutes of

limitation, the court does not find plaintiffs' claims time-barred at this stage of the

proceedings.[15]

## V. CONCLUSION

For the reasons discussed above, the court denies defendants' motions to

---

[15] In light of this finding, arguments concerning fraudulent concealment and tolling are deferred until purchase dates, and thus statute of limitation time frames, are clearly identified.

15

dismiss with respect to the state antitrust claims and grants defendants' motions with respect to the consumer protection and unjust enrichment claims with leave to amend. An appropriate order shall issue.