IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE CLASS 8 TRANSMISSION INDIRECT PURCHASER ANTITRUST LITIGATION | ) ) Civil Action No. 11-cv-00009 (SLR) ) CLASS ACTION ) ) |

## BRIEF IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

BIFFERATO LLC
Ian Connor Bifferato (#3273)
Thomas F. Driscoll III (#4703)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 225-7600
Facsimile: (302) 254-5383
cbifferato@bifferato.com
 tdriscoll@bifferato.com
*Liaison Counsel for Plaintiffs*

GLANCY BINKOW & GOLDBERG LLP
Brian P. Murray
Lee Albert
Gregory B. Linkh
122 E. 42nd Street
New York, New York 10168
Telephone: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

GUNDERSON SHARP LLP
Joseph R. Gunderson
21 E. Walnut Street, Suite 300
Des Moines, IA  50309
Telephone: (515) 288-0219
Facsimile (515) 288-0328
jgunderson@midwest-law.com

GUNDERSON SHARP LLP
David E. Sharp
712 Main Street, Ste. 1400
Houston, TX 77002
Telephone: (713) 490-3822
Facsimile: (713) 583-5448
dsharp@midwest-law.com

STUEVE, SIEGEL AND HANSON LLP
Jason S. Hartley
Jason M. Lindner
550 West C. Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822

GOLDMAN SCARLATO AND PENNY LLP
Brian Penny
Douglas Bench Jr.
101 E. Lancaster Ave., Suite 204
Wayne, PA 19087
Tel: (484) 342-0700
Fax: (484) 580-8729

KARON LLC
Daniel R. Karon
700 W. Saint Clair Ave.
Cleveland, OH 44113
Phone: (216) 551-9175
Fax: (216) 241-8175

# TABLE OF CONTENTS

Page

NATURE OF PROCEEDINGS AND SUMMARY OF ARGUMENT
PURSUANT TO LOCAL RULE PURSUANT TO LOCAL RULE 7.1.3 ....................................1

FACTUAL BACKGROUND ................................................................................................3

   A. Industry Background: Class 8 Trucks and Accompanying Transmissions .......................3

   B. ZF Meritor's Entry Threatens Eaton's Monopoly ............................................................5

   C. The Conspiracy: Eaton and the OEMs Plan to Eliminate Meritor and Share in the
      Proceeds of Eaton's Enhanced Monopoly ........................................................................6

   D. But For Defendants' Conduct, ZF Meritor Would Have Entered The
      Performance Transmission Market ..................................................................................11

   E. ZF Meritor Sues Eaton for Violations of Federal Antitrust Laws, and Wins ................13

ARGUMENT .....................................................................................................................14

   I. Applicable Legal Standards ..........................................................................................14

   II. The Proposed State Classes Should Be Certified .........................................................15

      A. The Requirements of Rule 23(a) Are Satisfied .........................................................16

         1. The State Class Members Are So Numerous That Joinder Of All
            Members Is Impracticable ..................................................................................16

         2. Questions Of Law And Fact Are Common To The Members
            Of The State Classes .........................................................................................17

         3. IPPs' Claims Are Typical Of The State Classes' Claims ....................................21

         4. The IPPs And Their Counsel Will Fairly And
            Adequately Protect The Interests Of The State Classes ......................................24

      B. This Action Fulfills All Of The Requirements Of Rule 23(b)(3) ...............................26

         1. The State Classes Should Be Certified Under Rule 23(b)(3)
            Because Issues Of Fact Predominate ..................................................................26

         2. The State Classes Should Be Certified Under Rule 23(b)(3) Because
            Common Issues Predominate Across The State Laws At Issue ...........................32

3.  A Class Action Is Superior To Any Alternative Method
    For The Fair And Efficient Adjudication Of This Controversy ............................34

4.  All Four Additional Factors Pertinent To Predominance
    And Superiority Support Class Certification In This Case ...................................36

    a.  Factors 23(b)(3)(A) – (C) Are Present Here ....................................................37

    b.  IPPs' Claims Are Manageable, Therefore, 23(b)(D) Is Satisfied ...................37

C.  The Members Of The State Classes Are Ascertainable ..............................................38

CONCLUSION ...........................................................................................................................38

## TABLE OF AUTHORITIES

Page

**Rules and Statutes**

Fed. R. Civ. P. 23 ..................................................................................... *passim*

**Cases**

*Amchem Prod. Inc. v. Windsor,*
    521 U.S. 591 (1997)....................................................................... 28, 35

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds,*
    133 S.Ct. 1184 (2013)..................................................................... 14, 27

*Arch v. American Tobacco Co.,*
    175 F.R.D. 469 (E.D. Pa. 1997)........................................................ 16

*Baby Neal v. Casey,*
    43 F.3d 48 (3d Cir. 1994) ......................................................... 17, 18, 22

*Beck v. Maximus, Inc.,*
    457 F.3d 291 (3d Cir. 2006)............................................................. 23

*Brooks v. Educators Mut. Life Ins. Co.,*
    206 F.R.D. 96 (E.D. Pa. 2002)................................................. 27, 29, 35

*Browne v. American Honda Motor Co., Inc.,*
    No. CV 09–06750 MMM (DTBx),
    2010 WL 9499072 (C.D. Cal. Jul. 29, 2010) ................................... 38

*Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796, 2013 WL 4478200 (7th Cir. Ill. 2013)...................... 36

*Carrera v. Bayer Corp.,*
    727 F.3d 300(3d Cir. 2013)............................................................. 38

*Chiang v. Vereman,*
    385 F.3d 256 (3d Cir. 2004)............................................................ 18

*Comcast Corp v. Behrend,*
    569 U.S. ___, 133 S.Ct. 1426 (2013)............................................. 14

*Danvers v. Ford Motor Co.,*
    543 F.3d 141 (3d Cir. 2008)............................................................ 23

*Deutschman v. Beneficial Corp.,*
    132 F.R.D. 359 (D. Del. 1990) .................................................................. 22

*Eisen v. Porsche Cars NA, Inc.,*
    No. 2:11cv9405 (CAS)(FFMx),
    2014 WL 439006 (C.D. Cal. Jan. 30, 2014) .................................................. 38

*Eisenberg v. Gagnon,*
    766 F.2d 770 (3d Cir. 1985).................................................................. 22

*Elliott v. ITT Corp.,*
    150 F.R.D. 569 (N.D. Ill. 1992).................................................................. 33

*Gen. Tel. Co. of Southwest v. Falcon,*
    457 U.S. 147 (1982)........................................................................... 21, 24

*Georgine v. Amchem Prods.,*
    83 F.3d 610 (3d Cir. 1996).................................................................. 35

*Greene v. Emersons Ltd.,*
    86 F.R.D. 47 (S.D.N.Y. 1980) .................................................................. 25

*Hassine v. Jeffes,*
    846 F.2d 169 (3d Cir. 1988).................................................................. 22

*Hoxworth v. Blinder,*
    980 F.2d 912 (3d Cir. 1992).................................................................. 23

*In re Bulk (Extruded) Graphite Products Antitrust Litig.,*
    No. Civ. 02-6030(WHW),
    2006 WL 891362 (D.N.J. Apr. 4, 2006) ...................................................... 16

*In re Busiprone Patent Litig.,*
    185 F. Supp. 2d 363 (S.D.N.Y. 2002)........................................................ 19, 33

*In re Chocolate Confectionary Antitrust Litig.,*
    1:08–MDL–1935,
    2012 WL 6652501 (M.D. Pa. Dec. 7, 2012)................................................. 30

*In re Citric Acid Litig.,*
    No. 95-1092,
    1996 WL 655791 (N.D. Cal. Oct. 2, 1996)................................................... 29

*In re Crazy Eddie's Sec. Litig.,*
    135 F.R.D. 39 (E.D.N.Y. 1991) ............................................................... 19, 20

*In re Data Access Systems Sec. Litig.*,
103 F.R.D. 130 (D.N.J. 1984).................................................................. 21

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. M. 02-1486 PJH,
2006 WL 1530166 (N.D. Cal. Jun. 5, 2006)........................................ 23, 30

*In re Flat Glass Antitrust Litigation*,
191 F.R.D. 472, 478 (W.D. Pa 1999) .................................................... 27, 28

*In re GMC Pick-up Truck Fuel Tanks Prod. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995),
*cert. denied*, 516 U.S. 824 (1995) ............................................................ 15

*In re Hydrogen Peroxide Antitrust Litig.*,
522 F.3d 305 (3d Cir. 2008)..................................................................... 14, 28

*In re K-Dur Antitrust Litig.*,
CIV.A. 01-1652 (JAG),
2008 WL 2660723 (D.N.J. Mar. 27, 2008)........................................... 25

*In re LifeUSA Holding Inc.*,
242 F.3d 136 (3d Cir. 2001)..................................................................... 35

*In re Linerboard Antitrust Litig.*,
203 F.R.D. 197 (E.D. Pa. 2001)................................................ 16, 23, 25, 30

*In re Microcrystalline Cellulose Antitrust Litig.*,
218 F.R.D. 79 (E.D. Pa. 2003).................................................................. 23

