**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE CLASS 8 TRANSMISSION INDIRECT PURCHASER ANTITRUST LITIGATION | )<br>)   Civil Action No. 11-cv-00009-SLR<br>)   REDACTED PUBLIC VERSION |

## DEFENDANTS' BRIEF IN OPPOSITION TO
## INDIRECT PURCHASER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

M. Duncan Grant (DE Bar No. 2994)
PEPPER HAMILTON LLP
1313 Market Street, Suite 5100
Wilmington, DE 19899-1709

PEPPER HAMILTON LLP
Philadelphia, PA

*Attorneys for Defendants Mack Trucks Inc.
and Volvo Trucks North America*

Kelly E. Farnan (DE Bar No. 4395)
RICHARDS, LAYTON & FINGER, PA
920 North King Street
Wilmington, DE 19801

KIRKLAND & ELLIS LLP
Chicago, IL

*Attorneys for Defendants Navistar
International Corporation and Navistar, Inc.
f/k/a International Truck and Engine
Corporation*

Donald E. Reid (DE Bar No. 1058)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
Wilmington, DE 19899
(302) 351-9219

BAKER BOTTS LLP
1299 Pennsylvania Ave. NW
Washington, D.C.

*Attorneys for Defendant Eaton Corporation*

James D. Heisman (DE Bar No. 2746)
NOVAK DRUCE CONNOLLY BOVE
QUIGG LLP
1007 North Orange Street
Wilmington, DE 19899

PERKINS COIE LLP
Seattle, WA

*Attorneys for Defendants PACCAR Inc.,
Kenworth Truck Co., and Peterbilt Motors Co.*

John A. Sensing (DE Bar No. 5232)
POTTER ANDERSON & CORROON LLP
1313 North Market Street
Wilmington, DE 19899-0951

HOGAN LOVELLS US LLP
Washington, DC

*Attorneys for Defendant Daimler Trucks North
America LLC (f/k/a Freightliner LLC)*

Dated:  January 23, 2015
Redacted Version Filed:  January 30, 2015

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS .......................................................................... 3

FACTUAL BACKGROUND ..................................................................................................... 4

      A.     THE CLASS 8 TRUCKS AT ISSUE ARE BUILT-TO-ORDER, CUSTOMIZED PRODUCTS SOLD IN A "HIGHLY COMPETITIVE" INDUSTRY ................................................................. 4

      B.     THE DISTRIBUTION CHAIN AND THE PROPOSED SUBCLASSES INCLUDE RESELLERS AND LEASING COMPANIES ................................................................................ 6

      C.     GIVEN THE INTENSE COMPETITION IN THE CLASS 8 TRUCK INDUSTRY, DEALERS, OEMS, AND EATON ALL OFFER VARIOUS INDIVIDUALIZED INCENTIVES TO WIN SALES ................................................................................................. 8

      D.     THE NAMED PLAINTIFFS ................................................................. 10

ARGUMENT ............................................................................................................................ 11

   I.     CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INDIVIDUAL ISSUES PREDOMINATE UNDER RULE 23(B)(3) ................ 11

      A.     Plaintiffs Cannot Show Antitrust Impact or Damages with Common Proof ........................................................................................ 12

           1.     Plaintiffs' Inability to Show That Direct Purchasers Paid an Alleged Transmission "Overcharge" With Common Proof Dooms Predominance Here as in the *Wallach* Matter ................ 14

           2.     Proof of Pass-Through Requires an Individualized, Transaction-by-Transaction, Reseller-by-Reseller Analysis ....... 14

               a.     Determining an Indirect Purchaser's Actual Price for a Class 8 Truck Requires an Individualized Inquiry .......................................................................... 15

               b.     Each Class 8 Truck Is Unique and Sold in a "Highly Competitive" Industry .................................................... 17

               c.     The Complex Distribution Chain Requires a Reseller-by-Reseller Analysis of Pass-Through .............. 18

               d.     Dr. Lamb's Pass-Through Analysis Is Fundamentally Flawed .................................................... 21

B.     Other Individualized Claims and Defenses Overwhelm Common Issues ................................................................................................. 23

C.     Plaintiffs' Proposed Class Action Is Unmanageable and Cannot Satisfy Rule 23(b)(3)'s Superiority Requirement ................................... 26

II.     PLAINTIFFS ALSO FAIL TO SATISFY RULE 23(a)'S TYPICALITY AND ADEQUACY REQUIREMENTS .............................................................. 27

A.     The Named Plaintiffs Are Not Typical of Large Fleet and Leasing Company Class Members ....................................................................... 28

B.     Fundamental Intra-Class Conflicts Defeat Adequacy ............................ 30

C.     Plaintiffs Are Not Adequate As They Lack Even A Basic Understanding of Their Claims and Duties as Class Representatives ...................................................................................... 32

D.     The Michigan and Vermont Subclasses Cannot Be Certified Because Cordes and Prosper Lack Standing ........................................... 34

E.     Plaintiffs and/or Members of the Subclasses They Seek to Represent Have Unique Claims or Defenses ......................................... 36

III.     THE PUTATIVE SUBCLASSES ARE NOT ASCERTAINABLE ................... 38

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen-Wright v. Allstate Ins. Co.*,
    2008 WL 5336701 (E.D. Pa. Dec. 17, 2008).............................................................37

*Am. Seed Co. v. Monsanto Co.*,
    238 F.R.D. 394 (D. Del. 2006) ...........................................................................14, 27, 34

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)............................................................................................12, 23, 27

*Apanewicz v. Gen. Motors Corp.*,
    80 F.R.D. 672 (E.D. Pa. 1978).....................................................................................27, 32

*Aryeh v. Canon Bus. Solutions, Inc.*,
    292 P.3d 871 (Cal. 2013) ................................................................................................25

*Baby Neal v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ...............................................................................................27

*Beck v. Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006)..................................................................................27, 35, 36

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ..........................................................................................13

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ..........................................................................................27

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ..........................................................................................13

*Byes v. Telecheck Recovery Servs., Inc.*,
    173 F.R.D. 421 (E.D. La. 1997)......................................................................................34

*Byrd v. Aaron's, Inc.*,
    2014 WL 1316055 (W.D. Pa. Mar. 31, 2014) ...............................................................39

*Carnival Corp. v. Rolls-Royce PLC*,
    2009 WL 3861450 (S.D. Fla. Nov. 17, 2009)................................................................25

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013)..................................................................................37, 38, 39

*Chin v. Chrysler Corp.*,
    182 F.R.D. 448 (D.N.J. 1998).................................................................................23, 26

*Clayworth v. Pfizer, Inc.*,
   233 P.3d 1066 (Cal. 2010) ...................................................................................7

*Comcast v. Behrend*,
   133 S. Ct. 1426 (2013) ...................................................................11, 12, 13, 23

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) .......................................................................30, 36

*Dewey v. Volkswagen Aktiengesellschaft*,
   681 F.3d 170 (3d Cir. 2012).................................................................................30

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982)......................................................................................12, 27

*Georgine v. Amchem Prods., Inc.*,
   83 F.3d 610 (3d Cir. 1996) ..........................................................................23, 31

*Grandalski v. Quest Diagnostics Inc.*,
   767 F.3d 175 (3d Cir. 2014)................................................................................25

*Grodko v. Cent. European Distrib. Corp.*,
   2012 WL 6595931 (D.N.J. Dec. 17, 2012)........................................................37

*Hanover Shoe, Inc. v. United Shoe Machine Corp.*,
   392 U.S. 481 (1968)............................................................................................31

*Hansberry v. Lee*,
   311 U.S. 32 (1940)..............................................................................................32

*Haskins v. First Am. Title Ins. Co.*,
   2014 WL 294654 (D.N.J. Jan. 27, 2014) .....................................................21, 39

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013)................................................................................34

*In re AEP ERISA Litig.*,
   2008 WL 4210352 (S.D. Ohio Sep. 8, 2008)......................................................34

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996) ..............................................................................26

*In re Cmty. Bank of N. Virginia*,
   622 F.3d 275 (3d Cir. 2010)................................................................................30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ...................................................13

*In re Elscint. Ltd, Sec, Litig.*,
674 F. Supp. 374 (D. Mass. 1987) ..................................................................25

*In re Flash Memory Antitrust Litig.*,
2010 WL 2332081 (N.D. Cal. June 9, 2010) ..................................14, 19, 20

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D. Pa. 1999) ....................................................................21

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,
2012 WL 379944 (D.N.J. Feb. 6, 2012) ..........................................................26

*In re Goldchip Funding Co.*,
61 F.R.D. 592 (M.D. Pa. 1974)..................................................................32, 34

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008)...............................................14, 20, 29, 30

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)..........................................................1, 12, 13

*In re Intel Corp. Microprocessor Antitrust Litig.*,
2014 WL 6601941 (D. Del. Aug. 6, 2014) ...........................21, 29, 30, 39

*In re K-Dur Antitrust Litig.*,
686 F.3d 197 (3d Cir. 2012)............................................................................31

*In re Lord Abbett Mut. Funds Fee Litig.*,
407 F. Supp. 2d 616 (D.N.J. 2005) ................................................................35

*In re Methionine Antitrust Litig.*,
204 F.R.D. 161 (N.D. Cal. 2001)....................................................................14

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008).......................................................................13, 39

*In re Optical Disk Drive Antitrust Litig.*,
--- F.R.D. ----, 2014 WL 4965655 (N.D. Cal. Oct. 3, 2014) ..........14, 29, 30

*In re OSB Antitrust Litig.*,
2007 WL 2253425 (E.D. Pa. 2007) .........................................................20, 23

*In re Plastic Cutlery Antitrust Litig.*,
1998 WL 135703 (E. D. Pa. Mar. 20, 1998)..................................................13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ...............................................................12, 13, 23

*In re Sch. Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986)..................................................................................26

*In re Schering Plough Corp. ERISA Litig.*,
   589 F.3d 585 (3d Cir. 2009)............................................................................36, 37

*In re Warfarin Sodium Antitrust Litigation*,
   391 F.3d 516 (3d Cir. 2004)..................................................................................20

*In re Static Random Access Memory Antitrust Litig.*,
   264 F.R.D. 603 (N.D. Cal. 2009)..........................................................................13

*In re Sugar Indus. Antitrust Litig.*,
   73 F.R.D. 322 (E.D. Pa. 1976)..............................................................................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 253298 (N.D. Cal. Jan. 26, 2012) .........................................................13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2012 WL 6709621 (N.D. Cal. Dec. 26, 2012) ........................................................7

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   267 F.R.D. 583 (N.D. Cal. 2010)..........................................................................13

*In re Vitamins Antitrust Litig.*,
   259 F. Supp. 2d 1 (D.D.C. 2003) ............................................................................7

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143 (E.D. Pa. 2009)............................................................................35

*Kelley v. Mid-Am. Racing Stables, Inc.*,
   139 F.R.D. 405 (W.D. Okla. 1990).......................................................................34

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
   337 F.3d 314 (3d Cir. 2003)..................................................................................37

*Lumco Indus. Inc. v. Jeld-Wen, Inc.*,
   171 F.R.D. 168 (E.D. Pa. 1997).......................................................................13, 23

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012).......................................................................37, 38, 40

*Martin v. Ford Motor Co.*,
   292 F.R.D. 252 (E.D. Pa. 2013)............................................................................35

*Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of*
   *Legal Affairs*,
   761 So. 2d 1256 (Fla. Ct. App. 2000)...................................................................25

*Nasir v. Morgan*,
    350 F.3d 366 (3d Cir. 2003)............................................................................34

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001).....................................................................12, 26

*Ogden v. Americredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) ................................................................32