*In re Neurontin Antitrust Litig.*,
MDL No. 1479,
2011 WL 286118 (D.N.J. Jan. 25, 2011) .............................................. 30

*In re OSB Antitrust Litig.*,
Master File No. 06-826,
2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ......................................... 16, 24

*In re Plastic Cutlery Antitrust Litig.*,
No. Civ. A 96-CV-928,
1998 WL 135703 (E. D. Pa. Mar. 20, 1998)........................................ 16, 29

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
148 F.3d 283 (3d Cir. 1998) ("*Prudential II*").......................... 21, 22, 25, 27

*In re Prudential Ins. Co. of Am.*,
   962 F. Supp. 450 (D.N.J. 1997),
   *aff'd*, 148 F.3d 283 (3d Cir. 1998),
   *cert. denied sub nom. Krell v. Prudential Ins. Co. of Am.*,
   525 U.S. 1114 (1999) ("*Prudential I*") ........................................................ 16, 22, 25, 29

*In re Relafen Antitrust Litigation*,
   221 F.R.D 260 (D. Mass 2004) ..................................................................... 20, 32, 35, 37

*In re School Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986) ............................................................................................ 19

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) .......................................................................................... 30

*In re South Central States Bakery Products Antitrust Litig.*,
   86 F.R.D. 407 (M.D. La. 1980) ....................................................................................... 23

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976) ......................................................................... 23, 24, 27, 29

*In re Synthroid Marketing Litig.*,
   188 F.R.D. 298 (N.D. Ill. 1999) ...................................................................................... 20

*In re TCT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 291 (N.D. Cal. 2010) .................................................................................... 23

*In re Terazosin Hydrochloride Antitrust Litigation*,
   220 F.R.D. 672 (S.D. Fl. 2004) ................................................................................ *passim*

*In re Urethane Antitrust Litig. v. Seegott Holdings, Inc., et al*,
   2014 WL 4801253 (10th Cir. Sept. 29, 2014) .............................................................. 30

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (D. Del. 2004) ..................................................................................... *passim*

*Infant Formula Antitrust Litig.*,
   No. MDL 878,
   1992 WL 503465 (N.D. Fla. Jan. 13, 1992) .................................................................. 28

*Jerry Enterprises of Gloucester Cnty., Inc. v. Allied Beverage Grp., L.L.C.*,
   178 F.R.D. 437 (D.N.J. 1998) ................................................................................... 25, 29

*Johnston v. HBO Film Mgmt., Inc.*,
   265 F.3d 178 (3d Cir. 2001) ..................................................................................... 24, 27

*Ketchum v. Sunoco, Inc.*,
     217 F.R.D. 354 (E.D. Pa. 2003) ................................................................ 16

*Lumco Indus. Inc. v. Jeld-Wen, Inc.*,
     171 F.R.D. 168 (E.D. Pa. 1997) ................................................................ 29

*Marcus v. BMW of N.A. LLC*,
     687 F.3d 583 (3d Cir. 2012) ................................................................ 18, 38

*Maywalt v. Parker & Parsley Petroleum Co.*,
     147 F.R.D. 51 (S.D.N.Y. 1993) ............................................................ 19, 20

*McDonough v. Toys R. Us, Inc.*,
     638 F. Supp. 2d 461 (E.D. Pa. 2009) ......................................................... 25

*McPeak v. S-L Distribution Co. Inc.*,
     Civ. No. 12-348,
     2014 WL 4388562 (D.N.J. Sept. 5, 2014) ................................................. 38

*New Directions Treatment Services v. City of Reading*,
     490 F.3d 293 (3d Cir. 2007) ..................................................................... 25

*Phillips Petroleum Co. v. Shutts*,
     472 U.S. 797 (1985) ................................................................................. 36

*Stephenson v. Bell Atlantic Corp.*,
     177 F.R.D. 279 (D.N.J. 1997) .................................................................. 22

*Stewart v. Abraham*,
     275 F.3d 220 (3d Cir. 2001) ................................................................ 16, 17

*Sullivan v. DB Inv., Inc.*,
     667 F.3d 273 (3d Cir. 2011) ..................................................................... 27

*Teva Pharmaceuticals USA v. Abbott Laboratories*,
     252 F.R.D. 213 (D. Del. 2008) ........................................................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
     131 S.Ct. 2541 (2011) ..................................................................... 14, 18, 19

*Waste Mgmt. Holdings, Inc., v. Mowbray*,
     208 F.3d 288 (1st Cir. 2000) ..................................................................... 19

*ZF Meritor, LLC v. Eaton Corp.*,
     696 F.3d 254 (3d Cir. 2012) ............................................................... *passim*

**Miscellaneous**

7B Wright, Miller & Kane,
     Wright & Miller's Federal Practice and Procedure, §1781 (1986).................................. 35

Larry Kramer,
     *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 585 (1996)..................... 19

## NATURE OF PROCEEDINGS AND SUMMARY OF ARGUMENT
## PURSUANT TO LOCAL RULE PURSUANT TO LOCAL RULE 7.1.3

1.      Indirect Purchaser Plaintiffs ("IPPs") move this Court to certify classes, based on

the antitrust laws of California, Kansas, Iowa, Michigan, Minnesota, Nebraska, North Carolina,

Tennessee, Vermont, and Wisconsin, and consumer protection laws of Florida (the "State

Classes"), of purchasers of new Class 8 Heavy Duty Trucks ("Trucks").[1] Furthermore, IPPs

move for appointment of the law firms of Glancy Binkow & Goldberg LLP and Gunderson

Sharp, LLP as Class Counsel.

2.      Starting in 2002, Defendant Eaton Corporation ("Eaton") conspired with various

Truck manufacturers (the Original Equipment Manufacturers or "OEMs")[2] to drive Eaton's

competitor Meritor[3] out of the Truck transmissions ("Transmissions") market.

---

[1] IPPs include Ryan Avenarius (representing the Iowa State Class); Big Gain Inc. (representing the Minnesota State Class); Carleton Transport Service (representing the Nebraska State Class); James Cordes on behalf of Cordes Inc. (representing the Michigan State Class); Meunier Enterprises LLC, individually and as parent company of Auto Transport Leasing, Inc. and Exotic Car Transport, Inc. (representing the Florida and North Carolina State Classes); Paul Prosper on behalf of Prosper Trucking Inc. (representing the Vermont State Class); Rodney E. Jaeger (representing the Wisconsin State Class); and Purdy Brothers Trucking Co. (representing the Tennessee State Class). On November 3, 2014, the IPPs moved to withdraw Premier Produce Co. Inc. and Joseph Williams, and substitute T.C. Construction Co. Inc. to represent the California State Class, and Phillip E. Nix to represent the Kansas State Class.

[2] The OEMs include Defendants Daimler Trucks North America LLC ("Daimler"); Navistar International Corporation ("Navistar"); International Truck and Engine Corporation ("International"); PACCAR Inc. ("PACCAR"); Kenworth Truck Company ("Kenworth"); Peterbilt Motors Company ("Peterbilt"); Volvo Trucks North America ("Volvo"); and Mack Trucks, Inc. ("Mack"). Daimler produces trucks under the labels Freightliner, Sterling, and Western Star. Navistar produces trucks under the International label. PACCAR produces trucks under the Peterbilt and Kenworth labels. Volvo and Mack merged in 2002.

[3] "Meritor" refers to both Meritor Inc., and ZF Meritor, a joint venture between Meritor subsidiary Arvin Meritor and ZF Friedrichshafen AG that lasted from 1999 to 2003.

2.      Eaton and each of the OEMs entered into Long Term Agreements ("LTAs") which were designed to marginalize Meritor's share of the Transmission market through various methods discussed below, including market penetration rebates, data book placement, and other incentives designed to move market share from Meritor to Eaton.

3.      While in many ways Meritor's Transmissions were superior to Eaton's Transmissions, the LTAs eroded Meritor's market share until Meritor was forced out of business, and Eaton obtained a monopoly.

4.      Many of these issues were litigated in a previous case before this Court, *ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation*, Civil Action No. 06-623-SLR (D. Del.) (the "*ZF Meritor* Action"). On October 14, 2009, a jury rendered a verdict in favor of ZF Meritor and against Eaton.

5.      Defendants' conduct, which led to and enhanced Eaton's anticompetitive monopoly, caused the price of Transmissions to rise by way of an overcharge that caused damages to IPPs and the members of the State Classes. The IPPs' expert, Dr. Russell Lamb, estimates that, during the Class Period, putative State Class Members were damaged by over $92 million. Dr. Lamb's declarations[4] contain reliable and commonly accepted methodologies to prove class wide antitrust injury, as well as class wide damages, resulting from Defendants' anticompetitive conduct. This expert evidence, like the factual evidence establishing Defendants' conspiracy, is common to all class members.

---

[4] Dr. Lamb has submitted two expert declarations in connection with this motion: (1) the Expert Report of Russell Lamb ("Lamb Direct Report") which has been filed in *Wallach v. Eaton Corp.*, Civ. Action No. 10-260-SLR, and is incorporated by reference in this Action, and (2) the Declaration of Russell Lamb ("Lamb Indirect Report"), which concerns additional issues specific to IPPs. The Lamb Indirect Report is filed and submitted herewith.