*Richburg v. Palisades Collection LLC*,
    247 F.R.D. 457 (E.D. Pa. 2008)..................................................................36

*Rose v. Vulcan Materials Co.*,
    194 S.E.2d 521 (N.C. 1973).........................................................................25

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441 (E.D. Pa. 2000)..................................................................35

*Schenley Distillers Corp. v. United States*,
    326 U.S. 432 (1946)....................................................................................34

*Site Microsurgical Sys., Inc. v. Cooper Cos., Inc.*,
    797 F. Supp. 333 (D. Del. 1992)................................................................34

*Spinelli v. Capital One Bank*,
    265 F.R.D. 598 (M.D. Fla. 2009)...............................................................34

*Teva Pharm. USA, Inc. v. Abbott Labs.*,
    252 F.R.D. 213 (D. Del. 2008) ...................................................................20

*Tucker v. BP Am. Prod. Co.*,
    278 F.R.D. 646 (W.D. Okla. 2011).............................................................32

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ..................................................................31

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*,
    546 U.S. 164 (2006).......................................................................................5

*W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*,
    712 F.3d 165 (3d Cir. 2013)........................................................................24

*Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*,
    453 F.3d 179 (3d Cir. 2006)........................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011).................................................................1, 11, 12, 27

*Wallach, et al. v. Eaton Corp., et al.*,
    No. 10-260-SLR (D. Del.) ............................................................................. passim

*Walsh v. Ford Motor Co.*,
    807 F.2d 1000 (D.C. Cir. 1986) ......................................................................... 25

*Warden v. Crown Am. Realty Trust*,
    1998 WL 725946 (W.D. Pa. Oct. 15, 1998), *aff'd*, 229 F.3d 1140 (3d Cir.
    2000) ............................................................................................................ 24, 25

*Weisman v. MCA Inc.*,
    45 F.R.D. 258 (D. Del. 1968) ............................................................................ 27

*Weiss v. York Hosp.*,
    745 F.2d 786 (3d Cir. 1984) ......................................................................... 27, 28

*ZF Meritor LLC v. Eaton Corp.*,
    No. 06-623-SLR (D. Del.) ................................................................................... 3

*Zimmerman v. HBO Affiliate Group*,
    834 F.2d 1163 (3d Cir. 1987) ............................................................................ 35

**STATUTES**

1995 N.C. Sess. Law 550 ........................................................................................ 25

**RULES**

Fed. R. Civ. P. 23 ......................................................................................... 1, 12, 13

Fed. R. Civ. P. 23(a) ........................................................................................ passim

Fed. R. Civ. P. 23(a)(2) .......................................................................................... 23

Fed. R. Civ. P. 23(a)(3) .................................................................................... 28, 35

Fed. R. Civ. P. 23(a)(4) .................................................................................... 27, 30

Fed. R. Civ. P. 23(b) .............................................................................................. 23

Fed. R. Civ. P. 23(b)(3) ..................................................................................... passim

Fed. R. Civ. P. 23(b)(3)(D) ................................................................................... 26

## SUMMARY OF ARGUMENT

As plaintiffs acknowledge, "class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met."  D.I. 185 ("IPP Br.") at 14 (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008)); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Plaintiffs here do not and cannot satisfy the requirements of Rule 23(a) and Rule 23(b)(3) by any measure, much less under the "rigorous analysis" standard the law requires.

First and foremost, for the reasons discussed at length in defendants' opposition to class certification in *Wallach*,[1] indirect plaintiffs cannot show through common proof that Eaton assessed an overcharge on all transmission sales to defendant truck manufacturers ("OEMs") or that each OEM passed the alleged overcharge on to its direct purchasers.  Because the theory of injury in *this* litigation depends first on a finding of overcharge to the direct purchasers, who then allegedly passed on the overcharge to the indirect purchasers, the plaintiffs' failure in *Wallach* condemns the indirect plaintiffs' class certification motion at its outset.  In short, if there is no common proof that the direct purchasers paid an overcharge in the first place, the indirect purchasers cannot possibly identify common proof that they were injured by a "pass-through" of that nonexistent overcharge.

Plaintiffs also cannot show that each of the hundreds and hundreds of direct purchasers passed on the alleged transmission overcharge to the myriad indirect purchasers because the individualized nature of the Class 8 truck sales at issue and the complexity of the distribution chain render "common" proof of class-wide impact impossible.  For example, some indirect purchasers received substantial monetary rebates on their transmission purchases, trade-in and

---

[1] *Wallach, et al. v. Eaton Corp., et al.*, No. 10-260-SLR (D. Del.).

trade-back benefits, and special financing terms that dramatically reduced the actual truck price they paid (and far exceeded the alleged passed-through overcharge); some indirect purchasers exercise buying leverage to refuse cost increases from dealers which, in turn, limits those dealers' ability to pass on any overcharge to those customers; and some indirect purchasers are truck resellers and leasing companies who themselves would pass on any alleged transmission overcharge to their customers—who are *also* putative class members.  Given the nature and complexity of the Class 8 truck industry, determining both impact (was there an overcharge?) and damage (how much?) would require an individualized inquiry into each truck sale.

Plaintiffs and their expert Dr. Lamb ignore these and other market realities and instead present a second pass-through model that is just as flawed and unreliable as the related methodology offered in *Wallach.*  In this case, Dr. Lamb's pass-through model is based upon *less than 1%* of the indirect truck sales he claims took place during the Class Period, by only *two* dealers, in a *single* state.  Dr. Lamb assumes, without testing, that the resulting pass-through rate is the same for *every* dealer in California and *every* dealer in the ten other states for which plaintiffs seek class certification.  Not only is this assumption unsupported, but widely accepted statistical testing by defendants' expert affirmatively demonstrates that it is false.

Certification is also improper under Rule 23(a).  Significant differences amongst the proposed representatives and the putative class members—including numerous claims and defenses unique to certain purchasers—and fundamental intra-class conflicts render the named plaintiffs' claims atypical and prevent them from adequately representing the absent subclass members' interests.   These problems are further compounded by the putative class representatives' fundamental lack of understanding of their claims and duties to the absent class members.

Finally, the proposed subclasses are not ascertainable.   Plaintiffs propose no administratively feasible, reliable way to identify the putative subclass members.

For all of these reasons, plaintiffs' motion for class certification should be denied.

## NATURE AND STAGE OF PROCEEDINGS

As in *Wallach*, this action was filed in 2010 on the heels of the jury verdict in the *ZF Meritor v. Eaton* litigation.[2]   Two of the current named plaintiffs filed this case against defendants in the U.S. District Court for the District of Kansas on October 4, 2010.  D.I. 1.  The suit was transferred to this Court on January 4, 2011, D.I. 17, and two additional named plaintiffs were added on February 4, 2011, D.I. 34.  Following this Court's October 16, 2012 ruling on defendants' motion to dismiss, D.I. 61, plaintiffs added six additional named plaintiffs.  D.I. 68.  Plaintiffs filed their third amended (and currently operative) complaint on January 15, 2013.  D.I. 73.  On November 3, 2014, plaintiffs moved for class certification.  D.I. 184.  Plaintiffs also moved to withdraw two named plaintiffs (seeking to represent California and Kansas subclasses).  At the same time—that is, nine months after the deadline to add new parties—plaintiffs moved to substitute in new named plaintiffs.  D.I. 180.  Defendants opposed that motion, D.I. 204, and it remains pending.[3]

The ten named plaintiffs seek class treatment of their claims in a single action, with eleven state subclasses of indirect purchasers to pursue claims under the antitrust laws of ten states, as well as Florida's consumer protection law.   D.I. 184; IPP Br. at 1, ¶ 1 & n.1.

---

[2] *ZF Meritor LLC v. Eaton Corp.*, No. 06-623-SLR (D. Del.).   As explained in the *Wallach* opposition, pages 2-3, the claims at issue here are fundamentally different from—and indeed contrary to—those at issue in that prior litigation.

[3] Were the Court to deny substitution, the Kansas and California subclasses could not be certified as there would be no proposed representative for either subclass.

Defendants oppose plaintiffs' motion.[4]

## FACTUAL BACKGROUND

### A.   THE CLASS 8 TRUCKS AT ISSUE ARE BUILT-TO-ORDER, CUSTOMIZED PRODUCTS SOLD IN A "HIGHLY COMPETITIVE" INDUSTRY

As explained in the DPP Opposition, the Class 8 trucks at issue here are highly customized products used for a host of different applications, including trucks that haul freight across country, trucks that haul logs down a mountain road, cement mixers, dump trucks, refuse vehicles, concrete booms, snow plows, and cranes.  There are hundreds of specific applications for Class 8 trucks, each of which generally requires a unique truck configuration and specialized components.[5]  Nearly every Class 8 truck is built-to-order for a specific application and based upon a specific customer's needs and preferences.  With dozens of different options for hundreds of components, there are literally thousands of potential truck configurations.  Because each truck is different, manufacturing costs for Class 8 trucks can vary by tens of thousands of dollars, even those with identical transmissions.[6]

Moreover, Class 8 trucks are sold in individualized, competitive bidding situations in what plaintiffs concede is a "highly competitive" industry.[7]  *See Volvo Trucks N. Am., Inc. v.*

---

[4] In support of their opposition, defendants rely on the arguments and authorities set forth herein, the Declaration of Cori Gordon Moore ("Moore Decl.") filed herewith, defendants' opposition to class certification in the *Wallach* matter ("DPP Opposition" or "Opp. to DPP"), which defendants incorporate by reference as though fully set forth herein, the Expert Report of Dr. John H. Johnson, IV filed in the *Wallach* matter ("Johnson DPP Rpt.," Ex. 1 to the Declaration of Jennifer Cowen), and the Expert Report of Dr. John H. Johnson, IV filed in the instant matter ("Johnson IPP Rpt.," Ex. 1 to the Moore Declaration.  All citations to exhibit numbers refer to exhibits to the Moore Declaration.

[5] *See* Johnson DPP Rpt., n.188; Ex. 1, Johnson IPP Rpt., ¶ 22.

[6] *See generally* Opp. to DPP, Factual Background §§ A, C.

[7] Ex. 50, Declaration of Russell Lamb ("Lamb IPP Rpt."), ¶ 26; *see also* Opp. to DPP, Factual Background § C.  Dealers occasionally purchase stock trucks, but in many cases ▮▮▮▮▮▮

*Reeder-Simco GMC, Inc.*, 546 U.S. 164, 170 (2006) (explaining that "the retail [Class 8] customer . . . invites bids from several dealers it selects" and identifying factors that impact the customer's selection of dealers). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

████████████████████████████████  ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  ██████████████████████████████

████████████████████████████████████████████████

████████  ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

<hr />

[8] *See* Opp. to DPP, Factual Background § C; Ex. 1, Johnson IPP Rpt., ¶ 21.

[9] Ex. 3, Aff. of R. Nuss, ¶¶ 30-31; Ex. 4, Aff. of J. Little, ¶¶ 27, 33-34; Ex. 5, Decl. of K. Treadway, ¶ 21.

[10] *See* Ex. 3, Aff. of R. Nuss, ¶ 31; Ex. 7, Aff. of E. Fite, ¶ 31; Ex. 4, Aff. of J. Little, ¶ 34.