6.      As explained in detail below, each element of Rule 23(a) and 23(b)(3) has been met. The numerosity, adequacy, typicality, and superiority elements of certification are easily met. Each of the elements of the state statutes at issue can be established by common proof, and those common legal and factual issues predominate over any individualized ones.

7.      Accordingly, the IPPs respectfully ask the Court to certify separate classes of persons and/or entities that indirectly purchased new Class 8 Trucks that contained Eaton Class 8 Truck Transmissions, beginning in October 1, 2002 and continuing until the present ("Class Period"), in the states of California, Florida, Kansas, Iowa, Michigan, Minnesota, Nebraska, North Carolina, Tennessee, Vermont, and Wisconsin. A list of the state statutes at issue is attached as Exhibit 1 to the Declaration of Lee Albert In Support of the IPPs' Motion for Class Certification ("Albert Declaration" or "Albert Decl."), submitted herewith.

8.      On October 4, 2010, this Action was filed in the District of Kansas. [Dkt. No. 1]

9.      On January 4, 2011, this Action was transferred to this Court. [Dkt. No. 4]

10.     On February 4, 2011, an Amended Complaint was filed. [Dkt. No. 34].

11.     Defendants moved to dismiss [Dkt. Nos. 46, 48], but on October 16, 2012, the Court denied Defendants' motions to dismiss. [Dkt. No. 61].[5]

12.     IPPs now move to certify the State Classes.

## FACTUAL BACKGROUND

A.      **Industry Background: Class 8 Trucks and Accompanying Transmissions**

Defendant Eaton manufactures and sells transmissions for Class 8 Trucks (also known as heavy duty trucks). Eaton Answer ¶19 [Dkt. No 77]. Class 8 Trucks consist of three distinct

---

[5] Following the denial of the motions to dismiss, a Second Amended Complaint was filed on November 30, 2012 [Dkt. No. 68], and a Third Amended Complaint was filed on January 15, 2013 [Dkt. No. 73].

subgroups – linehaul, vocational, and performance — with each subgroup requiring its own type of Class 8 Transmission. Eaton had been the only significant manufacturer of heavy duty (HD) transmissions from the 1950s until Meritor entered the market in 1989. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 264 (3d Cir. 2012). Defendant Eaton maintained its dominance because, in part, the barriers to entry into the Class 8 Transmissions market are substantial: a patent portfolio (which Eaton had),[6] research and development costs (for example, it took Meritor 10 years and $100 million to develop what became the FreedomLine transmission),[7] costs of building a manufacturing plant,[8] and capacity constraints.[9] However, as detailed below, Eaton's LTAs stifled competition and thus created another barrier to entry.

---

[6] ███████████████████████████████████████████████████████████████
███████████████████████████████ ZFMA0015604-15 at 08. (Albert Declaration, Ex. 2.) *See also* MV0194786 at 788 (████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████ (Albert Declaration, Ex. 3.)

[7] Developing an automated transmission can be very costly. In his deposition in the *ZF Meritor* Action, ███████████████████████████████████████████████████████████████████
█████████████████████████████. (Albert Declaration, Ex. 4.) Additionally, in his trial testimony in the *ZF Meritor* Action, ████████████████████████████████████
████████████████████████████████ (Albert Declaration, Ex. 5.) Similarly, ████████████████████████████████████████████████████████████████████
███████████████████ EATON-00163659-733 at 664. (Albert Declaration, Ex. 6.) See also ZFMA0004249 at 249 (███████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████) (Albert Declaration, Ex. 7.)

[8] See AT00453 (███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████)(Albert Declaration, Ex. 8).

[9] For example, ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

In the United States, Class 8 Truck purchasers select the brand and model for various component parts, including transmissions, to be included in their specific truck. *See ZF Meritor, 696 F.3d at 264.* Class 8 Truck purchasers often select components from an OEM's "data book." In a data book, various prices for optional components are listed, relative to the "standard" or "preferred" offering. *Id.* A component's position in the data book is crucial for business:

> Data book positioning is a form of advertising, and standard or preferred positioning generally means that customers are more likely to purchase that supplier's components. Although customers may, and sometimes do, request components that are not published in a data book, doing so is often cumbersome and increases the cost of the component. Thus, data book positioning is essential in the industry.

*Id.*[10]

## B.   ZF Meritor's Entry Threatens Eaton's Monopoly

Meritor began manufacturing Class 8 Transmissions in 1989, focusing mostly on transmissions intended for linehaul trucks. *See ZF Meritor, 696 F.3d at 264.* Soon thereafter, Meritor and ZF Friedrichshafen AG, a European manufacturer of automatic and fully-automated manual Class 8 Transmissions, formed the joint venture ZF Meritor. *Id.* One of the purposes of this joint venture was to adapt the two-pedaled European ASTronic transmission for the North American market. *Id.* In 2001, this transmission, called the "FreedomLine," was unveiled. *Id.*



ZFMA0033753-78 at 74. (Albert Declaration, Ex. 9.) *See also* ZFMA0171789 at 791 (

)(Albert Declaration, Ex. 10).

[10] *See also* the trial testimony of                                                ) in the *ZF Meritor* Action, at 323:6-12 (

")(Albert Declaration, Ex. 11).

The FreedomLine represented a significant improvement over other transmissions in reliability, fuel economy, and ease of operation.[11]

## C.   The Conspiracy: Eaton and the OEMs Plan to Eliminate Meritor and Share in the Proceeds of Eaton's Enhanced Monopoly

In response to ZF Meritor's growing competitive threat and an economic downturn affecting the OEMs' bottom line, Eaton and the OEMs agreed to marginalize ZF Meritor products and enhance Eaton's monopoly power. In exchange, the OEMs would receive a share of the monopoly's profits as demonstrated below and in the Lamb Direct Report.

Eaton and each of the OEMs facilitated their conspiracy by entering into substantially similar LTAs that were designed to, and did, foreclose competition in the Class 8 Truck Transmission Market, and amounted to what were essentially *de facto* exclusive dealing arrangements. A key component of these LTAs were share-based rebates, whereby the OEM would receive rebates on a quarterly basis that were tied to minimum purchasing thresholds that

---

[11] 

Declaration, Ex. 12.) ARMFTL002738. (Albert . PACCAR015132 at 132 (

)(Albert Declaration, Ex. 13).

EATON-01405202-03 at 02. (Albert Declaration, Ex. 14.)

required a large percentage of their trucks (often 90% or more)[12] be sold with Eaton

transmissions. These rebates were often applied directly to the OEM's bottom line, and funds

from the rebates were rarely used to lower the selling price of a truck.[13]

---

[12] Freightliner: "Eaton's LTA with Freightliner, the largest OEM, provided for rebates if Freightliner purchased 92% or more of its requirements from Eaton . . . . In 2003, Freightliner and Eaton modified the agreement from a fixed 92% goal to a sliding scale, which entitled Freightliner to different rebates at different market-penetration levels." *ZF Meritor*, 696 F.3d at 264 and n.7.

Navistar: "Under Eaton's LTA with International, Eaton agreed to make an up-front payment of $2.5 million, and any additional rebates were conditioned on International purchasing 87% to 97.5% of its requirements from Eaton." *Id.* at 264.

PACCAR: "The PACCAR LTA provided for an up-front payment of $1 million, and conditioned rebates on PACCAR meeting a 90% to 95% market-share penetration target." *Id.*

Volvo/Mack: "Eaton's LTA with Volvo provided for discounts if Volvo reached a market-share penetration level of 70% to 78%. . . . The share penetration targets in the Volvo LTA were lower because Volvo also manufactured transmissions for use in its own trucks. The commitment to Eaton, plus Volvo's own manufactured products, accounted for more than 85% of Volvo's needs." *Id.* at 264 and n.8.

[13] Navistar: An internal International email notes that ███████████████████ ████████████████████████ INT00016366 at 366. (Albert Declaration, Ex. 15)

Volvo/Mack: ███████████████████████████████████ ████████████████████████ (Albert Declaration, Ex. 16.); ███████████████ (Albert Declaration, Ex. 17); ████████████████ (Albert Declaration, Ex. 18).

PACCAR: ██████████████████████████████████ ████████████████████ (Albert Declaration, Ex. 19 and 20); ████████████████ )(Albert Declaration, Ex. 21).

To meet the penetration targets, the OEMs and Eaton employed a variety of tactics to further their conspiracy, ensure the OEMs reached their purchase thresholds, and enhance Eaton's monopoly power, including, among other things:

- **Manipulating the OEMs' data books in favor of Eaton and to the disadvantage of ZF Meritor:** For example, ████████ replaced ZF Meritor with Eaton as the standard data book option.[14] ████████ eventually removed certain ZF Meritor transmissions from their data books entirely,[15] and ████████ removed ZF Meritor transmissions from the ████████[16]

- **Pricing competing transmissions such as ZF Meritor's at artificial penalties compared to Eaton's:** ████████ each assigned artificially-high



[14] FTL0194-241 at 241(Albert Declaration, Ex. 22).

[15] ████████ EATON-00054793-94 at 93 (Albert Declaration, Ex. 23). ████████ EATON-00000422-23 at 23(Albert Declaration, Ex. 24).