[11] *See, e.g.*, Ex. 3, Aff. of R. Nuss, ¶ 20 ████████████

████████████████  ); Ex. 6, D. Hutter Dep. Tr. at 68:17-69:12 ████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

### B.   THE DISTRIBUTION CHAIN AND THE PROPOSED SUBCLASSES INCLUDE RESELLERS AND LEASING COMPANIES

The complex distribution chain for Class 8 trucks, which plaintiffs ignore entirely, interjects further competition and downward pricing pressure into the sales process. Plaintiffs wrongly assume that new trucks always follow the same, over-simplified distribution chain: OEM to national account end-users, or OEM to dealer to indirect-purchaser end-users. In reality, the distribution chain is much more complex.[14]

As an initial matter, authorized dealers often sell Class 8 trucks to entities that then *resell* the trucks to end users. Accordingly, in many instances, there will be multiple indirect purchasers of the *same* Class 8 truck, all of whom are in the proposed class. Plaintiffs ignore this significant conflict and the question of which indirect purchaser paid any alleged overcharge.[15] Moreover, the putative class members who resold trucks and passed on any alleged overcharge

---

[12] *See* Ex. 3, Aff. of R. Nuss, ¶¶ 24, 31; Ex. 7, Aff. of E. Fite, ¶¶ 23, 31; Ex. 4, Aff. of J. Little, ¶¶ 25, 34; Ex. 8, Decl. of G. Larson, ¶¶ 15, 17; Ex. 5, Decl. of K. Treadway, ¶¶ 18, 20; Ex. 9, Decl. of K. Gustainis, ¶ 17; *see generally* Opp. to DPP, Factual Background § C.

[13] *See, e.g.*, Ex. 3, Aff. of R. Nuss, ¶ 24 ████████████████████████████████████ ███████████████████████████████████████████; Ex. 7, Aff. of E. Fite, ¶¶ 23 (████); Ex. 4, Aff. of J. Little, ¶ 25 (████).

[14] *See* Ex. 1, Johnson IPP Rpt., ¶ 19 & Ex. 2.

[15] *See* Ex. 50, Lamb IPP Rpt., ¶ 20 ("[I]n order for members of the Indirect Purchaser Class to have been injured by the alleged misconduct, at least some portion of the overcharge would have to have been passed on to them *by Direct Purchaser Dealers* of Eaton Class 8 trucks.") (emphasis added); *cf.* Ex. 10, R. Lamb IPP Dep. Tr. at 14:1-8 ("█████████████████████████ ███████████████████████████████████████████ █████████").

may not recover damages under many of the relevant state statutes.[16]

These intermediate resellers include independent truck dealers [17] as well as body companies, also referred to as "bodybuilders."[18]  Body companies purchase thousands of Class 8 trucks per year from dealers,[19] mount a body to the truck—such as a cement mixer or refuse loader—and sell the complete package (chassis and body together) to other indirect purchasers.[20]  A body company's customer pays a price that is a function of both the truck cost *and* the body cost, which can be *much more than the truck cost.*[21]  Because body companies are selling a complete package that is often twice as costly as the truck alone, the actual pricing of a Class 8 truck in such transactions is very complex.  Determining if and to what degree the body company passed on any alleged overcharge on a truck's transmission, therefore, is an even more complex

---

[16] *See, e.g.*, *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010) (under California Cartwright Act, "defendants may assert a pass-on defense as needed to avoid duplication in the recovery of damages"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6709621, at *4, 7 (N.D. Cal. Dec. 26, 2012) (pass-on defense consistent with Michigan's and Minnesota's antitrust statutes); *see generally In re Vitamins Antitrust Litig.*, 259 F. Supp. 2d 1, 3 (D.D.C. 2003) ("[F]ive of twenty jurisdictions allowing for indirect purchaser claims explicitly provide a pass through defense [and] the majority . . . either allow a pass through defense or prohibit double recovery to limit liability to indirect purchasers.").

[17] Independent Class 8 truck dealers purchase trucks from authorized dealers and resell to  end-users who may have an immediate need for a truck.  *See, e.g.*, Ex. 11,  http://rdk.com; Ex. 12, http://www.trucks.com.

[18] *See, e.g.*, Ex. 13, EATON-00714354 at 356 ( ███████████████████████████████████████ ██████████████████████████ .

[19] *See* Ex. 3, Aff. of R. Nuss, ¶ 28; Ex. 1, Johnson IPP Rpt., Ex. 2 (Note).

[20] *See* Ex. 3, Aff. of R. Nuss, ¶ 17; Ex. 14, EATON-00908917 at 920 ("███████████████████████ ██████████████████████████████████ ); Ex. 15, PACCAR156407 at 423 (Kenworth T880 product presentation detailing "Special Equipment & Options" including "Multi-function Engine Connector For Bodybuilder Interface" and "Bodybuilder Harness to End of Frame"); Ex. 16, EATON-00189178 at 182 ("██████████ ███████████████████████████████████████████ ).

[21] *See, e.g.*, Ex. 17, http://www.altec.com/inventory at 10 (listing a new 2014 Peterbilt model 365 with boom body for $368,071).

and individualized inquiry than a straight dealer sale.[22]

Dealers also sell thousands of trucks per year to leasing companies.[23]  Leasing companies are yet another option for Class 8 truck users and provide further competition for dealers.



Given the highly competitive Class 8 truck industry, whether a leasing company would have passed on any alleged transmission overcharge (or even benefitted from it) varies transaction to transaction and requires an individualized inquiry.

### C.   GIVEN THE INTENSE COMPETITION IN THE CLASS 8 TRUCK INDUSTRY, DEALERS, OEMS, AND EATON ALL OFFER VARIOUS INDIVIDUALIZED INCENTIVES TO WIN SALES

Given the intense competition in the Class 8 truck industry, the OEMs, their authorized

---

[22] Additionally, dealers may also purchase bodies themselves, mount them on new trucks, and then sell the packaged product. *See* Ex. 16, EATON-00189178 at 188, 193; Ex. 18, G. L. Moore Dep. Tr. at 40:15-41:17. In such instances, "the dealer may make a large margin over and above" its normal margin, "because he's making an investment in the inventory, the body, the time . . . and really just the sophistication that not everybody can offer that and make it readily available." *Id.*  Plaintiffs again ignore this type of dealer-to-indirect-purchaser transaction when making assumptions about dealer profit margins and pass-through.

[23] *See* Ex. 1, Johnson IPP Rpt., Ex. 2 (Note); *see also* Ex. 19, D. Shust Dep. Tr. at 77:14-78:9; Ex. 3, Aff. of R. Nuss, ¶ 28.

[24]

[25]

dealers, and truck component manufacturers provide a variety of sales incentives to customers that reduce the final truck price.  Indeed, many truck purchasers shop various dealers of the competing OEMs and leverage dealers against one another to negotiate the best price.[26]

Dealers and OEMs offer significant benefits in the form of upfront and back-end trade allowances to reduce a customer's truck cost and secure the sale.[27]  For example, a dealer might offer a customer an additional $2,000 for his old truck if the customer buys a new truck from the dealer instead of a competitor, effectively reducing the customer's *new truck* cost by $2,000.[28] Dealers and OEMs also may offer trade-back terms on new Class 8 trucks, guaranteeing to buy the truck back at a certain time (*e.g.*, three years) at a fixed price.[29]  Dealers and certain OEMs further provide preferred financing terms to win a truck sale from a competitor.  These financing terms effectively lower the truck price, influence buying decisions, and exceed the overcharge plaintiffs allege here by several magnitudes.[30]

In addition, Class 8 truck component manufacturers (including Eaton) provide valuable incentives directly to certain truck purchasers (typically large fleets) in exchange for "spec'ing"

---

[26] Ex. 21, D. Wagner Dep. Tr. at 58:14-59:15; Ex. 22, E. Carleton Dep. Tr. at 37:1-42:8; Ex. 23, J. Cordes Dep. Tr. at 45:6-10; 102:18-104:2; Ex. 40, P. Prosper Dep. Tr. at 96:10-98:20; Ex. 24, J. Tharp Dep. Tr. at 35:7-36:12.  Purchasers also shop multiple dealers of the same brand.  For example, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[27] *See, e.g.*, Ex. 25, D. Surrett Dep. Tr. at 29:10-33:22; Ex. 20, R. Jaeger Dep. Tr. at 66:2-67:2; Ex. 26, T. Meunier Dep. Tr. at 52:17-53:10.

[28] Moreover, trade-in values are separately negotiated by the purchaser, enabling the purchaser to effectively lower the price of the truck if successful.  *See, e.g.*, Ex. 27, P. Nix Dep. Tr. at 54:11-55:2; 84:3-16; 99:6-100:2; Ex. 26, T. Meunier Dep. Tr. at 89:6-14.

[29] *See, e.g.*, Ex. 25, D. Surrett Dep. Tr. at 30:11-32:18; Ex. 28, R. Reichard Dep. Tr. at 57:9-58:9.

[30] *See, e.g.*, Ex. 25, D. Surrett Dep. Tr. at 29:10-33:22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); *see also* Ex. 23, J. Cordes Dep. Tr. at 119:20-121:14; Ex. 26, T. Meunier Dep. Tr. at 52:17-53:10.

their products.[31]  Such incentives include extended warranties, additional product support, field incentives (also called "SPIFFs"), or a combination thereof.[32]  These financial incentives are often *not* reflected in the invoice price from the dealers to truck purchasers.[33]

### D.   THE NAMED PLAINTIFFS

Each of the ten named plaintiffs, five individuals and five corporations, seeks to represent all indirect purchasers of Class 8 trucks with Eaton transmissions under a particular state law:

| | | | |
|---|---|---|---|
| **Avenarius**, Ryan | **IA** | **Meunier** Enterprises LLC[34] | **FL & NC** |
| **Big Gain**, Inc. | **MN** | **Nix**, Phillip | **KS** |
| **Carleton** Transport Service, Inc. | **NE** | **Prosper**, Paul (purportedly on behalf of Prosper Trucking Inc.) | **VT** |
| **Cordes**, James (purportedly on behalf of Cordes Inc.) | **MI** | **Purdy** Brothers Trucking Co., Inc. | **TN** |
| **Jaeger**, Rodney | **WI** | **T.C. Construction** Co., Inc. | **CA**[35] |

Rarely did any of these named plaintiffs purchase more than one truck at a time.[36]  With one exception, none of the named plaintiffs purchased more than 25 new Class 8 trucks containing

---

[31] The process through which a customer selects all the components is called "spec'ing" a truck. Ex. 3, Aff. of R. Nuss, ¶ 23.

[32] *See id.*, ¶ 27; Ex. 7, Aff. of E. Fite, ¶ 26; Ex. 4, Aff. of J. Little, ¶ 29; Ex. 29, D. Louya Dep. Tr. at 127:21-128:5; Ex. 30, C. Allen Dep. Tr. at 31:1-8; Ex. 31, J. Feiger Dep. Tr. at 44:5-23.

[33] Component manufacturers often pay SPIFFs directly to the customer.  At times, however, they will route SPIFFs through the OEM or the dealer to reduce the federal excise tax (in which case it would be reflected on the customer's invoice).  *See* Ex. 5, Decl. of K. Treadway, ¶ 26.

[34] Meunier brings suit individually and purportedly on behalf of its subsidiaries Auto Transport Leasing, Inc. and Exotic Car Transport, Inc.  *See* IPP Br. 1 n.1.

[35] *See also* Ex. 1, Johnson IPP Rpt., ¶ 22 (detailing the wide variety of plaintiffs' businesses, truck applications, and transmission needs).

[36] *See* Ex. 32, Avenarius Interrog. Resp., Sched. A; Ex. 33, Jaeger Interrog Resp., Sched. A; Ex. 34, Prosper Interrog Resp., Sched. A; Ex. 35, Big Gain Interrog. Resp., Sched. A; Ex. 36, Carleton Interrog. Resp., Sched. A; Ex. 37, Cordes Interrog. Resp., Sched. A; Ex. 26, T. Meunier Dep. Tr. at 60:2-3; Ex. 38, Nix Interrog Resp. & Exhibits.