[16] ████████ EATON-01202757(Albert Declaration, Ex. 25).

[17] ████████ EATON-01198805-06 at 05 (Albert Declaration, Ex. 26). ████████ EATON-00930506-07 at 06. (Albert Declaration, Ex. 27.)

prices to ZF Meritor products in their data books. ████████████

████████████████████████████████████ [19]

- **Identifying truck purchasers and fleets that could be converted to Eaton transmissions and assisting with that conversion:** ████████ [20] ████████, [21] and ████████ [22] all worked with Eaton to provide them with information about customers

---

[18] ████████████████████████ EATON-01202757-58 at 57. (Albert Declaration, Ex. 25.) . ████████████████ EATON-00999738-40 at 39 (Albert Declaration, Ex. 28).

[19] *See also* the trial testimony of ████████████████████████ ████████████████████████ (Albert Declaration, Ex. 29.)

[20] ████████████████████████ EATON-00029306. (Albert Declaration, Ex. 30.) ████████████████████████ ARMFTL002727. (Albert Declaration, Ex. 31.)

[21] ████████████████████████ EATON-00438080-90 at 81. (Albert Declaration, Ex. 32.)

[22] See, e.g., PACCAR021900 (████████████████ ) (Albert Declaration, Ex. 33); PACCAR021862 (████████████████████████ )(Albert Declaration, Ex. 34).

9

who could be "conquested," i.e. convinced to change their orders from Meritor to Eaton

Transmissions.

- **Dissuading buyers from choosing, or refusing to promote ZF Meritor Transmissions:** To turn customers to Eaton products,





EATON-00029321. (Albert Declaration, Ex. 35.)

EATON-00634903. (Albert Declaration, Ex. 36.)

(Albert Declaration, Ex. 37.)

EATON-00085510. (Albert Declaration, Ex. 38.)

EATON-00111933. (Albert Declaration, Ex. 39.)



**D.    But For Defendants' Conduct, ZF Meritor Would Have Entered
The Performance Transmission Market**

---

[27]  EATON-00387109 (Albert Declaration, Ex. 40).

[28]  "Heavy-duty trucks include 18–wheeler 'linehaul' trucks, which are used to travel long distances on highways, and 'performance' vehicles, such as cement mixers, garbage trucks, and dump trucks." *ZF Meritor*, 696 F.3d at 263.

[29]  *See* trial testimony of ) (Albert Declaration, Ex. 11.)

[30]  ZFMA0287385-437 at 411 ( ZFMA0287385-437 at 397(Albert (Albert Declaration, Ex. 42.)

[31]  VM 000147-61 at 49. (Albert Declaration, Ex. 43.)



32                       ZFMA0369760-68 at 63. (Albert Declaration, Ex. 44.)

) (Albert Declaration, Ex. 42.)

33                                             (Albert Declaration, Ex. 42.)

34                       (Albert Declaration, Ex. 42.)

35           (Albert Declaration, Ex. 42.)

36

**E.     ZF Meritor Sues Eaton for Violations of Federal Antitrust Laws, and Wins**

The conduct above hurt ZF Meritor and competition in general. In 2003, the ZF Meritor joint venture decided to dissolve, and in January 2007, Meritor all but exited the transmission business. *ZF Meritor*, 696 F.3d at 267.

On October 5, 2006, ZF Meritor and Meritor filed a complaint in the District Court of Delaware against Eaton, alleging that Eaton engaged in illegal predatory and monopolistic activity with respect to its Class 8 Transmission business, in violation of Federal antitrust laws. *ZF Meritor,* 696 F.3d at 267. On October 14, 2009, a jury rendered a verdict in favor of ZF Meritor, finding, *inter alia*, as follows:

- Eaton's LTAs with the OEM Defendants constituted a contract, combination, or conspiracy that unreasonably restrained trade in violation of Federal antitrust laws;

- Eaton's LTAs with the OEM Defendants constituted *de facto* exclusive dealing agreements which substantially lessened competition or tended to create a monopoly in the Class 8 Truck Transmission Market; and

- Eaton unlawfully acquired or maintained monopoly power in the Class 8



(Albert Declaration, Ex. 5.)

13

Truck Transmission Market.[37]

On October 30, 2009, the Court released the trial transcripts—which outlined the OEMs'

substantial involvement in (and initiation of) the price fixing conspiracy with defendant Eaton.

On March 10, 2011, the Court denied Eaton's motion for judgment as a matter of law, or in the

alternative, a new trial,[38] and, on September 28, 2012, the Third Circuit affirmed.[39]

## ARGUMENT

**I.    Applicable Legal Standards**

To certify a class, a district court must "resolve factual disputes by a preponderance of

the evidence and make findings that each Rule 23 requirement is met or is not met, having

considered all relevant evidence and arguments presented by the parties." *In re Hydrogen

Peroxide Antitrust Litig.*, 522 F.3d 305, 320 (3d Cir. 2008). A certification decision requires a

"rigorous analysis" that may "entail some overlap with the merits of plaintiffs' underlying

claim." *Comcast Corp v. Behrend*, 569 U.S. ___, 133 S.Ct. 1426, 1432 (2013) (*quoting Wal-

Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)). While the court must "resolve all

factual or legal disputes relevant to class certification, even if they overlap with merits,"

*Hydrogen Peroxide*, 552 F.3d at 307, "the office of a Rule 23(b)(3) certification is not to

adjudicate the case." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S.Ct.

1184, 1191 (2013).

Class certification under Rule 23 has two parts. First, Plaintiffs must satisfy the four

elements of Rule 23(a), which are:

---

[37] Jury Verdict Sheet in *ZF Meritor* Action (Albert Declaration Ex. 45).

[38] *ZF Meritor, LLC v. Eaton Corp.*, 769 F. Supp. 2d 684 (D. Del. 2011).

[39] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Once it is determined that the proposed Class satisfies Rule 23(a), the Court must examine the requirements of Rule 23(b). Here, Plaintiffs seek class certification pursuant to Rule 23(b)(3), which requires a finding that "[t]he questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are known as predominance and superiority.

This case – like many other cases in this district, this circuit and elsewhere, cited in this memorandum – easily satisfies the requirements of Rule 23(a) and 23(b)(3) and the Class should be certified.

## II.     The Proposed State Classes Should Be Certified

IPPs are entitled to class certification under Federal Rule of Civil Procedure 23, because the action meets the four requirements of Rule 23(a), as well as the requirements of Rule 23(b)(3). According to the Third Circuit, Rule 23 must be given a flexible reading to "enable it to achieve its broader purposes of vindicating difficult individual claims and conserving judicial resources." *In re GMC Pick-up Truck Fuel Tanks Prod. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995).

As discussed below, the Third Circuit and other federal courts routinely certify classes, like the State Classes proposed in this motion, which allege violations of state antitrust and consumer protection statutes.

**A.    The Requirements of Rule 23(a) Are Satisfied**

**1.    The State Class Members Are So Numerous
That Joinder Of All Members Is Impracticable**

In order to meet the first requirement of Rule 23, plaintiffs must demonstrate the proposed class is so numerous that joinder is impracticable. *Teva Pharmaceuticals USA v. Abbott Laboratories,* 252 F.R.D. 213, 224 (D. Del. 2008). Impracticability means difficulty or inconvenience of joinder, but the rule does not require the impossibility of joinder. *See In re Prudential Ins. Co. of Am.*, 962 F. Supp. 450, 509 (D.N.J. 1997) ("*Prudential I*"); *aff'd*, 148 F.3d 283 (3d Cir. 1998), *cert. denied sub nom. Krell v. Prudential Ins. Co. of Am.*, 525 U.S. 1114 (1999); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 476 (E.D. Pa. 1997).

To satisfy this requirement, Plaintiffs need not demonstrate that joinder would be impossible; rather, the numerosity requirement is satisfied where the traditional joinder of parties would be "unworkable." *In re Bulk (Extruded) Graphite Products Antitrust Litig.*, No. Civ. 02-6030(WHW), 2006 WL 891362, at *5 (D.N.J. Apr. 4, 2006) (citation omitted). In determining numerosity, "a court may accept common sense assumptions." *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 205 (E.D. Pa. 2001) (citation omitted). "There is no magic number which satisfies the [Rule 23(a)(1)'s] numerosity requirement, and plaintiffs do not have to allege the precise number or identity of the class members," *In re Plastic Cutlery Antitrust Litig.*, No. Civ. A 96-CV-928, 1998 WL 135703, at *2 (E. D. Pa. Mar. 20, 1998) , but "[g]enerally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement of Rule 23(a) has been met." *In re OSB Antitrust Litig.*, Master File No. 06-826, 2007 WL 2253418, at *2 (E.D. Pa. Aug. 3, 2007) (*quoting Ketchum v. Sunoco, Inc.,* 217 F.R.D. 354, 357 (E.D. Pa. 2003)). *See also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).

The Third Circuit has stated that "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d at 226-27; *Teva,* 252 F.R.D. at 224 (*quoting Stewart*). Given the length of the State Class periods, the nationwide scope of the conspiracy, and the thousands of purchasers of Class 8 Transmissions during the State Class periods, the total number of class members for each state is sufficiently numerous that joinder is impracticable.