Eaton transmissions in total during the Class Period.  Accordingly, their purchases and negotiations are nothing like that of large fleet purchasers who purchased hundreds (or thousands) of trucks at a time.  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

## ARGUMENT

### I.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INDIVIDUAL ISSUES PREDOMINATE UNDER RULE 23(B)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  The Supreme Court's decisions in *Comcast Corp. v. Behrend* and *Wal-Mart Stores, Inc. v. Dukes* underscored the seriousness of this inquiry, noting that Rule 23(b)(3) is "an adventuresome innovation . . . designed for situations in which class-action treatment is not as clearly called for."  *Comcast*, 133 S. Ct. 1426, 1432 (2013) (quoting *Dukes*, 131 S. Ct. 2541, 2558 (2011)).  As the D.C. Circuit recently recognized, "Before [*Comcast*], the case law was far more accommodating to class certification under Rule 23(b)(3)."    *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).  Thus, plaintiffs are simply wrong that predominance is, as a

---

37   ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

general matter, "readily met" in antitrust cases (IPP Br. at 19, 27-28).[38]  Even in antitrust cases—
and particularly after *Comcast* and *Dukes*—"[c]lass certification is far from automatic." *Rail
Freight*, 725 F.3d at 249.  Indeed, the Third Circuit has made clear that "[c]lass certification is
proper *only* 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule
23 are met."  *Hydrogen Peroxide*, 552 F.3d at 309 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457
U.S. 147, 161 (1982)) (emphasis added); *see also Dukes*, 131 S. Ct. at 2551.  For all of the
reasons discussed below, plaintiffs fall far short of Rule 23(b)(3)'s requirements.[39]

###### A.    Plaintiffs Cannot Show Antitrust Impact or Damages with Common Proof

Plaintiffs do not and cannot meet their burden of showing that class-wide antitrust injury
(or antitrust "impact") can be established through common proof.  As the Third Circuit observed
in *Hydrogen Peroxide*, Rule 23(b)(3) requires that plaintiffs:

---

[38] Plaintiffs' "readily met" language comes originally from *Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997).  *See id.* at 625 ("Predominance is a test readily met in certain cases alleging
consumer or securities fraud or violations of the antitrust laws.").  But the Third Circuit has
explicitly qualified that dicta.  For example, in *Newton v. Merrill Lynch, Pierce, Fenner & Smith,
Inc.*, 259 F.3d 154 (3d Cir. 2001), the court held that a securities class action did not meet the
predominance requirement because "plaintiffs' claims will require an economic injury
determination for each trade," notwithstanding *Amchem*'s dicta. *Id.* at 190. As the Third Circuit
explained in *Hydrogen Peroxide*, "We recognize the Supreme Court['s 'readily met' dicta, b]ut it
does not follow that a court should relax its certification analysis, or presume a requirement for
certification is met, merely because a plaintiff's claims fall within one of those substantive
categories." 552 F.3d at 321-22.

[39] It should go without saying that subclasses cannot be certified to pursue claims based on any
individual OEM's agreement with Eaton.  Having advanced neither evidence nor argument for
certifying subclasses to challenge these four alleged *individual* conspiracies between Eaton and
each OEM (and having failed to propose class representatives for each state subclass who
purchased trucks from *each* OEM—a necessary requirement for standing to assert these
individual conspiracy claims), plaintiffs have effectively abandoned these claims, and this Court
should so hold.  In any event, those claims are not certifiable for class treatment, as plaintiffs
present no damages model consistent with these theories of liability. *See* Opp. to DPP, § III.A;
*Comcast*, 133 S. Ct. at 1433 (plaintiff "cannot . . . establish that damages are susceptible of
measurement across the entire class for purposes of Rule 23(b)(3)" if it fails to provide a "model
supporting [its] damages case [that is] consistent with its liability case").

> demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members. Deciding this issue calls for the district court's rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial.

552 F.3d at 311-12. Knowing they cannot meet this "rigorous" standard, plaintiffs ignore it, citing instead to outdated cases and arguing they need "only make a threshold showing."[40] The standard is not, however, up for debate: Plaintiffs must establish that reliable, common evidence can be used to prove that *all* or *nearly all* of the proposed class members paid a higher price than they would have absent the alleged conspiracy. *Hydrogen Peroxide*, 552 F.3d at 311 ("every class member" must prove impact); *Rail Freight*, 725 F.3d at 252 (plaintiffs must "show . . . that all class members were in fact injured"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008) (must prove "each" class member was injured); *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) ("damages to all class members" must be shown); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) (no class certification "where fact of damage cannot be established for every class member"). Plaintiffs have woefully

---

[40] IPP Br. at 29 (quoting *Lumco Indus., Inc. v. Jeld-Wen, Inc.*, 171 F.R.D. 168, 174 (E.D. Pa. ***1997***); *In re Plastic Cutlery Antitrust Litig.*, 1998 WL 135703, at *5 (E. D. Pa. Mar. 20, ***1998***)), 27 (citing *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D. Pa. ***1976***)). On reply, plaintiffs may seek to rely on *In re Static Random Access Memory Antitrust Litigation*, 264 F.R.D. 603 (N.D. Cal. 2009) ("*SRAM*"), *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 267 F.R.D. 583 (N.D. Cal. 2010) ("*TFT-LCD*"), and *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) ("*CRT*"). The standard applied in all three of those cases has, however, been overruled. *See SRAM*, 264 F.R.D. at 612 (declining to "weigh in on the merits of plaintiffs' substantive arguments" or "engag[e] in a battle of expert testimony"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 253298, at *4 (N.D. Cal. Jan. 26, 2012) (same); *CRT*, 2013 WL 5391159, at *8 (same). Such an approach "flatly contradicts [Supreme Court] cases requiring a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim." *Comcast*, 133 S. Ct. at 1433. Any contrary rule leads to the absurd result that, "at the class-certification stage, *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*; *see also* n.63, *infra*.; Opp. to DPP, n.101.

failed to meet that standard here.

           **1.**       **Plaintiffs' Inability to Show That Direct Purchasers Paid an Alleged Transmission "Overcharge" With Common Proof Dooms Predominance Here as in the *Wallach* Matter**

Plaintiffs concede they must demonstrate the ability to show through common proof (1) that Eaton assessed an overcharge on all of its transmission sales to all of the OEMs; (2) that each of the OEMs passed on the alleged overcharge to substantially all of its direct purchasers; and (3) that each of the many hundreds of direct purchasers passed on part of that alleged overcharge to substantially all of the thousands of indirect purchasers.  To satisfy (1) and (2), indirect plaintiffs rely entirely upon the expert report of Dr. Russell Lamb submitted in the *Wallach* matter.  As discussed in defendants' DPP Opposition, direct plaintiffs and Dr. Lamb can show neither antitrust impact nor damages with proof common to the putative class of "direct" purchasers.[41]  There is thus no need to consider whether common proof can show that the direct purchasers passed through the alleged overcharge to the indirect purchaser plaintiffs because there is no common proof that direct purchasers paid any overcharge to begin with.  This alone is dispositive.  *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.* ("*ODD*"), --- F.R.D. ----, 2014 WL 4965655, at *12 (N.D. Cal. Oct. 3, 2014) ("Because the IPPs have failed to show a viable method for establishing impact to all or nearly all of the underlying direct purchasers, the class cannot be certified regardless of their showing on pass-through.").[42]

           **2.**       **Proof of Pass-Through Requires an Individualized, Transaction-by-Transaction, Reseller-by-Reseller Analysis**

Plaintiffs likewise cannot show that direct purchasers passed on the alleged transmission

---

[41] *See* Opp. to DPP, § II; *see also* Johnson DPP Rpt.; Ex. 1, Johnson IPP Rpt., ¶¶ 3, 12-16.

[42] *See also, e.g.*, *Am. Seed Co. v. Monsanto Co.*, 238 F.R.D. 394, 402 (D. Del. 2006) (Robinson, J.); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *6 (N.D. Cal. June 9, 2010); *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 500 (N.D. Cal. 2008); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001).

overcharge to indirect purchasers through common proof.  The complexity of truck pricing and the complexity of the indirect purchaser distribution chain alone make it impossible to identify "common" proof of class-wide injury.  Put differently, the way Class 8 trucks are priced and sold requires an individualized inquiry into each truck sale to determine whether an indirect purchaser paid an alleged transmission overcharge on its Class 8 truck purchase.  Plaintiffs' reliance on another flawed "pass-through regression" from Dr. Lamb only underscores that reality.

> **a.  Determining an Indirect Purchaser's Actual Price for a Class 8 Truck Requires an Individualized Inquiry**

Simply determining the actual price paid for a new Class 8 truck requires an individualized inquiry.  As plaintiffs admit, each truck sale is unique, and Class 8 trucks are sold in a "highly competitive" market.[43]  This intense competition causes OEMs, dealers, and component manufacturers to offer significant financial incentives to truck purchasers to win their business.  These financial incentives impact the final truck price, are often not apparent from the invoice price, and are ignored by plaintiffs.  Component manufacturers, for example, give extended warranties, additional product support, and monetary rebates (also called "SPIFFs") to certain customers, typically large fleets, if the customers will spec their component.[44]  Indeed, as plaintiffs acknowledge, Eaton granted monetary rebates directly to some indirect purchasers— though not to any of the named plaintiffs—in exchange for choosing an Eaton transmission.[45] This fact alone requires individualized inquiry.[46]

---

[43] Ex. 50, Lamb IPP Rpt., ¶ 26.

[44] *See* Ex. 3, Aff. of R. Nuss, ¶ 27; Ex. 7, Aff. of E. Fite, ¶ 26; Ex. 4, Aff. of J. Little, ¶ 29; Ex. 29, D. Louya Dep. Tr. at 127:21-128:5; Ex. 30, C. Allen Dep. Tr. at 31:1-8; Ex. 31, J. Feiger Dep. Tr. at 44:5-23.

[45] *See* Expert Report of Russell Lamb filed in *Wallach* (D.I. 232, Ex. A), ¶ 159.

[46] Plaintiffs' expert Dr. Lamb side-steps this fact by reducing all indirect purchasers' truck prices by Eaton's total rebates.  *See id.* ¶¶ 175, 178. Not only does Dr. Lamb ignore rebates received

In addition, as detailed in Factual Background § C, *supra*, dealers and OEMs often offer preferred trade-in, buyback, and special financing terms to win a customer's business.  If a dealer increases a trade-in value in a negotiation, that reduces the new truck price but is not captured on the invoice as such.  Similarly, guaranteed trade-back terms effectively lower the truck price in a way that is not reflected in the invoice price.   Dealers and certain OEMs further provide preferred financing terms to win a truck sale from a competitor.   These financing terms effectively lower the truck price and influence buying decisions.   Plaintiffs ignore these monetary benefits (which they themselves received).   These benefits both directly reduce new truck prices and often exceed the alleged overcharge by several magnitudes.  For example:



- r. Jaeger also purchased the truck under a special sales program that granted a $3,500 discount provided certain components were selected, including an Eaton transmission.[48]

---

from other component manufacturers; he creates an intra-class conflict by artificially reducing the prices paid by indirect purchasers who never received a rebate from Eaton.  *See* § II.B., *infra*.

[47] ▮▮▮▮▮▮▮▮▮▮▮▮

[48] ▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 41, PACCAR091994.

[49] ▮▮▮▮▮▮▮▮▮▮▮▮



In sum, the unique sales incentives that OEMs, dealers, and component manufacturers may (or may not) provide on a transaction-by-transaction basis requires individualized inquiry.