During the Class Period, thousands, if not tens of thousands, of Class 8 Trucks were sold in the states for which the IPPs bring claims Lamb Indirect Declaration at ¶ 18 (Vermont, the smallest state at issue, had 1,572 trucks sold, and California, the largest state in at issue, had 41,307 trucks sold).

### 2.   Questions Of Law And Fact Are Common To The Members Of The State Classes

Rule 23(a)(2) requires the existence of a single question of law or fact common to all class members. *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). As alleged in the Complaint this case involves multiple questions of law and fact, including, *inter alia*:

(a)     whether Defendants engaged in a contract, combination, or conspiracy to restrain trade in, exclude competition in, or monopolize the relevant market for Class 8 Truck Transmissions;

(b)     whether Defendants conspired to unreasonably restrain trade and maintain prices for Class 8 Truck Transmissions sold in the United States, and the Indirect Purchaser State submarkets, at supra-competitive levels by foreclosing the market for Class 8 Truck Transmissions in the United States and in the states at issue;

(c)     the existence and duration of the illegal conduct alleged herein;

(d)    whether Defendants concealed their unlawful activities;

(e)    whether Defendants' anticompetitive conduct resulted in diminished competition for Class 8 Truck Transmissions in the United States and in the states at issue;

(f)    whether Defendants' anticompetitive conduct caused prices for Class 8 Truck Transmissions to be higher than they would have been in the absence of Defendants' conduct;

(g)    whether IPPs and the other members of the State Classes were injured by Defendants' conduct, and if so, the appropriate classwide measure of damages; and

(h)    whether Defendants' conduct violated the antitrust and unfair competition laws of the Indirect Purchaser States.

In the Third Circuit, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. . . . Because the requirement may be satisfied by a single common issue, it is easily met" *Baby Neal*, 43 F.3d at 56; *see also Teva*, 252 F.R.D. at 225 ("Commonality requires that class members share a single common issue of law or fact."). "Rule 23(a)(2)'s commonality requirement 'does not require identical claims or facts among class members.'" *Marcus v. BMW of N.A. LLC*, 687 F.3d 583, 597 (3d Cir. 2012) (quoting *Chiang v. Vereman*, 385 F.3d 256, 265 (3d Cir. 2004)).

In *Dukes*, the Supreme Court held that the relevant inquiry is not solely whether common questions exist, but instead whether class members' claims "depend upon a common contention … that is capable of classwide resolution" such that "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. As this factor is meant to evaluate "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation," the Court reiterated that

"even a single common question" can satisfy the commonality requirement. *Id.* at 2551, 2556 (internal citations and quotation marks omitted). In this case, as in almost all antitrust cases, this standard is readily met.

In this case, common issues of law and fact abound among the proposed State Classes. IPPs satisfy Rule 23's commonality requirements because State Class members have not merely *some* relevant legal or factual issues in common but virtually *all* legal or factual issues in common.

IPPs allege violations of the antitrust statutes of ten states, as well as the unfair competition laws of Florida.[40] As detailed below, the state antitrust statutes at issue are substantially similar and share common elements and interpretation guidelines.

The Third Circuit, as well as many other federal courts, has held that the commonality requirement may be met by classes, like the State Classes in this action, which include state law claims.[41] In *In re Relafen Antitrust Litigation*, the court found commonality among class members alleging violations of state and federal antitrust law, and state consumer protection statutes "[b]ecause each of the end payor plaintiffs claim injuries resulting from the same alleged conduct, [therefore] resolving these common questions collectively will 'advance the litigation.'"

---

[40] A list of the state antitrust statutes and consumer protection statutes under which the State Classes bring claims, as well as the pertinent statutory citation for each, can be found at Exhibit 1 to the Albert Declaration.

[41] *See, e.g., In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004); *In re Synthroid Marketing Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51 (S.D.N.Y. 1993); *In re Crazy Eddie's Sec. Litig.*, 135 F.R.D. 39 (E.D.N.Y. 1991); *In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672, 687 (S.D. Fla. 2004); *Waste Mgmt. Holdings, Inc., v. Mowbray*, 208 F.3d 288 (1st Cir. 2000); *In re Busirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002); *see also* Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. REV. 547, 585 (1996) (opining that a court can successfully administer an action under different states' laws).

221 F.R.D 260, 267 (D. Mass 2004) (citations omitted). "[T]he unlawfulness of [defendant's] conduct under federal antitrust law, as well as state law, the causal link between [defendant's] conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled . . . naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (D. Del. 2004); *see also In re Synthroid Marketing Litig.*, 188 F.R.D. 298-99 (N.D. Ill. 1999) (holding "plaintiffs have alleged that the defendants directed standardized conduct toward the potential class members, and 'courts have readily found a common nucleus of operative facts' in such situations . . . . [P]laintiffs' allegations are sufficient to meet the commonality requirement."). As here, "while liability depends on the conduct of [defendant], and whether it conducted a nationwide campaign of misrepresentation and deception, it does *not* depend on the conduct of individual class members." *Warfarin*, 391 F.3d at 528 (emphasis added).

When faced with a similar class certification motion alleging federal securities claims and pendent state law claims, the U.S. District Court for the Southern District of New York held that "because the alleged violations in both sets of claims arise out of the same conduct by Defendants, and because the discovery and proof presented at trial will be the same for both," the commonality requirement was met. *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 58 (S.D.N.Y. 1993). In *In re Crazy Eddie Sec. Litigation*, the Court certified a class alleging violations that included state law claims, reasoning that "the application of the laws of different states, if necessary, does not preclude class action litigation of this case. Issues relating to defendants' conduct will be common to the class regardless of the law to be applied." 135 F.R.D. 39, 41 (E.D.N.Y. 1991). The fact that remedies for violations of state laws may vary between

states does not override the commonality of plaintiffs' questions of law and fact. As explained in *In re Relafen*, while "remedies available under state statutes differ, . . . '[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).'" 221 F.R.D. at 279 (citations omitted).

As explained herein, the legal issues for the State Classes are identical and the statutes at issue for the State Classes are composed of substantially similar statutory language, elements, and interpretation guidelines.

### 3.   IPPs' Claims Are Typical Of The State Classes' Claims

This case turns almost entirely on Defendants' conduct which affected the State Classes as a whole, causing the State Classes to suffer injuries of an identical nature; therefore, the claims of IPPs are typical of the State Classes. Rule 23(a)(3) requires "the claims . . . of the representative parties [be] typical of the claims . . . of the class." Fed R. Civ. P. 23(a)(3). Courts have recognized that this requirement:

> "can be met with surprising ease in most cases, because the majority of class action decisions support the view that when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is met."

*In re Data Access Systems Sec. Litig.*, 103 F.R.D. 130 (D.N.J. 1984) (citations omitted).

The typicality and commonality analyses "tend to merge" into a single inquiry. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Where there is an allegation that the plaintiff and other class members were targeted by the same wrongful course of conduct under a common legal theory, Rule 23(a)(3) does not mandate that they share identical claims, and "factual differences among the claims of putative class members do *not* defeat certifications." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998) ("*Prudential II*") (emphasis added); *see also Stephenson v. Bell Atlantic Corp.*, 177 F.R.D. 279,

285 (D.N.J. 1997); *Baby Neal*, 43 F.3d 48, 58 (3d Cir. 1994). In other words, "the focus of the typicality inquiry is not plaintiff's behavior, but defendants'. If defendants' course of conduct gives rise to the claims of all class members, and defendants have not taken any action unique to the named plaintiff, then the representative's claim is typical." *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 373 (D. Del. 1990).

Put simply, "typical does not mean identical." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985). *See also Prudential I*, 962 F. Supp. at 518 (holding that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct") (quoting *Baby Neal*, 43 F.3d at 58); *Warfarin*, 391 F.3d at 531-32. Typicality also generally entails an inquiry into whether "'the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988) (quoting *Eisenberg*, 766 F.2d at 786).

A finding of typicality will generally *not* be defeated even if there are factual differences where there is a strong similarity of legal theories. *Prudential II*, 148 F.3d at 311 (emphasis added). For example, in *In re Terazosin Hydrochloride Antitrust Litigation*, the court found the representative of an indirect purchaser class met the typicality requirement, despite factual differences in the plaintiffs' actual purchases, where "Indirect Purchaser Plaintiffs allege that the same unlawful conduct affected both the class representatives and the class itself." 220 F.R.D. 672, 687 (S.D. Fla. 2004). Ultimately, the court reasoned that the plaintiffs "engaged in the exact same type of transactions (retail transactions of terazosin), . . . and suffered the same damage as a result of generic delay—they paid more than they otherwise would have for terazosin." *Id.* In antitrust disputes, "[s]ince the representative parties need prove a conspiracy, its effectuation,

and damages therefrom[,] precisely what the absentees must prove to recover[,] the representative claims can hardly be considered atypical." *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 336 (E.D. Pa. 1976); *see also In re South Central States Bakery Products Antitrust Litig.*, 86 F.R.D. 407, 417 (M.D. La. 1980).