**b.** **Each Class 8 Truck Is Unique and Sold in a "Highly Competitive" Industry**

Once the actual "truck" price to the indirect purchaser is determined, an individualized inquiry remains necessary to determine whether the dealer was able to pass on the alleged transmission overcharge of a few hundred dollars. The record evidence is unambiguous that dealers do ***not*** uniformly pass on cost increases to customers. As multiple dealers have testified through sworn affidavits,



---

[50] Ex. 27, P. Nix Dep. Tr. at 54:11-55:2; 84:3-16; 99:6-100:2; Ex. 38, Nix Interrog. Resp., Ex. B (reflecting negotiated trade-in value of $80,000 applied to base purchase price of $107,908).

[51]

[52]

[53]

[54] *See* Ex. 3, Aff. of R. Nuss, ¶¶ 20, 31; Ex. 7, Aff. of E. Fite, ¶ 31; Ex. 4, Aff. of J. Little, ¶ 34; Ex. 8, Decl. of G. Larson, ¶¶ 15, 17; Ex. 5, Decl. of K. Treadway, ¶¶ 18, 20; Ex. 9, Decl. of K. Gustainis, ¶ 17; *see also* Ex. 1, Johnson IPP Rpt., ¶¶ 27-28.

████ ███████████████████████████████████████████████████

Customers will also "shop" various truck manufacturers for the best price and leverage dealers against one another to get the lowest truck price. This competition calls into question whether a dealer can pass on any cost increase on a particular sale.[57] In sum, determining whether a dealer passed on or absorbed a cost increase requires an individual inquiry into each truck sale.

> **c.    The Complex Distribution Chain Requires a Reseller-by-Reseller Analysis of Pass-Through**

Plaintiffs also ignore the Class 8 truck distribution chain and wrongly assume that every indirect purchaser is an end-user that would have fully absorbed any alleged overcharge. In reality, the distribution chain is much more complex and includes independent resellers, body builders, and leasing companies—all of whom purchase from dealers and are within plaintiffs' proposed subclasses. An individual inquiry is required to identify whether these "resellers" and leasing companies were injured or whether they passed on any alleged overcharge.

Some resellers are simply unauthorized Class 8 truck dealers that buy from authorized dealers and then resell to end-user companies, adding an additional level of distribution that renders tracing an overcharge on a common basis impossible.[58] Further complicating the issue of pass-through is the fact that body companies do not simply resell the truck; instead, they mount a significant body (*e.g.*, a garbage body, concrete boom, cement mixer, or tanker) and sell the complete package, truck, and body together.[59] These bodies have their own individual cost

---

[55] Ex. 4, Aff. of J. Little, ¶ 27; Ex. 3, Aff. of R. Nuss, ¶ 20; Ex. 1, Johnson IPP Rpt., ¶ 29.

[56] Ex. 3, Aff. of R. Nuss, ¶ 31; Ex. 4, Aff. of J. Little, ¶ 34; Ex. 7, Aff. of E. Fite, ¶ 31.

[57] Ex. 3, Aff. of R. Nuss, ¶ 26; Ex. 4, Aff. of J. Little, ¶ 28; Ex. 7, Aff. of E. Fite, ¶ 25.

[58] *See* n.17, *supra*.

[59] *See* Ex. 3, Aff. of R. Nuss, ¶ 17; Ex. 42, http://www.mcneiluscompanies.com (showing examples of Class 8 trucks sold with concrete mixer and refuse bodies).

structure and margin and can be more costly than the Class 8 truck itself.[60]  Determining if and to

what degree the body company passed on any alleged overcharge on a truck's transmission is,

therefore, an even more complex and individualized inquiry than a straight dealer sale.[61]

Leasing companies, which purchase thousands of trucks per year, are also included

within plaintiffs' proposed class definition.  Leasing companies often determine a truck's lease

price based in large part upon their cost for the truck (price paid to dealer). ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Plaintiffs' inclusion of these diverse putative class members—many of whom could have

passed on any alleged transmission overcharge in its entirety—necessarily means that an

individual inquiry would be required to identify which of those plaintiffs (if any) suffered

antitrust injury.  Not surprisingly, courts confronted with similarly complex distribution chains

and industries with similarly heterogeneous and disparately negotiated products routinely deny

certification of indirect purchaser classes.  In *Flash Memory*, for example, plaintiffs sought to

certify twenty state damages subclasses of indirect purchasers of flash memory products under

Rule 23(b)(3).  2010 WL 2332081, at *4.  Like Class 8 transmissions, "[t]he types of consumer

and industrial products utilizing [] flash memory var[ied] greatly."  *Id.* *2.  As with new Class 8

---

[60] *See* Factual Background § B, *supra*.

[61] *See* Ex. 1, Johnson IPP Rpt., ¶ 19-20, 23 & Ex. 2.

[62] *See* Ex. 4, Aff. of J. Little, ¶ 35; Ex. 7, Aff. of E. Fite, ¶ 38; Ex. 3, Aff. of R. Nuss, ¶ 32.

- 19 -

trucks, "[t]he distribution channel (i.e., the chain of intermediaries) through which Defendants' []

flash memory chips and products travel from Defendants to the end consumer [wa]s complex and

varied." *Id.* And like new Class 8 truck resellers, "different retailers respond[ed] to cost changes

in different ways . . . , i.e., there [wa]s no general or monolithic approach to passing-on increased

costs." *Id.* Under such circumstances, the indirect pass-through inquiry required an

individualized analysis of each transaction, defeating predominance and requiring denial of the

class certification motion. *Id.* at *11.

The *GPU* court made the same determination. In that case, plaintiffs sought to certify

nineteen state damages subclasses of indirect purchasers of graphics processing units ("GPUs")

under Rule 23(b)(3). 253 F.R.D. at 481. As here, GPUs "were sold to a variety of customers

through a number of distribution channels." *Id.* at 480. Because of this complexity, the court

concluded that the only way to accurately assess antitrust impact to each class member "would

[be] to construct separate equations using different variables for each reseller in each part of the

distribution chain in order to determine with any precision who passed on overcharges and at

what rate." *Id.* at 504. Such an inquiry would be "unmanageably individualized." *Id.*; *see also,

e.g.*, *In re OSB Antitrust Litig.*, 2007 WL 2253425, at *8 (E.D. Pa. 2007) (where "many resellers

absorbed any . . . price increase and so did not 'pass through' the increase to the end-users[,] . . .

Plaintiffs will have to prove economic impact customer by customer," thus no predominance).[63]

---

[63] *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3d Cir. 2004), on which plaintiffs
heavily rely, is inapposite. In that case, plaintiffs alleged that the defendant producer of
Coumadin misled consumers about the relative quality of Coumadin versus lower-priced, generic
alternatives. *Id.* at 522. Thus, it was undisputed that prices were lower in the but-for world (in
which class members bought the lower-priced generic). *See also, e.g., Teva Pharm. USA, Inc. v.
Abbott Labs.*, 252 F.R.D. 213, 220 (D. Del. 2008) (certifying class where plaintiffs alleged
defendants conspired to "impede[] the market entry of the generic version of [defendants'] brand
name drug"). Here, by contrast, the central issue is whether each and every indirect purchaser

#### d.      Dr. Lamb's Pass-Through Analysis Is Fundamentally Flawed

Plaintiffs try to avoid these market realities by introducing a second pass-through regression model ("indirect pass-through model") from Dr. Lamb to layer on top of the work he did in *Wallach*. This methodology further undermines the already flawed analysis in *Wallach*. Most problematically, as was true for his work in *Wallach*, Dr. Lamb relies on the assumption of uniformity rather than testing whether such uniformity exists. In effect, he assumes the conclusions that plaintiffs want him to reach, despite record evidence that directly undermines those assumptions. Dr. Lamb's analysis, therefore, fails to answer the central question—whether there is common proof that the indirect purchasers received any alleged overcharge.

Dr. Lamb's regression model calculates an *average* pass-through rate based on only *1,833* truck sales by only *two* dealers in California—*less than 1%* of the 235,868 trucks he claims were sold to indirect purchasers.[64] By excluding the vast majority of truck sales at issue, Dr. Lamb eliminates significant variation in truck prices.[65] Equally important, his data set contains *no* truck sales from ten of the eleven states for which plaintiffs seek class certification.[66] Dr. Lamb makes no effort to account for the myriad of factors that both affect truck price and

---

would have paid a lower price in the but-for world—plaintiffs have to *prove* they can show that with evidence common to the class.

Plaintiffs' reliance on direct-effects price-fixing cases, *e.g.*, *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (W.D. Pa. 1999), is similarly misplaced. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 2014 WL 6601941, at *10 (D. Del. Aug. 6, 2014) ("An illegal price fixing agreement that directly inflates prices is far more persuasive to show that injury can be proven on a class-wide basis, than an alleged array of anticompetitive conduct having an *indirect effect* on, among other things, the general price level of the products at issue.") (quotation marks omitted). Plaintiffs here allege an "array" of LTAs with more differences than similarities, different conduct by each OEM, and indirect price effects—routed through multiple distribution levels—which supposedly resulted from ZF Meritor's market exit. *See also* Opp. to DPP, n.101.

[64] *See* Ex. 50, Lamb IPP Rpt., ¶¶ 41, 48 & n.90; Ex. 1, Johnson IPP Rpt., ¶¶ 32, 37 & Ex. 3.

[65] *See* Ex. 1, Johnson IPP Rpt., ¶¶ 33-34 & Exs. 4A, 4B & 5.

[66] *Id.*, ¶ 35 & Ex. 6.

vary by dealer and geography. And he fails to even consider how a dealer's size or the competition in a particular geographic area might impact his assumption of a uniform indirect pass-through rate. This is despite the fact that competition and the number of truck dealers in a particular geographic area vary significantly state to state, city to city, and county to county.[67]

Not surprisingly, statistical analysis proves Dr. Lamb's one-size-fits-all assumption to be wrong. Applying Dr. Lamb's exact indirect pass-through model individually to California and Nevada—the only two states in Dr. Lamb's data sample that have sufficient records to be tested—demonstrates that indirect pass-through rates varied significantly from state to state. For example, Dr. Lamb's model implies a 95.2% pass-through rate for California, but only a 63.6% pass-through rate for Nevada.[68] Dr. Lamb's model reveals even greater variation city to city—from a low of 62.3% to a high of 121.0% among the limited data available.[69] These differences are statistically significant and undermine Dr. Lamb's assumption that one model can reliably demonstrate a pass-through rate for all dealers within California, much less eleven states. In the end, Dr. Lamb's indirect pass-through model demonstrates only that there is no common method to show indirect pass-through. *See, e.g.*, *OSB*, 2007 WL 2253425, at *11 (plaintiffs failed to show common proof of impact where their expert's "opinion regarding pass-through . . . has little probative value because he has not conducted any analysis of the 'real economic world'").[70]

While the aforementioned defects in Dr. Lamb's assumptions and model are most

---

[67] *Id.*, ¶¶ 43, 45-47 & Exs. 8-9.

[68] *Id.*, ¶ 49 & Ex. 11.

[69] *Id.*, ¶ 51 & Ex. 13; *see also id.* ¶ 44 & Ex. 7.

[70] Thus, unlike the defendants in *Lumco*, cited by plaintiffs, defendants here have not simply "criticized the[] [plaintiffs' expert's] methodologies [without] . . . produc[ing] specific evidence to demonstrate that such methods will not work." 171 F.R.D. at 174. Defendants have affirmatively *shown* that Dr. Lamb's models do not and cannot work. "No damages model, no predominance, no class certification." *Rail Freight*, 725 F.3d at 253; *see Comcast*, 133 S. Ct. at 1433 (same).

remarkable, his errors do not end there.  Other flaws include:

- Dr. Lamb calculates a pass-through rate on truck rather than *transmission* prices, thus impermissibly assuming that the rate of pass-through that applies to transmission costs is the same as that for the entire truck.  There is no basis for this assumption. *See* Ex. 1, Johnson IPP Rpt., ¶ 18.