As long as "plaintiffs' claims arise from the same allegedly illegal practices and course of conduct that underlie the claims of the proposed class[], namely, defendants' conspiracy to raise, fix, maintain, or stabilize prices for" a product, typicality is satisfied. *Linerboard*, 203 F.R.D. at 207. "Factual differences will not defeat typicality if the named plaintiffs' claims arise from the same event or course of conduct that gives rise to the claims of the class members and are based on the same legal theory." *Danvers v. Ford Motor Co.*, 543 F.3d 141, 150 (3d Cir. 2008) (*citing Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006)) (emphasis omitted). "A finding of typicality will generally not be precluded even if there are 'pronounced factual differences' where there is a strong similarity of legal theories." *Linerboard*, 203 F.R.D. at 207 (citations omitted); *see also In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 84 (E.D. Pa. 2003) (*citing Hoxworth v. Blinder*, 980 F.2d 912, 923 (3d Cir. 1992)). Thus, for example, typicality is satisfied in a price-fixing class action even if "the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class." *In re TCT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 300 (N.D. Cal. 2010) (*quoting In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M. 02-1486 PJH, 2006 WL 1530166, at *4 (N.D. Cal. Jun. 5, 2006)).

Here, the IPPs' claims satisfy the typicality requirement because claims of the representatives of the proposed State Classes are based on the same conduct by Defendants and

substantially similar legal theories. With regard to factual typicality, all members of the State Classes, by definition, are consumers who purchased new Trucks with Eaton Class 8 Transmissions indirectly and seek recovery of the overcharge resulting from Defendants' illegal conspiracy. Therefore, the named IPPs and their claims are typical of the claims of all members because all such claims arise from the same events or course of conduct by Defendants.

With regard to typicality of legal theories, in order to recover on behalf of themselves and each member of the State Classes, IPPs must prove that Defendants' conduct violated substantially similar state antitrust and consumer protection laws by conspiring to charge indirect purchasers artificially high prices for Class 8 Transmissions during the Class Period and that, as a result, all Class members paid higher prices than they would have paid absent such collusion.

### 4.    The IPPs And Their Counsel Will Fairly And Adequately Protect The Interests Of The State Classes

Under Rule 23(a)(4), a class may be certified if the representative parties "will fairly insure the adequate representation of all other unnamed plaintiffs." *Sugar Indus.*, 73 F.R.D. at 336. There are two components to the Rule 23(a)(4) requirement: (1) the representative plaintiffs do not have interests that conflict with those of the other members of the class; and (2) the representative plaintiffs and their counsel must be capable of competently and vigorously prosecuting the litigation. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 & n.13; *Prudential I*, 962 F. Supp. at 519.

Rule 23(a)'s fourth requirement is that "[t]he representative parties will fairly and adequately protect the interests of the class." "In evaluating this requirement [the court] must determine whether 'the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class.'" OSB, 2007 WL 2253418, at *3 (*quoting Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185 (3d Cir. 2001)); *see also McDonough v.*

*Toys R. Us, Inc.*, 638 F. Supp. 2d 461, 477 (E.D. Pa. 2009) (the adequacy requirement "depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class") (*quoting New Directions Treatment Services v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)); *Prudential I*, 148 F.3d at 312 (*quoting Amchem*, 521 U.S. at 625); *Linerboard*, 203 F.R.D. at 207.

The party challenging certification bears the burden of proving that representation is not adequate. *See Prudential I*, 962 F. Supp. at 519. As long as "there is at least one named Plaintiff who will fairly and adequately represent the class," the adequacy requirement is met. *In re K-Dur Antitrust Litig.*, CIV.A. 01-1652 (JAG), 2008 WL 2660723 (D.N.J. Mar. 27, 2008) *(citing Jerry Enterprises of Gloucester Cnty., Inc. v. Allied Beverage Grp., L.L.C.,* 178 F.R.D. 437, 442 (D.N.J. 1998)). The inquiry into adequacy largely focuses only on whether there are any conflicts of interest between the named plaintiffs and the class they seek to represent. *Teva*, 252 F.R.D. at 226.

It is well-settled that factual differences in the amounts of damages, date, size or manner of purchase, the type of purchaser and other such variations will not defeat class certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class. *See Prudential I*, 962 F. Supp. at 517 (stating that "individual damages issues do not defeat an otherwise valid class certification attempt"); *Greene v. Emersons Ltd.*, 86 F.R.D. 47, 61 (S.D.N.Y. 1980).

In this case, IPPs have no interests that conflict with those of the State Classes. All indirect purchasers of Class 8 Transmissions have been and are impacted adversely by Defendants' conspiracy because their ability to purchase Class 8 Transmissions has been and is

restricted by Defendants' conduct, and IPPs and class members have paid artificially inflated prices for Class 8 Transmissions as a result. Each Plaintiff and member of the State Classes has a strong interest in proving the existence of Defendants' illegal price-fixing conspiracy and their illegal monopoly, and in establishing the appropriate measure of damages. Each IPP proving a claim will necessarily be supporting the claims of all members of the State Classes. The interests of IPPs and the interests of the proposed State Classes are, therefore, in harmony.

Finally, IPPs have engaged qualified, experienced and capable attorneys for this type of litigation. Interim Class counsel each have extensive experience in federal antitrust and class action litigation, and have served with distinction as lead or co-lead counsel in numerous major class actions in courts located throughout the United States.[42] Counsel possess the ability and willingness to vigorously prosecute this action and to obtain the best possible result.

**B.**     **This Action Fulfills All Of The Requirements Of Rule 23(b)(3)**

In addition to Rule 23(a) requirements, class certification requires one of the mandates of Rule 23(b) to be met as well. Rule 23(b)(3) requires, *inter alia*, a showing that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**1.     The State Classes Should Be Certified Under
Rule 23(b)(3) Because Issues Of Fact Predominate**

Certification under Rule 23(b)(3) is appropriate where "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient

---

[42] The resumes of Interim Class Counsel Glancy Binkow & Goldberg LLP and Gunderson Sharp, LLP are attached to the Albert Declaration as Exhibits 46 and 47.

adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). A predominance of common questions does not require unanimity of common questions, but rather that common questions outweigh individual questions. *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 185 (3d Cir. 2001); *Brooks v. Educators Mut. Life Ins. Co.*, 206 F.R.D. 96, 104 (E.D. Pa. 2002); *In re Sugar Indus.*, 73 F.R.D at 345. Rule 23(b)(3)'s predominance inquiry asks whether the proposed class is "sufficiently cohesive to warrant adjudication by representation, and assesses whether a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (internal quotation marks omitted). Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen,* 133 S.Ct. at 1196 (emphasis in original, internal quotation marks, brackets omitted). Rather, Rule 23(b)(3) merely requires "that common questions *predominate* over any questions affecting only individual class members." *Id.* (emphasis in original); *see also Prudential II*, 148 F.3d at 315 ("[T]he presence of individual questions does not *per se* rule out a finding of predominance."). Here, Defendants' conduct presents a host of common issues that predominate over any individual issues.

Courts routinely find that common questions predominate in antitrust conspiracy cases. In *In re Flat Glass Antitrust Litigation*, the Third Circuit held that "an allegation of a conspiracy is often viewed as a central or single *overriding* issue or a common nucleus." 191 F.R.D. 472, 478 (W.D. Pa. 1999). The court reasoned that:

> The predominance requirement is met if there is one underlying conspiracy alleged to have affected all members of a class, and damages are ascertainable on a general level, . . . [and] . . . any difference in the manner in which the conspiracy was manifested throughout marketing and distribution of the various products does not change the common question, namely, whether defendants acted in concert to decrease competition among themselves.

*Id.* at 484-85.

As stated by the U.S. Supreme Court, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prod. Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *Warfarin*, 391 F.3d at 528 (*quoting* same); *Teva,* 252 F.R.D. at 227 (*quoting* same); *Infant Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *6 (N.D. Fla. Jan. 13, 1992) (stating that "[w]here a horizontal price-fixing conspiracy is alleged, the questions common to the class predominate over questions that may affect only individual class members").

Plaintiffs must "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 522 F.3d at 311-12. To satisfy that burden, Plaintiffs must establish that their theory of impact is "plausible in theory" and "susceptible to proof at trial through available evidence common to the class." *Id.* at 325.

Here, the common issues surrounding IPPs' allegation of a conspiracy satisfy the predominance test. Common issues that predominate for all State Class members include: (1) whether Defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the prices of Class 8 Transmissions; (2) whether Defendants monopolized or engaged in a conspiracy to monopolize trade and commerce in the market for Class 8 Transmissions sold to consumers in the United States; and (3) whether Defendants' conduct caused the prices of Class 8 Transmissions to be maintained at higher levels than would exist in a competitive market. Courts routinely find such issues predominate and support certification under Rule 23(b)(3).