- Dr. Lamb fails to test whether his pass-through rate declined during the Class Period compared to the pre-Class Period for some or all subclass members which could entirely offset the alleged "overcharge." *Id.*, ¶ 40 & n.120.

- Dr. Lamb acknowledges that this is a highly competitive industry, but wrongly assumes that this competition translates into uniform pass-through without testing this assumption. *Id.*, ¶¶ 24-31, 54-57 & Exs. 15-16; *see also id.*, ¶¶ 26-29 ("Dr. Lamb's theoretical assertions are oversimplifications of the theory on pass-through and do not demonstrate class-wide injury.").  His assumption contradicts dealers' testimony that competition in the industry often *prevents* them from passing on cost increases.[71]

Dr. Lamb's indirect pass-through model is fatally flawed.  With no model, plaintiffs can show neither fact of impact nor damages with common proof.

## B.     Other Individualized Claims and Defenses Overwhelm Common Issues

Because the predominance inquiry of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," it is "far more demanding" than the Rule 23(a)(2) requirement that common questions of law and fact merely exist across the subclasses.  *Amchem*, 521 U.S. at 623-24.  Where there are a "greater number of questions peculiar to [different] categories of class members" than there are common questions, and where those uncommon questions are "significan[t]," "any overarching dispute about the [alleged antitrust conspiracy] cannot satisfy the Rule 23(b)(3) predominance standard." *Id.*; *see also Chin v. Chrysler Corp.*, 182 F.R.D. 448, 453 (D.N.J. 1998); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 618 (3d Cir. 1996) (where "each individual plaintiff's claim raises radically different factual and legal issues from those of other plaintiffs[,] the predominance requirement of Rule 23(b)

---

[71] Ex. 3, Aff. of R. Nuss, ¶ 26; Ex. 4, Aff. of J. Little, ¶ 28; Ex. 7, Aff. of E. Fite, ¶ 25; Ex. 1, Johnson IPP Rpt., ¶ 30.

cannot be met"). Here, in addition to lacking common proof of class-wide impact, plaintiffs also fail to satisfy Rule 23(b)(3) because of numerous individualized claims and defenses that overwhelm any common issues. These unique issues include:

The claim that ZF Meritor would have entered the performance market. Plaintiffs include within the proposed subclasses and seek damages for indirect purchasers that purchased Class 8 trucks with Eaton transmissions. As plaintiffs concede, ZF Meritor did not even manufacture performance transmissions. *See* IPP Br. at 11-12. Therefore, performance truck purchasers must prove at trial that ZF Meritor would have entered the performance market (thus constraining the prices of Eaton's performance transmissions).[72] Subclass members who purchased only linehaul transmissions need not make this proof in order to recover.

Defendants' statute of limitations defenses. Plaintiffs' proposed Class Period starts October 1, 2002—over eight years before two of the named plaintiffs filed the instant lawsuit. Plaintiffs claim their lawsuit is not barred by the relevant statutes of limitations because they "did not discover, and could not have discovered through the exercise of reasonable due diligence," the conduct forming the basis of their claims until October 5, 2006. D.I. 36, ¶ 138; D.I. 1, ¶ 142.[73] As an initial matter, only two named plaintiffs—Avenarius and Jaeger—filed suit within the applicable limitations period. The other eight filed suit anywhere from several months to several *years* too late. They and the putative class members they seek to represent are

---

[72] *See* Johnson DPP Rpt., ¶¶ 95-96 (explaining the many reasons it is entirely speculative, and unlikely, that ZF Meritor would have entered the performance market).

[73] In their second and third amended complaints, plaintiffs arbitrarily and self-servingly extended their alleged constructive notice date to October 30, 2009. D.I. 73, ¶ 144. Plaintiffs cannot disclaim their prior admission so easily. *See W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 172-73 (3d Cir. 2013) ("A superseded pleading may be offered as evidence rebutting a subsequent contrary assertion."). In the end, the statute of limitations issue is still an open one.

thus subject to the unique defense that their claims are time-barred.[74] Even putting this aside, countless numbers of subclass members likely *were* aware of some of the alleged conduct forming the basis of this lawsuit, such as the existence of LTAs between Eaton and the OEMs, long before October 5, 2006. For example, ███████████████████████████ ███████████████████████████████████████████████ ■ These statute of limitations defenses raise further factual and legal issues uncommon across the subclasses.

<u>Variation across the state laws at issue.</u> Plaintiffs have made absolutely no showing that common issues will predominate across the state laws at issue. In multi-state class actions such as this, plaintiffs must "creditably demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles" that would render the class action unmanageable. *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183-84 (3d Cir. 2014) (quoting *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986)). Plaintiffs have not met that burden here and "must do more than provide their own *ipse dixit*, citation to a similar case, and a generic assessment of state [antitrust] statutes." *Id.* at 184.[76]

---

[74] Avenarius' and Jaeger's filing of the original complaint did not toll the other named plaintiffs' (and their subclass members') limitations periods. Before a class is certified, a named plaintiff must have standing to pursue a subclass's claims in order to toll those absent class members' limitations periods. *See Warden v. Crown Am. Realty Trust*, 1998 WL 725946, at *6 (W.D. Pa. Oct. 15, 1998), *aff'd*, 229 F.3d 1140 (3d Cir. 2000). Where it is clear from the face of the complaint that he does not, the later intervention of a plaintiff who *does* have standing does not "relate back" to the original filing. Any rule to the contrary would "condone or encourage attempts to circumvent the statute of limitations by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule." *Id.* (quoting *In re Elscint. Ltd, Sec, Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987)).

[75] ██████████████████████████████████████

[76] Even a cursory review of the laws at issue reveal variation. Florida's consumer protection act requires the unlawful conduct itself—not just the purchase—to occur in Florida. *See Carnival Corp. v. Rolls-Royce PLC*, 2009 WL 3861450, at *6 (S.D. Fla. Nov. 17, 2009); *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000). In California, "[i]nterpretations of federal antitrust law are at most instructive, not conclusive." *Aryeh v. Canon Bus. Solutions, Inc.*, 292 P.3d 871, 877 (Cal.

**C.   Plaintiffs' Proposed Class Action Is Unmanageable and Cannot Satisfy Rule 23(b)(3)'s Superiority Requirement**

Class certification should be denied where "a class action is [not] superior to other available methods for fairly and efficiently adjudicating the controversy" because of the "likely difficulties in managing [the] class action." Fed. R. Civ. P. 23(b)(3)(D); *see also Newton*, 259 F.3d at 191. Here, "[i]ndividual questions of economic loss present insurmountable manageability problems." *Id.* at 192. Compounding the manageability problems are the myriad claims and defenses unique to subsets of purchasers. By the time these individual issues are litigated, nothing will have been gained by class adjudication. *See, e.g., id.* (manageability not met where "[t]here are simply too many uncommon issues"); *In re Sch. Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir. 1986) ("The potential for individualized defenses . . . clearly poses significant case management concerns.").

Likewise, plaintiffs have offered no roadmap for managing a class action involving the laws of eleven different states on the subjects of antitrust and consumer protection, statute of limitations, fraudulent concealment, and damages. *See, e.g., Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 186 n.7 (3d Cir. 2006); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) (no superiority of nationwide class because "[i]f more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law"); *see, e.g., Chin*, 182 F.R.D. at 463 (no superiority where plaintiffs "fail to meet their burden of setting forth a workable plan"); *In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, 2012 WL 379944, at *34 (D.N.J. Feb. 6, 2012). Under such circumstances, "[t]he specter of adjudicating plaintiffs' claims at trial is, at the very least, daunting." *Newton*,

---

2013). And in 1995, North Carolina repealed its exclusive dealing statute. *See* 1995 N.C. Sess. Law 550. No exclusive dealing case law has developed since, and Sherman Act authorities are "not binding" there. *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973).

259 F.3d at 192.  Plaintiffs' class action is not manageable and therefore fails Rule 23(b)(3)'s superiority requirement.

## II.   PLAINTIFFS ALSO FAIL TO SATISFY RULE 23(A)'S TYPICALITY AND ADEQUACY REQUIREMENTS

Plaintiffs' motion also fails for the independent reason that they cannot satisfy the typicality and adequacy requirements of Rule 23(a).  Typicality requires that a "class representative . . . be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (quotation marks omitted).  "[W]here the named plaintiff's individual circumstances are markedly different" from those of the absent class members, typicality is not met. *Weiss v. York Hosp.*, 745 F.2d 786, 809 n.36 (3d Cir. 1984).  As a related matter, the adequacy requirement of Rule 23(a)(4) requires that courts evaluate any conflicts of interest among the named plaintiffs and proposed class members. *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006).  "[T]he typicality and adequacy inquiries often 'tend to merge' because both look to potential conflicts and to 'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Id.* (quoting *Amchem*, 521 U.S. at 626 n.20).  Where the evidence reveals differences or conflicts such that one or more of the Rule 23(a) requirements is not met, class certification should be denied.[77]

---

[77] Plaintiffs claim that "[t]he party challenging certification bears the burden of proving that representation is not adequate" (IPP Br. at 25), but they cite to no Third Circuit or Delaware precedent for that proposition.  The burden is on plaintiffs. *See Dukes*, 131 S. Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule . . . ."); *Apanewicz v. Gen. Motors Corp.*, 80 F.R.D. 672, 679 (E.D. Pa. 1978) ("The burden of convincing us that he is [an adequate representative] lies with the plaintiff . . . ."); *Weisman v. MCA Inc.*, 45 F.R.D. 258, 262 (D. Del. 1968) (same); *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482 (5th Cir. 2001) (district court erred in presuming adequacy); *Am. Seed*, 238 F.R.D. at 396 ("[I]t is plaintiffs' burden to 'establish that all four requisites of Rule 23(a) . . . are met.'") (*quoting Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994)).

Here, significant differences between the proposed representatives and the putative subclass members render the named plaintiffs' claims and defenses atypical and render them incapable of fairly and adequately representing the absent subclass members' interests. Adding to their inadequacy is named plaintiffs' lack of even a basic understanding of their claims and duties to the absent class members, and the intra-class conflicts they have created by including individuals and entities at multiple levels of the distribution chain in the subclasses.

### A.  The Named Plaintiffs Are Not Typical of Large Fleet and Leasing Company Class Members

The typicality requirement of Rule 23(a) is not satisfied "where the named plaintiff's individual circumstances are markedly different" from those of the absent class members. *Weiss*, 745 F.2d at 809 n.36.  Such is the case here.  Unlike the named plaintiffs, large fleet and leasing company subclass members often have relationships with—and negotiate directly with—OEMs and component suppliers, even though they ultimately purchase the truck through an intermediary dealer.  These large fleets and leasing companies place multi-year purchase orders for hundreds or thousands of trucks at a time.  They play OEMs and component suppliers off one another to secure the most competitive price.  To win these large orders, the OEMs and component suppliers often extend substantial discounts to these customers.[78]  For example, during the Class Period, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ █ ████████████████████████████████

████████████████████████████████████████████████████████████

---

[78] *See generally* Factual Background, *supra*.