Common questions of Defendants' conduct predominate over the possibility of individualized damages. A diversity of products and prices is not an impediment to class

classwide basis. *Plastic Cutlery*, 1998 WL 135703, at \*5-8; *Lumco Indus. Inc. v. Jeld-Wen, Inc.*, 171 F.R.D. 168, 174 (E.D. Pa. 1997) (stating that the "[p]laintiffs need only make a threshold showing that the element of impact will predominately involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class.").[43] It is well-established that "'courts generally find predominance where individual proof of damages exist, but do not predominate over questions of liability.'" *Jerry Enter.*, 178 F.R.D. at 446 (citing 5 Moore's Federal Practice § 23.46[2][a] at 23-208); *see also Warfarin*, 391 F.3d at 530 (holding that "any material variations [in damages] could be considered in the context of calculating damages as well as in assessing the fairness of the settlement"); *Brooks*, 206 F.R.D. at 108 (stating that "it is well settled that 'the necessity for calculation of damages on an individual basis should not preclude class determination") (citations omitted); *Prudential I*, 962 F. Supp. at 517 (stating that "[i]ndividualized damages issues do not defeat an otherwise valid class certification attempt").[44] Additionally, classwide proof is not required for all issues. Instead, Rule 23(b)(3) simply requires a showing that the questions common to the class predominate

---

[43] Some courts have observed that because the existence of the alleged conspiracy is such an overwhelmingly predominate issue, "[e]ven if common impact cannot be proven, the Court may certify the Class." *In re Citric Acid Litig.*, No. 95-1092, 1996 WL 655791 at \*8 (N.D. Cal. Oct. 2, 1996).

[44] *See also Sugar Indus.*, 73 F.R.D. at 344 (observing that "uniformly, courts have rejected arguments that various disparate facts relating to the claims of possible class members preclude the finding that common conspiracy issues predominate") and 354 (stating that "no wrongdoer should be entitled to complain that damages cannot be measured with the precision that would have been possible had the situation it alone caused been otherwise" and that denying class actions because of differences in individualized damages "would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action.")

over individual questions. *In re Urethane Antitrust Litig. v. Seegott Holdings, Inc., et al*, 2014

WL 4801253, at *6 (10th Cir. Sept. 29, 2014).

IPPs' expert, Dr. Russell Lamb, presents a classwide methodology to measure damages

to all consumers, using a "benchmark" model, whereby he determines prices that would have

prevailed in a world free of the alleged misconduct, called "but-for" prices. The benchmark

methodology is an accepted method for calculating damages in the field of antitrust economics

and has received widespread judicial acceptance. *See, e.g,. In re Scrap Metal Antitrust Litig.*, 527

F.3d 517, 531 (6th Cir. 2008) (upholding testimony of expert who "performed his analysis

according to a reliable method (the 'during and after' method) and reliably applied that method

to the facts of this case").[45] *See also In re Neurontin Antitrust Litig.*, MDL No. 1479, 2011 WL

286118, at *10 (D.N.J. Jan. 25, 2011) (finding such benchmark analyses to be "judicially

recognized and commonly accepted"); and *Am. Sales Co., Inc. v. SmithKline Beecham Corp.*,

274 F.R.D. 127, 136, (stating, "[t]his method has been recognized as a 'judicially recognized and

commonly accepted' method of modeling classwide antitrust damages, and has previously served

as the basis for a finding of predominance on the question of damages"); *see Teva*

*Pharmaceuticals USA* 252 F.R.D. at 229 *(citing In re Linerboard*, 305 F.3d 145, 153–55 (finding

---

[45] *See also In re Chocolate Confectionary Antitrust Litig.*, 1:08–MDL–1935, 2012 WL 6652501, at *21 (M.D. Pa. Dec. 7, 2012) (because expert presented "statistically feasible methods for estimating damages on a classwide basis, including his use of a 'before and after' (i.e. benchmark and damages period) approach, multiple regression analysis, and a compilation of various price indices based on transactional data provided by Defendants as well as data which is publically available," class certification was warranted as plaintiffs' liability theory was "'sufficiently cohesive' such that 'adjudication by representation' is the proper method for proceeding with this litigation"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02–1486 PJH, 2006 WL 1530166, at *10 (N.D. Cal. Jun. 5, 2006) ("[T]he before/after methodolog[y] ... [has] already [been] upheld [ ] as [a] valid means for proving damages on a classwide basis, and this court has found no reason to reject [it] at this stage of the proceedings").

a benchmark analysis that was supported by data could be effectively applied in an overcharge situation).

Dr. Lamb's damages model is comprised of three steps. First, he calculated the overcharge on Eaton Class 8 Linehaul transmission sales to the OEMs. Dr. Lamb analyzed the various data provided by the Defendants, and compared the price paid by the OEMs for the transmissions with various factors affecting price to create a regression model. Lamb Direct Report at ¶¶ 179-90.

Second, in order to measure the damages to direct purchasers, Dr. Lamb created another regression model, using the transaction data provided by the OEMs, to determine that at least a portion of the overcharges were passed from the OEMs to direct purchasers. *Id.* at ¶¶ 192-212. Dr. Lamb calculated that, as a result of this pass through, the direct purchaser class suffered $398.4 million in damages during the Class Period. *Id.* at ¶ 212.

Third, Dr. Lamb then used yet another regression model, using third party transaction data provided by truck dealers, to calculate the damages that were passed on from direct purchaser dealers to end user indirect purchaser class members. Lamb Indirect Report at ¶¶ 40-51. Dr. Lamb calculated that 94.2% of the overcharges were passed from direct purchasers to indirect purchasers,[46] and as a result of this pass through, the State Classes (who amount to

---

[46] In addition to the regression analysis, Dr. Lamb provides additional factors that demonstrates almost complete pass-through of the overcharge. Dr. Lamb demonstrates that because dealers' margins were so low (often in the 1% to 2% range), the vast majority of overcharge is passed on from dealers to end customers. Lamb Indirect Report at ¶¶ 25-33. Similarly, Dr. Lamb points to documentary evidence in the record indicating that Defendants were aware of this pass through, and expected that dealers would pass price increases on to their customers. *Id.* at ¶ 36.

approximately 31.7% of new truck purchasers during the Class Period) suffered $91,391,262 in damages.[47]

As stated above and in Dr. Lamb's Direct and Indirect Reports, these are generally accepted methodologies used to prove damages in antitrust cases. As a result, Dr. Lamb's methodology demonstrates that damages can be calculated for all class members using common proof. Accordingly, classwide issues of damages will predominate here.

2. **The State Classes Should Be Certified Under Rule 23(b)(3) Because Common Issues Predominate Across The State Laws At Issue**

Federal courts have regularly certified classes with various state antitrust claims. In *In re Relafen*, the court concluded that the state laws' reliance on federal antitrust statutes and interpretation rendered them sufficiently common to create predominance among the class. Specifically, the court found that "[w]ith respect to substantive matters . . . these state statutes [allowing indirect purchaser claims under state antitrust law] uniformly parallel their federal counterparts, the Sherman Act and the Federal Trade Commission Act." 221 F.R.D. at 278. Similarly, in *Terazosin Hydrochloride*, the court held that:

> Although each proposed class is proceeding under its own state law, class certification pursuant to Rule 23(b)(3) is nonetheless appropriate where there is a commonality of substantive law applicable to all class members. . . . Indirect Purchaser Plaintiffs have cited case law under each state antitrust statute interpreting the acts coextensively with the federal antitrust laws. . . . [T]he essential elements of Indirect Purchaser Plaintiffs' antitrust claims do not vary significantly from state-to-state, and they are susceptible to proof using common evidence.

220 F.R.D. at 695. The court went on to analyze the elements of conspiracy and monopolization under state statutes allowing claims by indirect purchasers, and concluded that:

---

[47] If the Class Period is limited to October 1, 2002 through March 31, 2010, Dr. Lamb found $56,862,766 in damages.

> In general, a *federal or state* claim based upon a theory of antitrust conspiracy raises three ultimate issues to be proven at trial: (1) the existence of a contract, combination or conspiracy in restraint of trade (liability); (2) injury-in-fact (antitrust injury); and (3) the extent of injury (damages).

*Id.* (emphasis added). The court found that "all proof relative to Defendants' alleged conspiracy to restrain trade is common to the members of each of the state classes," and that plaintiffs' intention to rely on generalized evidence of a conspiracy "will apply to each class as a whole." *Id.*

> With respect to monopolization, the court concluded that:

> "[w]hether proceeding under federal or state antitrust law, claims of monopolization are generally proven by demonstrating: (1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance or use of that power by anti-competitive or exclusionary means. . . . In the instant case, all proof relevant to the monopolization of claims is common to each of the state classes."

220 F.R.D. at 695-96 (citations omitted).

The Court concluded that common questions of law predominated, because the same evidence would be used to prove common elements to show a violation of each state antitrust law.[48] *Id.*

The state antitrust statutes of which plaintiffs allege violations are substantially similar to each other and to the federal antitrust statutes they were modeled after. As evidenced by the language of the state statutes provided in Exhibit 1 to the Albert Declaration, the language of

---

[48] *See also Warfarin*, 391 F.3d at 530 ("the fact that there may be variations in the rights and remedies available to injured class members under the various laws of the fifty states in this matter does not defeat commonality and predominance."); *Elliott v. ITT Corp.*, 150 F.R.D. 569, 579 (N.D. Ill. 1992) (certifying class with federal claims and state consumer protection claims, holding that "the application of different state laws is not in itself a deterrent to class certification"); *In re Busiprone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (holding that "when a class action raises common issues of conduct that would establish liability under a number of different States' laws, it is possible for those common issues to predominate and for class certification to be an appropriate mechanism for handling the dispute.").

nearly all of the state laws is identical or substantially similar to the Sherman Act. Because state antitrust laws at issue in this case mirror the Sherman Act and largely require common elements to be met, defendants' liability under the statute is a common issue that predominates among the proposed State Classes. The same elements and proof will be applied to all of the state antitrust laws. The fact that the state antitrust statutes at issue in this case allow indirect purchasers to recover damages does not change the substantive interpretation of liability under the statute, which, as shown above and in Exhibit 1 to the Albert Declaration, mirrors federal law and uses interpretations of federal antitrust law.