[79] *See* Opp. to DPP, Factual Background § F; Johnson DPP Rpt. ¶ 93. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████████████

████████  All but one named plaintiff purchased 25 or fewer relevant trucks during the 12-year

Class Period, and half of them purchased fewer than 10.[80]

Where, as here, absent subclass members "negotiate[d] deals in a different competitive

landscape than individual customers" like the named plaintiffs, Rule 23(a)(3) typicality is

lacking.  *Intel*, 2014 WL 6601941, at *12 (quotation marks omitted).  For example, in *Intel*, the

named plaintiffs were individuals and small businesses that each purchased "a small number of

computers" containing Intel microprocessors and paid the retail sticker price.  *Id.* at *11.  They

sued Intel, alleging—much like plaintiffs' theory here—that Intel excluded rival AMD from the

relevant market for microprocessors by paying "loyalty payments" or rebates to computer

manufacturers.  The plaintiffs claimed that Intel's exclusion of AMD allowed Intel to charge

supracompetitive prices for its microprocessors to computer manufacturers who in turn passed

through the overcharge to their customers.  The plaintiffs sought certification of a class of all

persons who purchased a microprocessor indirectly from Intel as part of a computer.  *Id.* at *4.

The Court denied plaintiffs' motion because, among other deficiencies, the claims of the

class representatives were not typical of the claims of "enterprise customers"—"large businesses,

generally those having more than 500 employees"—included within the class.  *Id.* at *3, 11-12.

The court found that, in contrast to the class representatives, enterprise customers "purchase

larger volumes and different types of computers"; they "often negotiate multiyear contracts"; and

"the prices they pay result from individual negotiations."  *Id.* at *11.  These differences resulted

in "significantly different motivations and concerns" as between the two segments of customers,

and "prov[ing] that Intel overcharged the enterprise customers would require different proof

---

[80] *See generally* Factual Background, *supra*.

- 29 -

because they were able to negotiate deals in a different competitive landscape than individual customers." *Id.* at *11-12 (quotation marks omitted).[81]

As in *Intel*, *GPU*, and *ODD*, here, "plaintiffs' proof that [defendants] overcharged them would hardly prove that [defendants] overcharged the [large fleet and leasing company] customers." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 468 (4th Cir. 2006). As in *GPU*, those large fleets and leasing companies "came to the negotiating table in a fundamentally different position than the representative plaintiffs." 253 F.R.D. at 490. As in *Intel*, "to prove that [defendants] overcharged the [large fleets and leasing companies] would require different proof because they were able to negotiate deals in a different competitive landscape" than the named plaintiffs, and "[p]laintiffs have not shown that they can do so." 2014 WL 6601941, at *12. As in *Intel*, *GPU*, and *ODD*, "the disparity between the named class members . . . preclude[s] certification of the class" for failure to show typicality. *ODD*, 2014 WL 4965655, at *5.

## B.   Fundamental Intra-Class Conflicts Defeat Adequacy

A class action may be maintained only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Third Circuit describes the adequacy inquiry as "vital": "[C]lass members with divergent or conflicting interests from the named plaintiffs and class counsel cannot be adequately represented.'" *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 291 (3d Cir. 2010) (quotation marks omitted).

---

[81] *See also, e.g.*, *GPU*, 253 F.R.D. at 489-90 (claims of named plaintiffs—retail purchasers who paid the sticker price for the allegedly overpriced product—atypical of those of "wholesale customers" who "purchased a vast array of products on individually negotiated terms" and thus "came to the negotiating table in a fundamentally different position than the representative plaintiffs"); *ODD*, 2014 WL 4965655, at *5 (typicality lacking where "named plaintiffs are three small companies and four individuals" who "purchased non-customized ODDs [optical disk drives] . . . from a defendant at nonnegotiable, list prices" whereas "the putative class encompasses a myriad of other ODD purchasers whose volumes and means of ODD purchases do not compare" in that they "typically negotiated prices").

"Fundamental" conflicts that per se violate Rule 23(a)(4) include "conflict[s] concerning the allocation of remedies amongst class members with competing interests" as well as circumstances "where some class members claim to have been harmed by the same conduct that benefitted other members of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) (quotation marks omitted).  Both kinds of "fundamental" intra-class conflicts are present here.

First, truck resellers, and those to whom they re-sold—both of which are included in the subclasses—have "competing interests."  The reseller is interested in proving that he passed through none of the alleged overcharge and therefore is entitled to 100% of the damages attributable to that truck purchase whereas the downstream purchaser will seek to prove the exact opposite—that the overcharge was fully passed through and that *he* should recover 100% of the overcharge.  There is no way for the plaintiffs to adequately represent these competing interests.

The second kind of "fundamental" conflict is also present here.  First, the entities that re-sold or leased out the new trucks they purchased at a percentage markup over their own costs not only *passed on* the alleged overcharge in certain circumstances; they actually *benefitted* from it as they could charge a higher price to their customers.[82]  *See, e.g.*, *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190-96 (11th Cir. 2003) (adequacy not met where some class members who purchased drugs from defendant resold them at a constant percentage markup or "cost-plus" basis, and therefore benefited from the alleged overcharge).[83]  In addition, as

---

[82] ████████████████████████████████████████

[83] *In re K-Dur Antitrust Litigation*, 686 F.3d 197, 223-24 (3d Cir. 2012), does not alter the analysis.  In *K-Dur*, the Third Circuit held that *Hanover Shoe, Inc. v. United Shoe Machine Corp.*, 392 U.S. 481 (1968), precludes defendants in *direct purchaser* actions under *federal law* from arguing that the proposed class representatives are inadequate on the ground that some class members benefitted from the defendants' conduct.  This holding flowed directly from the *Hanover Shoe* doctrine, under which defendants in federal antitrust actions generally may not

discussed *supra*, in some circumstances, the OEMs and/or Eaton applied LTA funds far in excess of the alleged "overcharge" to particular deals. The recipients of those discounts—mostly large fleets and leasing companies—thus *benefitted* from the very agreements plaintiffs assert resulted in *higher* prices to *other* subclass members.[84]  Moreover, by spreading out these LTA funds over *all* indirect purchasers, plaintiffs and their expert have created an intra-class conflict by artificially reducing the truck price for indirect purchasers who never received a rebate from Eaton, against those indirect purchasers' interests.  These "serious intra-class conflicts preclude this class from meeting the adequacy of representation requirement." *Georgine*, 83 F.3d at 630.

> ## C.    Plaintiffs Are Not Adequate As They Lack Even A Basic Understanding of Their Claims and Duties as Class Representatives

"Because absent members of the class would be conclusively bound by the results obtained by the[] representatives and their attorneys, due process requires that they be more than pro forma representatives." *In re Goldchip Funding Co.*, 61 F.R.D. 592, 594 (M.D. Pa. 1974) (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)); *see id.* at 595 (named plaintiffs—not their attorneys—must serve as representatives of the class to avoid "possible conflicts of interest" that create an "unacceptable situation").  Numerous courts have denied certification on the ground that the proposed class representative's lack of understanding of his claims and duties to the absent class members rendered him inadequate.  *See, e.g.*, *Tucker v. BP Am. Prod. Co.*, 278 F.R.D. 646, 655-56 (W.D. Okla. 2011); *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 532-38 (N.D. Tex. 2005).

To be sure, "there is no requirement that a plaintiff be the best of all possible plaintiffs,"

---

assert a pass-on defense.  *Hanover Shoe* is inapplicable here, where plaintiffs assert claims under the laws of states that have repealed *Illinois Brick* and defendants may thus assert a pass-on defense.  In such cases, the intra-class conflict is real.

[84] *See* Johnson DPP Rpt., ¶ 93.

and he need not be "conversant with sophisticated legal doctrines concerning the antitrust laws." *Apanewicz*, 80 F.R.D. at 677, 679.   But if a plaintiff "neither claim[s] nor demonstrate[s] familiarity with the vast majority of material facts in th[e] case" and his class representative duties, and shows not even a pulse of interest in vigorously prosecuting it, he fails his burden of proving he will be an adequate representative. *Id.* at 679.   Such is the case here.   The named plaintiffs have little to no understanding of the claims they have asserted in this action and their obligations to the putative subclasses.   In many cases, they have not so much as read the complaint.   For example:



Certain named plaintiffs also confess a complete lack of understanding of their obligations to the putative subclasses:



- 

The totality of circumstances militates in favor of one conclusion—the named plaintiffs cannot adequately represent their respective subclasses.[93]

**D.    The Michigan and Vermont Subclasses Cannot Be Certified Because Cordes and Prosper Lack Standing**

As the Third Circuit has recognized, "[i]t is axiomatic that the lead plaintiff must fit the class definition."  *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 360 (3d Cir. 2013).  Here, James Cordes and Paul Prosper fail this basic requirement because—unlike the putative subclass

---

[90]

[91]

[92]



[93] *See, e.g., Spinelli v. Capital One Bank*, 265 F.R.D. 598, 614-15 (M.D. Fla. 2009) (representative inadequate in part because she "clearly has little or no understanding of how she became a class representative or what class she seeks to represent" or "her responsibilities" as class representative and "has not discussed the goals of the case and simply goes along with what counsel says"); *In re AEP ERISA Litig.*, 2008 WL 4210352, at *4 (S.D. Ohio Sep. 8, 2008) (representative inadequate where he "did not appreciate that this designation carries with it a special responsibility to actively assist class counsel in prosecuting the litigation and monitor their work" and therefore "has a poor understanding of his role and responsibilities as a class representative"); *Byes v. Telecheck Recovery Servs., Inc.*, 173 F.R.D. 421, 428 (E.D. La. 1997) (representative inadequate where she was "admittedly unaware that she ha[d] duties"); *Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409-10 (W.D. Okla. 1990).

members they seek to represent—they never purchased Class 8 trucks.[94]

James Cordes purports to sue "on behalf of" his company, Cordes Inc., which did buy trucks.  But having failed to allege or put forth any evidence that Cordes Inc. is legally or physically unable to bring suit in its own capacity, James Cordes lacks third-party standing to sue on behalf of Cordes Inc.  *See Nasir v. Morgan*, 350 F.3d 366, 376 (3d Cir. 2003).

Similarly, ██████████████████████████████████████ ████████████████████████ He therefore could not have paid any alleged overcharge, could not have suffered injury, and thus has no claim.  *See Am. Seed*, 238 F.R.D. at 396-97 ("To satisfy the typicality requirement, plaintiffs must show that the class representatives are part of the class and possess the same injury as the class members.") (quotation marks omitted); *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169 (3d Cir. 1987) ("It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim.").[96]

Because neither Cordes nor Prosper has standing to pursue the very causes of action they seek to assert on behalf of the Michigan and Vermont subclasses, they are atypical and inadequate class representatives.  *See, e.g.*, *Martin v. Ford Motor Co.*, 292 F.R.D. 252, 270 (E.D. Pa. 2013) (named plaintiff who "cannot personally recover damages" neither typical nor

---

[94] Alternatively, the Court need not reach the question whether Cordes and Prosper are proper class representatives and could simply dismiss their claims for lack of standing and deny their certification motion as moot. *See In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 154 (E.D. Pa. 2009); *In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d 616, 624 (D.N.J. 2005).

[95] ████████████████████████████████████████

[96] Prosper also lacks third-party standing to sue on behalf of Prosper Trucking. *See Nasir*, 350 F.3d at 376.  Similarly, Meunier does not have standing to assert claims "as parent company of Auto Transport Leasing, Inc. and Exotic Car Transport, Inc." (IPP Br. at 1 n.1).  *See Schenley Distillers Corp. v. United States*, 326 U.S. 432, 435 (1946) (parent company lacks standing to sue for subsidiary's alleged injuries); *Site Microsurgical Sys., Inc. v. Cooper Cos., Inc.*, 797 F. Supp. 333, 337-38 (D. Del. 1992) (same).

adequate because his "interest in pursuing the[] claims . . . is not sufficiently aligned with Class members who actually have valid . . . claims"); *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 448 (E.D. Pa. 2000).  Thus, the Michigan and Vermont subclasses cannot be certified.