Similarly, the Florida consumer protection statute at issue provides a private right of action to consumers, and proving the same unlawful conduct which would violate the state antitrust statutes will also prove violations of those statutes. The Florida Deceptive & Unfair Trade Practices Act ("FDUTPA"), F.S.A. §§ 501.201, *et seq.* is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Courts have held that causation under FDUTPA is subject to the same common proof as the state antitrust laws at issue.

As discussed above, the Defendants' conduct is common across the State Classes. It is well-established that state antitrust statutes are similar in language and interpretation to Sections 1 and 2 of the Sherman Act. Because the determinative factual and legal issues for the State Classes are common, and predominate over individual issues, the predominance requirement is met.

> **3.    A Class Action Is Superior To Any Alternative Method
> For The Fair And Efficient Adjudication Of This Controversy**

Under Rule 23(b)(3)'s superiority requirement, class certification is appropriate where it

is "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 593; *see also In re LifeUSA Holding Inc.*, 242 F.3d 136, 143 (3d Cir. 2001). "The rule asks [a court] to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Georgine v. Amchem Prods.*, 83 F.3d 610, 632 (3d Cir. 1996).

The size of the proposed State Classes here and the amount at stake for each plaintiff not only makes a class action lawsuit the most convenient means of adjudicating this case; it also renders a class action the sole vehicle by which a fair and efficient resolution can be attained. The class action is a superior means by which to adjudicate matters such as these because it will "(1) prevent a multiplicity of suits that would waste judicial resources . . . (2) avoid the risk of inconsistent judgments, and (3) enable plaintiffs with small claims to get into court." *Brooks*, 206 F.R.D. at 108.

Moreover, "[s]ince antitrust actions typically present many complicated issues, the courts should utilize these [class action] provisions to settle the common issues on a representational basis to avoid congesting the courts with separate actions requiring the repetitive adjudication of the same matters." 7B Wright, Miller & Kane, Wright & Miller's Federal Practice and Procedure, §1781 (1986); *see also In re Relafen Antitrust Litig.*, 221 F.R.D. at 287 (quoting same). In *In re Relafen Antitrust Litigation*, the court held that in a class action with federal and state law claims, "the vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all" made the class action superior, because "protection of the public depends upon vigorous private enforcement of state laws but the small size of individual claims renders such enforcement unlikely." 221 F.R.D. at 287 (internal quotation marks and citations omitted). After all, "[t]he realistic alternative to a

class action is not 17 million individual suits, but zero individual suits". *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

Similarly, in *In re Terazosin Hydrochloride Antitrust Litigation*, the court found that a class action was the superior method of addressing claims by indirect purchasers of terazosin hydrochloride brought under various state laws. The court reasoned that "as to the consumer class members, the class action device is particularly appropriate where, as here, it is necessary to 'permit the plaintiffs to pool claims, which would be uneconomical to litigate individually.'" 220 F.R.D. at 700 (*quoting Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985)).

Considering the size of the State Classes proposed here, the predominating commonality of the allegations and proof involved, the impracticability of joinder, the extraordinary problems which would be created by individual litigation of all of the State Class members' claims, the size and scope of the individual claims, and the other policy considerations set forth above, it is clear that a class action is the only fair and efficient means of adjudicating this case, and therefore, is far superior to any alternative methods of resolving these disputes.

### 4.    All Four Additional Factors Pertinent To Predominance And Superiority Support Class Certification In This Case

Additional factors pertinent in determining predominance and superiority include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

### a.   Factors 23(b)(3)(A) – (C) Are Present Here

All of the class members suffered pecuniary loss and thus have an interest in utilizing the efficient and cost-effective class action mechanism to ensure they are adequately represented and that their claims against Defendants may be heard. Absent the class action device, most or all of these class members would not be in a financial position to pursue their claims individually, given the relatively small individual damages when compared with the high expense of litigating an antitrust case like this one. Prior to the filing of this action, no litigation was commenced by any actual or potential State Class member. As detailed above regarding superiority, it is desirable to litigate class members' claims in one forum, namely a federal court with jurisdiction to hear all state law claims arising out of the defendants' course of conduct, because it is efficient and eliminates the possibility of conflicting rulings.

### b.   IPPs' Claims Are Manageable, Therefore, 23(b)(D) Is Satisfied

Federal courts regularly find that manageability is not a problem in multi-state class actions, where the state laws at issue are in harmony and the common issues are legion. In *Relafen*, the court concluded that "having thoroughly examined the relevant statutes . . . the remaining states' laws are neither so varied nor so numerous as to render this action unmanageable," and "any damages-related difficulties could be more appropriately dealt with as they arose." 221 F.R.D. at 288. In *Terazosin Hydrochloride*, the Court found "because common issues of the alleged illegal conduct by Defendants predominate, variations in individual state unjust enrichment laws are not a manageability concern," especially given that "applicable substantive laws are virtually identical in their required elements." 220 F.R.D. at 701. Accordingly, the existence of the state law classes here does not make this case unmanageable, because the state consumer laws and state antitrust laws are all substantially similar.

C.    **The Members Of The State Classes Are Ascertainable**

Courts in the Third Circuit, when determining whether a class should be certified, also examine whether the putative class is objectively ascertainable. *Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013). Ascertainability serves the following objectives:

> (1) it eliminates administrative burdens that would run counter to the intended efficiency of class actions in general; (2) it serves to protect absent class members by ensuring that "the best notice practicable" can be provided to class members; and (3) it protects defendants by clearly identifying those who will be bound by the final judgment.

*McPeak v. S-L Distribution Co. Inc.*, Civ. No. 12-348, 2014 WL 4388562, at *10 (D.N.J. Sept. 5, 2014) (*citing Marcus,* 687 F.3d at 593).

Here, the members of the State Classes are ascertainable. Each truck can be identified by a vehicle identification number ("VIN"). Data provided by the Defendants contain the VIN of each Truck sold, the transmission for each Truck, the direct purchaser of that truck, and, in some instances, the end purchaser of the Truck. Lamb Indirect Report at ¶ 52. Proposed class members could be identified through various methods, including the use of vehicle registration data or through Truck Dealers. *Id.* Accordingly, affected class members can be clearly ascertained by the use of VIN numbers. *See Eisen v. Porsche Cars NA, Inc.*, No. 2:11cv9405 (CAS)(FFMx), 2014 WL 439006, at *1 n.1 (C.D. Cal. Jan. 30, 2014) (approving settlement where class was identifiable through VIN number); *Browne v. American Honda Motor Co., Inc.*, No. CV 09–06750 MMM (DTBx), 2010 WL 9499072, at *1 (C.D. Cal. Jul. 29, 2010) (same).

## CONCLUSION

For the foregoing reasons, as well as the reasons in the Lamb Direct Declaration and Lamb Indirect Declaration, the IPPs have met the requirements of Fed. R. Civ. P. 23. Accordingly, the State Classes should be certified. Furthermore, for the reasons set forth above,

the law firms of Glancy Binkow & Goldberg LLP and Gunderson Sharp LLP should be appointed as Class Counsel.

Dated: November 3, 2014

Respectfully Submitted,

BIFFERATO LLC

*/s/ Thomas F. Driscoll III*
Ian Connor Bifferato (#3273)
Thomas F. Driscoll III (#4703)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 225-7600
Facsimile: (302) 254-5383
cbifferato@bifferato.com
tdriscoll@bifferato.com

*Liaison Counsel for Plaintiffs*

GLANCY BINKOW & GOLDBERG LLP
Brian P. Murray
Lee Albert
Gregory B. Linkh
122 E. 42nd Street
New York, New York 10168
Telephone: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

GUNDERSON, SHARP LLP
Joseph R. Gunderson
21 E. Walnut Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 288-0219
Facsimile (515) 288-0328
jgunderson@midwest-law.com

GUNDERSON, SHARP LLP
David E. Sharp
712 Main Street, Ste. 1400
Houston, TX 77002
Telephone: (713) 490-3822
Facsimile: (713) 583-5448
dsharp@midwest-law.com

*Interim Class Counsel for Plaintiffs*


STUEVE, SIEGEL AND HANSON LLP
Jason S. Hartley
Jason M. Lindner
550 West C. Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822

GOLDMAN SCARLATO AND PENNY LLP
Brian Penny
Douglas Bench Jr.
101 E. Lancaster Ave., Suite 204
Wayne, PA 19087
Tel: (484) 342-0700
Fax: (484) 580-8729

KARON LLC
Daniel R. Karon
700 W. Saint Clair Ave.
Cleveland, OH 44113
Phone: (216) 551-9175
Fax: (216) 241-8175

*Additional Counsel for Indirect Plaintiffs*