### E.    Plaintiffs and/or Members of the Subclasses They Seek to Represent Have Unique Claims or Defenses

Finally, there are several major claims and defenses at issue in this case that are unique to only certain purchasers, dooming any prospect of showing Rule 23(a)(3) typicality, and raising serious doubts about the named plaintiffs' ability to fairly and adequately represent absent class members' interests.  *See Beck*, 457 F.3d at 296.  The adequacy concern with unique claims and defenses is that "the representative's interests might not be aligned with those of the class" and, as a result, he might not have any incentive to pursue claims or defeat defenses that he does not share with class members, or "might devote time and effort to [his unique claims or] defense[s] at the expense of issues that are common and controlling for the class."  *Id.* at 297.  Contrary to plaintiffs' contentions, it is not enough that "all members of the State Classes, by definition, are consumers who purchased new Trucks with Eaton Class 8 Transmissions indirectly and seek recovery of the overcharge resulting from Defendants' illegal conspiracy" (IPP Br. at 24).  Plaintiffs' claim is "made at an unacceptably general level," *Deiter*, 436 F.3d at 467, and impermissibly ignores the many unique claims and defenses at issue here.

First, all of the uncommon claims and defenses that defeat the predominance requirement also render the named plaintiffs atypical and inadequate.  *See* § I.B, *supra*. For example, Avenarius, Jaeger, Nix, Prosper, and T.C. Construction—whose relevant claimed truck purchases include only performance transmissions[97]—have an outsized incentive to prove that

---

[97] *See* Ex. 32, R. Avenarius Interrog. Resp., Sched. A; Ex. 33, R. Jaeger Interrog. Resp., Sched. A; Ex. 38, P. Nix Interrog. Resp. & Exs.; Ex. 34, P. Prosper Interrog. Resp., Sched. A; Ex. 40, P. Prosper Dep. Tr. at 25:3-16; 45:20-22; 63:21-64:2; Ex. 42, T.C. Construction Interrog. Resp.,

ZF Meritor would have entered the performance market and constrained the transmission prices they paid. The effort they expend on this proof will be a waste for the absent class members who purchased only linehaul transmissions. And Carleton and Purdy Brothers, having purchased only linehaul transmissions,[98] will have no incentive to present this proof, even though the claims of the absent class members who purchased performance transmissions depend on it. This unique claim—that ZF Meritor would have entered the performance market—will necessarily "play a significant role at trial." *Beck*, 457 F.3d at 300. Indeed, without this proof, plaintiffs cannot show that defendants caused an overcharge on *any* performance transmissions, cutting the estimated damages pool approximately in half.[99]

Several of the named plaintiffs are also subject to additional unique defenses. For example, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████ ██ ████████████████████████████████████████ ██████████████████ And as discussed, both Cordes and Prosper are uniquely subject to the defense that they lack standing and/or suffered no injury. *See, e.g.*, *Schering Plough*, 589 F.3d at

---

Sched. A; Ex. 43, Eaton Product Classification Guide. T.C. listed one linehaul transmission, but it was purchased outside California. *See* Ex. 44, TC000001 at 39-41.

[98] *See* Ex. 36, Carleton Interrog. Resp., Sched. A; Ex. 49, Purdy Bros. Interrog. Resp., Sched. A.

[99] *See* Johnson DPP Rpt., Ex. 2; *see generally id.*, ¶¶ 94-96. The other uncommon claims and defenses, discussed in § I.B, *supra*, are no less central to this litigation. *See, e.g.*, *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599-600 (3d Cir. 2009) (bar to named plaintiff's suit, such as covenant not to sue, can defeat typicality and adequacy); *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 463 (E.D. Pa. 2008) (issue whether plaintiff acknowledged her debt was "no quibble" because "[a]cknowledging the debt would toll the statute of limitations and thus eliminate the underlying wrong which [plaintiff's] claim seeks to remedy"); *Grodko v. Cent. European Distrib. Corp.*, 2012 WL 6595931, at *8 (D.N.J. Dec. 17, 2012) ("[T]he Court cannot prejudice the class with the time and expense that will probably ensue from litigating the unique loss causation defense to which only the [proposed lead plaintiff is] subject.").

[100] ████████████████████████████████████████

599-600; *Allen-Wright v. Allstate Ins. Co.*, 2008 WL 5336701, at *4 (E.D. Pa. Dec. 17, 2008). The numerous claims and defenses unique to one or more named plaintiffs, or that one or more named plaintiffs do not share with large swaths of their putative subclasses, defeat typicality and adequacy.

## III.   THE PUTATIVE SUBCLASSES ARE NOT ASCERTAINABLE

"[A]n essential prerequisite of a class action . . . under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012). "Ascertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013). "[T]o satisfy ascertainability . . . , the plaintiff must demonstrate his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." *Id.* at 308.

Plaintiffs fall far short of "demonstrating" a reliable and administratively feasible method to identify class members in this case. *Id.* First, plaintiffs suggest that class members can be identified from defendants' historical truck sale data, but this is not the case. Defendants maintain records of their own direct customers, *e.g.*, dealers, but it is not customary for OEMs to retain records of their customers' customers. In many instances, for example, the "customer" indicated in the data for dealer stock truck orders is "Stock"—a value that gives no indication of the end-customer who purchased the truck.[101] In other instances, the information that the dealers provided to the OEMs is not accurate. For example, the "customer" listed in PACCAR's data associated with the trucks that Meunier claims to have purchased includes ███████████

---

[101] *See, e.g.*, Moore Decl., ¶ 4.

██████████████████████████████████ not "Meunier Enterprises."[102]  Where, as

here, "nothing in company databases shows or could show whether individuals should be

included in the proposed class," no further inquiry is required—the class is not ascertainable.

*Marcus*, 687 F.3d at 593 (collecting cases).

As an alternative, plaintiffs suggest that "[p]roposed class members could be identified

through other methods, including the use of vehicle registration data or through Truck Dealers."

IPP Br. at 38 (citing two inapposite, unpublished, out-of-circuit cases in which the question

whether the ascertainability of a litigation class from DMV records was not before the court).

Plaintiffs provide no explanation of how either method would be reliable and administratively

feasible.  They present no evidence that truck dealers have records for the Class Period—which

started more than twelve years ago—or that any records they do have contain (current) customer

name and contact information.  *See, e.g.*, *Carrera*, 727 F.3d at 309.  This is not to mention the

administrative complexity of subpoenaing thousands of truck dealers for these records.

Nor have plaintiffs shown that DMV records can be used to ascertain class members in

an "administratively feasible" way.  *Id.* at 308.  Plaintiffs apparently propose to search the DMV

records of eleven states for the vehicle identification numbers ("VINs") in defendants' truck sale

data.  This is an administratively burdensome process:  Each record must be obtained and then

scrutinized to identify the initial owner of the vehicle.  Worse, these record are not reliable

sources of original owner name and contact information.  For example, the DMV record of a

truck Meunier claims to have purchased lists the original registrant as "unknown"; does not list

an "owner" until a 2006 title transfer; and does not list Meunier Enterprises *anywhere*.[103]

---

[102] *Id.*, ¶ 5.

[103] Ex. 45, DMV record for VIN ████████████████; *see also, e.g.*, Ex. 46, DMV record for VIN ██████████████ (claimed truck purchase of Carleton Transport Service) (listing

Moreover, as discussed, the proposed subclasses include all new truck purchasers throughout the entire chain of distribution.  While DMV records (where complete) contain a record of title, they contain no information about whether subsequent purchasers bought the vehicle in question *new*.  Identifying those downstream members of the putative subclasses will require an individualized inquiry into *each* purchase.  *See, e.g.*, *Byrd v. Aaron's, Inc.*, 2014 WL 1316055, at *5 (W.D. Pa. Mar. 31, 2014) (class not ascertainable because plaintiffs did not identify administratively feasible way to determine members); *Haskins v. First Am. Title Ins. Co.*, 2014 WL 294654, at *13 (D.N.J. Jan. 27, 2014) (same).  Nor have plaintiffs put forth a "reliable screening method . . . to ensure that only those purchasers who were injured by [defendant's alleged conduct] will be included in the certified class." *Intel*, 2014 WL 6601941, at *12.  Because "class members cannot be ascertained from a defendant's records," *Carrera*, 727 F.3d at 304, and "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,'" the ascertainability requirement is unmet and "a class action is inappropriate," *Marcus*, 687 F.3d at 593.

## CONCLUSION

For all of the reasons discussed herein, plaintiffs fail to satisfy the requirements of Rule 23(a) and Rule 23(b)(3), and their motion should be denied.

---

not Carleton, as registrant/owner); Ex. 7, DMV record for VIN ("                              not Carleton).

*OF COUNSEL*

Erik T. Koons
Joseph A. Ostoyich
Williams C. Lavery
Julie B. Rubenstein
Baker Botts LLP
Suite 1250
1299 Pennsylvania Avenue, NW
Washington, DC  20004


*OF COUNSEL*

J. Robert Robertson
Corey W. Roush
Benjamin F. Holt
Justin W. Bernick
Meghan C. Edwards-Ford
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC  20004
Telephone:  (202) 637-5600


*OF COUNSEL*

Cori Gordon Moore
Thomas L. Boeder
Eric J. Weiss
Catherine S. Simonsen
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
(206) 359-8000

MORRIS, NICHOLS, ARSHT, & TUNNELL LLP

By:   */s/ Donald E. Reid*
    Donald E. Reid (#1058)
    1201 North Market Street
    P.O. Box 1347
    Wilmington, DE  19899
    dreid@mnat.com

*Attorneys for Defendant Eaton Corporation*


POTTER ANDERSON & CORROON LLP

By:   */s/ John A. Sensing*
    Richard L. Horwitz (#2246)
    John A. Sensing (#5232)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    Wilmington, Delaware  19801
    (302) 984-6000
    rhorwitz@potteranderson.com
    jsensing@ potteranderson.com

*Attorneys for Defendants Daimler Trucks North America LLC (f/k/a Freightliner LLC)*


NOVAK DRUCE CONNOLLY BOVE & QUIGG LLP

By:   */s/ James D. Heisman*
    James D. Heisman (#2746)
    The Nemours Building, 9th Floor
    1007 North Orange Street
    P.O. Box 2207
    Wilmington, DE  10899
    james.heisman@novakdruce.com

*Attorneys for Defendants Kenworth Truck Co., Paccar Inc. and Peterbilt Motors Company*

PEPPER HAMILTON LLP

*OF COUNSEL:*

Jeremy Heep
Daniel J. Boland
Michael J. Hartman
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103

By:   */s/ James H.S. Levin*
     M. Duncan Grant (#2994)
     James H.S. Levin (#5355)
     1313 North Market Street, Suite 5100
     P.O. Box 1709
     Wilmington, DE  19899-1709
     grantm@pepperlaw.com
     levinejh@pepperlaw.com

*Attorneys for Defendants Mack Trucks Inc. and
Volvo Trucks North America*

RICHARDS, LAYTON & FINGER, PA

*OF COUNSEL:*

James H. Mutchnik
Daniel E. Laytin
Jennifer Cowen
Brian Borchard
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL  60654

By:   */s/ Kelly E. Farnan*
     Lisa A. Schmidt (#3019)
     Kelly E. Farnan (#4395)
     One Rodney Square
     920 N. King Street
     Wilmington, DE  19801
     schmidt@rlf.com
     farnan@rlf.com

*Attorneys for Defendants Navistar
International Corporation and Navistar, Inc.
f/k/a International Truck and Engine
Corporation*