## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

IN RE CLASS 8 TRANSMISSION        )
INDIRECT PURCHASER ANTITRUST   )        Civ. No. 11-00009-SLR
LITIGATION                                          )

Ian Connor Bifferato, Esquire and Thomas Francis Driscoll, III, Esquire of Bifferato LLC, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Lee Albert, Esquire and Gregory B. Linkh, Esquire of Glancy Binkow & Goldberg LLP, Joseph R. Gunderson, Esquire, Barbara C. Frankland, Esquire, Rex A. Sharp, Esquire and David E. Sharp, Esquire of Gunderson, Sharp LLP, Jason S. Hartley, Esquire and Jason M. Lindner, Esquire of Stueve, Siegel and Hanson LLP, Brian Penny, Esquire and Douglas Bench Jr., Esquire of Goldman Scarlato & Penny LLP.

Donald E. Reid, Esquire of Morris Nichols, Arsht & Tunnell, Wilmington, Delaware. Counsel for Defendant Eaton Corporation. Of Counsel: Joseph A. Ostoyich, Esquire, Erik T. Koons, Esquire, Julie B. Rubenstein, Esquire and William C. Lavery, Esquire of Baker Botts, LLP.

Richard L. Horwitz, Esquire and John A. Sensing, Esquire of Potter, Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendants Daimler Trucks North America LLC (f/k/a Freightliner LLC). Of Counsel: J. Robert Robertson, Esquire, Benjamin F. Holt, Esquire, Justin W. Bernick, Esquire, and Meghan C. E. F. Rissmiller, Esquire of Hogan Lovells US LLP and Corey W. Roush, Esquire of Akin Gump Strauss Hauer & Feld LLP.

Kelly E. Farnan, Esquire and Lisa A. Schmidt, Esquire of Richards, Layton & Finger, PA, Wilmington, Delaware and Jeffrey B. Bove, Esquire of Novak Druce Connolly Bove Quigg LLP, Wilmington, Delaware. Counsel for Defendant Navistar International Corporation (f/k/a International Truck and Engine Corporation). Of Counsel: Daniel E. Laytin, Esquire, James H. Mutchnik, Esquire, and Brian Borchard, Esquire of Kirkland & Ellis, LLP.

Jeffrey B. Bove, Esquire of Novak Druce Connolly Bove Quigg LLP, Wilmington, Delaware. Counsel for Defendants Kenworth Truck Company, Paccar Inc., and Peterbilt Motors Company. Of Counsel: Catherine S. Simonsen, Esquire, Cori G. Moore, Esquire, Eric J. Weiss, Esquire, and Thomas L. Boeder, Esquire of Perkins Coie LLC.

M. Duncan Grant, Esquire and James Harry Stone Levine, Esquire of Pepper Hamilton LLP, Wilmington, Delaware. Counsel for Defendants Mack Trucks Inc. and Volvo Trucks North America. Of Counsel: Daniel J. Boland, Esquire, Jeremy Heep, Esquire and Michael Hartman, Esquire of Pepper Hamilton LLP.

---

**MEMORANDUM OPINION**

Dated: October 봤 , 2015
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Presently before the court is indirect purchaser plaintiffs'[1] ("plaintiffs") motion for class certification pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3). (D.I. 184) Also before the court is plaintiffs' motion to substitute various parties as class representatives. (D.I. 180) Defendants to this action include Eaton Corporation ("Eaton"), Daimler Trucks North America LLC ("Daimler Trucks"), Freightliner LLC "Frightliner"), Navistar International Corporation ("Navistar"), International Truck and Engine Corporation ("International"), Paccar, Inc. ("Paccar"), Kenworth Truck Company ("Kenworth"), Peterbilt Motors Company ("Peterbilt"), Volvo Trucks North America ("Volvo"), and Mack Trucks, Inc. ("Mack") (collectively, "defendants").

Plaintiffs assert that defendants engaged in anticompetitive conduct. (D.I. 34 at ¶¶ 1-2) Specifically, defendants allege Eaton entered into exclusive dealing agreements with the Original Equipment Manufacturers ("OEMs") (Daimler Trucks, Freightliner, Navistar, International, PAACAR, Kenworth, Peterbilt, Volvo and Mack) of Class 8 trucks to maintain or enhance their monopoly power in the market for

---

[1] The indirect purchaser plaintiffs or the "proposed IPP class" include Ryan Avenarius (representing the Iowa State Class); Big Gain Inc. (representing the Minnesota State Class); Carleton Transport Service (representing the Nebraska State Class); James Cordes on behalf of Cordes Inc. (representing the Michigan State Class); Meunier Enterprises LLC, individually and as parent company of Auto Transport Leasing, Inc. and Exotic Car Transport, Inc. (representing the Florida and North Carolina State Classes); Paul Prosper on behalf of Prosper Trucking Inc. (representing the Vermont State Class); Rodney E. Jaeger (representing the Wisconsin State Class); and Purdy Brothers Trucking Co.(representing the Tennessee State Class).

transmissions used the Class 8 trucks. (*Id.*) Both direct[2] and indirect purchaser plaintiffs allege that such anticompetitive conduct resulted in the elimination of Eaton's biggest competitor ZF Meritor. (*Id.*) The court has jurisdiction pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

## II. BACKGROUND

### A. The Parties

Plaintiffs purchased Class 8 trucks from one or more of defendants' authorized sales agents or dealers and, therefore, are indirect purchasers of Class 8 transmissions. (D.I. 34 at ¶¶ 9-12) Plaintiffs assert violations of 20 state antitrust laws and 2 state unfair competition laws in a total of 21 different states.

Defendants are involved in the manufacture and sale of Class 8 trucks. Eaton manufactures transmissions for Class 8 trucks. (*Id.* at ¶ 13) The OEM defendants manufacture and sell Class 8 trucks. (*Id.* at ¶¶ 14-21) In order to assemble and sell Class 8 trucks, OEMs purchase component parts, such as transmissions, from suppliers, such as Eaton. (*Id.* at ¶ 27)

### B. Class 8 Trucks and Transmissions

There are eight recognized classes of vehicles, with Class 8 trucks being the heaviest. (*Id.* at ¶ 25) Examples of Class 8 heavy duty trucks include fire trucks, garbage trucks, and long-distance freighters. (*Id.* at ¶ 26) The purchase of Class 8 trucks is unique in the sense that buyers can essentially build a truck to their desired

---

[2] Direct purchaser plaintiffs have since been dismissed for lack of standing. (Civ. No. 10-260, D.I. 393 at 6, D.I. 394). The issue of standing as related to the indirect purchaser plaintiffs as a whole has not been reasserted since the court denied defendants' motion to dismiss with respect to plaintiffs' state antitrust claims. (D.I. 60)

2

specifications. (*Id.* at ¶ 27) When purchasing a Class 8 truck, buyers can consult OEM "databooks," which list an OEM's standard and non-standard component offerings,[3] and designate the specific components they desire in their trucks. (*Id.*) Since manufacturers of component parts in the Class 8 truck industry market products directly to potential customers, it is not uncommon for buyers to select non-standard options from a databook. (*Id.*)

## C. Plaintiffs' Allegations

Plaintiffs contend that Eaton has been the dominant and most widely recognized American manufacturer of Class 8 transmissions, holding a near monopoly in the market since the 1950s. (*Id.* at ¶¶ 28, 42-45) In the 1990s, ZF Meritor established itself as a viable competitor to Eaton, producing desirable, competitive and innovative transmissions. (*Id.* at ¶¶ 28-29, 51-61) In response to this competition from ZF Meritor and a significant downturn in the Class 8 truck market which occurred in late 1999-early 2000, plaintiffs allege that Eaton and the OEMs conspired to put ZF Meritor out of business, thereby expanding Eaton's monopoly and permitting all defendants to share in the profits resulting from this monopoly. (*Id.* at ¶ 62)

This conspiracy was allegedly achieved by Eaton entering into Long Term Agreements ("LTAs") in the early 2000s with each of the four OEMs.[4] (*Id.* at ¶¶ 62-68). While each Eaton-OEM LTA was separately negotiated and thus distinct, the LTAs

---

[3] A databook is a term of art used in the trucking industry. It represents the truck broken down to its core components and provides customers with standard and nonstandard component options. (D.I. 25 at ¶¶ 4, 41) A transmission is an example of a component part that exists in a databook. (*Id.*)

[4] A series of mergers in the mid-1990's reduced to four the number of OEMs purchasing Class 8 transmissions. (D.I. 25 at ¶ 51)

shared a similar purpose and features. (*Id.* at ¶¶ 74-112) Each LTA contained a provision whereby the OEMs would receive sizable and lucrative rebates from Eaton assuming the OEMs utilized a certain percentage of Eaton transmissions annually. (*Id.*) For example, under the Freightliner-Eaton LTA, Freightliner was required to purchase 92% of its Class 8 transmission needs from Eaton in order to receive the specified rebates. (*Id.* at ¶ 77) Aside from tying percentage requirements to rebates, the LTAs included other provisions designed to minimize ZF Meritor's market share. Examples of these provisions included eliminating ZF Meritor transmissions from databooks or removing them from the standard position, refusing to provide warranties on trucks with ZF Meritor transmissions, overcharging for ZF Meritor transmissions, and refusing to provide financing on vehicles with ZF Meritor transmissions. (*Id.* at ¶¶ 74-113) In essence, plaintiffs argue that the LTAs were defacto exclusive dealing contracts and the OEMs all agreed with each other to enter into these agreements in order to eliminate ZF Meritor and share in the profits of Eaton's monopoly. (*Id.* at ¶¶ 62; 66) In the end, plaintiffs allege that defendants' conspiracy was successful as the LTAs greatly diminished ZF Meritor's market share in the Class 8 transmission field and left it no opportunity for growth. (*Id.* at ¶¶ 115-117) In the face of these economic realities, ZF Meritor's market share declined to an insignificant level. (*Id.*) Plaintiffs ultimately contend that they had to pay higher prices for transmissions and, in turn, for Class 8 trucks, as a result of defendants' actions; they also assert that "they had less choice and suffered from a decrease in innovation." (*Id.* at ¶¶ 4; 114)

## III. STANDARD

4

A district court has broad discretion to grant or deny class certification. *See Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985). The court does not inquire into the merits of a lawsuit when determining whether it may be maintained as a class action. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974). However, the court must conduct a limited preliminary inquiry, examining beyond the pleadings, to determine whether common evidence could suffice to make out a prima facie case for the class. *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal citation omitted); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 167 (3d Cir. 2001) ("[C]ourts may delve beyond the pleadings to determine whether the requirements for class certification are satisfied.").

The party seeking class certification bears the burden of establishing that certification is warranted under the circumstances. *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for certification of a class. Under Rule 23(a), these requirements are: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004). Plaintiffs bear the burden to "establish that all four requisites of Rule 23(a)

and at least one part of Rule 23(b) are met." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).

Under Rule 23(b)(3), two additional requirements must be met for a class to be certified: (a) common questions must predominate over any questions affecting only individual members; and (b) class resolution must be superior to other available methods for the fair and efficient adjudication of the controversy. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Relevant to this inquiry are the following factors: (a) the interest of members of the class individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of the class action. *Id.* at 615-16. The Supreme Court has noted that the dominant purpose behind certifying Rule 23(b)(3) cases is to vindicate the rights of people who individually would be without the strength to bring their opponents into court; it overcomes the problem of small recoveries, which do not provide enough incentive for individual actions to be prosecuted. *Id.* at 617.

## IV. DISCUSSION

The proposed IPP state classes are as follows:

All persons or entities, in the state of [California, Florida, Kansas, Iowa, Michigan, Minnesota, Nebraska, North Carolina, Tennessee, Vermont, Wisconsin], that indirectly purchased from Defendants new Class 8 Heavy Duty trucks containing Eaton transmissions, beginning October 1, 2002 and continuing until the present ("Class Period"). Excluded from this class are: (i) Defendants and their parent companies, subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs, assigns, and co-conspirators; and (ii) any judges presiding over this action and the members

6

of his/her immediate family and judicial staff, and any juror assigned to this action.

(D.I. 184 at 1-3) Plaintiffs assert the following claims: 1) violation of 20 state antitrust laws (for the following states: Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin); and 2) violation of two state unfair competition laws (for the following states: Florida and New Hampshire). (D.I. 68 at ¶¶ 168-277) Plaintiffs move for certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3). (D.I. 184)

## A. Numerosity

To be certified, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 227–28 (3d Cir. 2001). Plaintiffs argue that the number of relevant Class 8 truck sales during the proposed class period numbers in the thousands to tens of thousands and joinder, therefore, is impracticable. (D.I. 185 at 15). Dr. Russell Lamb ("Dr. Lamb"), plaintiffs' proffered expert, provided a range of relevant Class 8 truck sales per state between 1,572 and 41,307. (D.I. 187 at ¶ 18) Defendants do not dispute that the numerosity requirement is satisfied. The court notes that once all potential class members are identified, the class will be so numerous as to make joinder impracticable. Accordingly, the proposed IPP class satisfies the numerosity requirement.

## B. Commonality

7

Commonality requires that class members share a single common issue of law or fact. *See Baby Neal*, 43 F.3d at 56. The proposed IPP class alleges a common course of conduct which, it contends, had a general effect on the market in that defendants' conduct artificially raised the price of Class 8 transmissions and decreased innovation. Specifically, plaintiffs assert that at least eight questions of law or fact are common to the proposed IPP class: (1) whether defendants engaged in a contract, combination, or conspiracy to restrain trade in, exclude competition in, or monopolize the relevant market for Class 8 truck transmissions; (2) whether defendants conspired to unreasonably restrain trade and maintain prices for Class 8 truck transmissions sold in the United States, and the indirect purchaser state submarkets, at supra-competitive levels by foreclosing the market for Class 8 truck transmissions in the United States and in the states at issue; (3) the existence and duration of the illegal conduct alleged herein; (4) whether defendants concealed their unlawful activities; (5) whether defendants' anticompetitive conduct resulted in diminished competition for Class 8 truck transmissions in the United States and in the states at issue; (6) whether defendants' anticompetitive conduct caused prices for Class 8 truck transmissions to be higher than they would have been in the absence of defendants' conduct; (7) whether members of the proposed IPP class were injured by defendants' conduct and, if so, the appropriate classwide measure of damages; and (8) whether defendants' conduct violated the antitrust and unfair competition laws of the indirect purchaser states. (D.I. 185 at 17-18) Defendants do not dispute that the commonality prong is satisfied. The proposed IPP class has demonstrated the commonality requirement because these questions generally focus on defendants' conduct and, as such, are common to all members of

8

the class. *See In re Warfarin*, 391 F.3d at 529 (stating that allegations for a violation of § 2 of the Sherman Act "naturally raise several questions of law and fact common to the entire class"); *In re Linerboard Antitrust Litigation*, 305 F.3d 145, 151-52 (3d Cir. 2002) (finding that, when the inquiry focuses on defendants' actions, a conspiracy claim pursuant to § 1 of the Sherman Act involves common issues of fact and law).

## C. Typicality

Typicality requires that "the claims . . . of the representative parties are typical of the claims . . . of the class," not that the claims are identical. *See* Fed. R. Civ. P. 23(a)(3); *see also In re Warfarin*, 391 F.3d at 531-32. "The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members." *Stewart*, 275 F.3d at 227-28. More specifically, "[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory." *Id.* (alteration in original) (citing *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir. 1992)). The proposed IPP class contends that typicality is satisfied because "claims of the representatives of the proposed [s]tate [c]lasses are based on the same conduct by [d]efendants and substantially similar legal theories." (D.I. 185 at 23-24) Generally, plaintiffs argue the same legal theory applies across the state classes because all proposed IPP class members allege defendants conspired or contracted to reduce competition in the Class 8 transmission market. Defendants submit that typicality is not met because plaintiffs are not large fleet or leasing company purchasers. (D.I. 233 at 28) Rather, defendants assert that as indirect purchasers, plaintiffs purchased trucks through intermediary dealers and did not

negotiate with OEMs and component suppliers or enter into any long-term purchase contracts. (*Id.* at 28-29) Defendants additionally assert that absent subclass members "negotiate[d] deals in a different competitive landscape than individual customers." (*Id.* at 29 (citing *In re Intel Corp. Microprocessor Antitrust Litig.*, Civ. No. 05-485-LPS, 2014 WL 6601941, at \*12 (D. Del. Aug. 6, 2014)) The court disagrees with defendants' assertions as related to the typicality requirement. Regardless of plaintiffs' status as indirect purchasers, typicality is met because recovery necessitates proof of defendants' collusive conduct resulting in artificially high prices for Class 8 transmissions. As discussed above, plaintiffs' claims arise out of the same course of alleged conduct that, if true, would have similarly injured each of them by artificially raising the price of Class 8 transmissions. Thus, any claims from absent class members will also arise out of the same course of conduct and alleged overpayment. *See In re* Warfarin, 391 F.3d at 531-32. Typicality, therefore, is satisfied.

## D. Adequacy

Rule 23(a) also requires that the representative class members "fairly and adequately protect the interests of the class." *See* Fed. R. Civ. P. 23(a)(4). This inquiry "has two components designed to ensure that absentees' interests are fully pursued." *See In re Warfarin*, 391 F.3d at 532 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 630 (3d Cir. 1996), *aff'd, Amchem*, 521 U.S. at 591. "First, the adequacy inquiry 'tests the qualifications of the counsel to represent the class.' " *Id.* (quoting *In re Prudential Ins. Co. America Sales Practice Litig. Agent Actions*, 148 F.3d 283, 313 (3d Cir. 1998)). "Second, it seeks 'to uncover conflicts of interest between named parties and the class they seek to represent.'" *Id.* (quoting *Prudential*, 148 F.3d at 313).

10

### 1. Qualifications of counsel

Counsel for the proposed IPP class have submitted firm resumes demonstrating that counsel possess the competence, skill, and experience necessary to prosecute the class' claims. (D.I. 186, exs. 46-47); *See Jerry Enterprises of Gloucester County, Inc. v. Allied Beverage Group, L.L.C.*, 178 F.R.D. 437, 446 (D.N.J. 1998). The resumes demonstrate that counsel have participated in several class action antitrust suits, including representing indirect purchasers alleging overcharges as a result of price-fixing and market allocation conspiracy. (*See id.*) Plaintiffs have sufficiently demonstrated this requirement.

### 2. Absence of conflict

The proffered representatives are indirect purchasers of Class 8 truck transmissions from one or more of defendants' authorized sales agents/dealers. (D.I. 68 at ¶¶ 9-18) Plaintiffs argue that the members of the proposed IPP class do not have any interests antagonistic to those of the other class members, as all share a strong interest in proving defendants' liability. (D.I. 185 at 25-26) That is, each class representative has the same interest as each class member in proving their claims. Additionally, plaintiffs assert that each class member has been adversely impacted by defendants' conspiracy because their ability to purchase Class 8 transmissions has been restricted by defendants' conduct. As a result of that conduct, plaintiffs assert they have paid artificially inflated prices for Class 8 transmissions. (*Id.* at 26) Defendants challenge the adequacy of the proffered representatives, arguing that fundamental intra-class conflicts exist and that plaintiffs lack understanding of their claims and duties as class representatives. (D.I. 233 at 30-32)

At the outset, the court notes plaintiffs' request to withdraw and substitute two new parties as class representatives filed on the same day as the instant motion for class certification.[5] (D.I. 180) Apparently, California class representative Premier Produce Co., Inc. "is no longer able to participate in this action," and Kansas class representative Joseph Williams is no longer a class member as the proposed class is now defined. (Id.) This lawsuit was initially filed on October 4, 2010. (D.I. 1) It is, therefore, four years into the course of this litigation that plaintiffs request to remove class representatives and substitute new parties.[6] On the very same day plaintiffs requested removal and substitution of several class representatives, plaintiffs also asserted that their proffered representatives would adequately represent the class. The parties additionally dispute whether the representatives of the Michigan and Vermont subclasses have standing. (D.I. 233 at 34-36; D.I. 239 at 19) Given the potential upheaval in class representation at this stage of the litigation, the court is unable to find that the proffered class representatives or their proposed substitutions can "fairly and adequately protect the interests of the class." See Fed. R. Civ. P. 23(a)(4). Plaintiffs have had over four years to proffer adequate class representatives that can represent

---

[5] The court additionally notes that plaintiffs' request was filed more than ten months after the court's deadline of January 1, 2014 to add or amend parties. This deadline was set in the original scheduling order filed on February 7, 2013 in the related case, Wallach v. Eaton, Corp., Civ. No. 10-260, D.I. 99 at ¶ 3, and here on March 12, 2013. (D.I. 88)

[6] Over the course of this four-year-old litigation, the parties briefed a motion to dismiss, completed extensive fact discovery, and the parties' class certification economists drafted expert reports and were subsequently deposed. At the time this motion was filed, defendants had "already taken nine depositions, with at least five more scheduled, and produced over 24,000 documents." (D.I. 204 at 4)

12

the interests of both present and absent class members without conflict.[7] Based on the foregoing, the court concludes that, while counsel is adequately qualified to represent the class, plaintiffs have not demonstrated that the adequacy requirement is satisfied with respect to class representatives.

## E. Predominance

The court recognizes that the predominance requirement has been characterized as "readily met" in cases alleging violations of the antitrust laws.[8] *Amchem*, 521 U.S. at 625. However, the Supreme Court has acknowledged in this regard that questions of individual damages can "overwhelm questions common to the class." *Comcast Corp. v. Behrend*, – U.S. –, 133 S. Ct. 1426, 1433 (2013). Additionally, the Supreme Court has noted that Rule 23(b)(3) is an "'adventuresome innovation' of the 1966 amendments,

---

[7] Moreover, there appears to be fundamental conflict defeating certification as the class includes parties who claim to have been harmed by the same conduct that benefitted other members of the class. (D.I. 233 at 31-32); *In re Intel*, 2014 WL 6601941, at *12 (citing *In re Photochromic Lens Antitrust Litig.*, Civ. No. 8:10-CV-00984-T-27EA, 2014 WL 1338605 at *10 (M.D. Fla. April 3, 2014)). First, the truck resellers within the class have an interest in proving that they passed-through zero overcharge in order to recover 100% of the damages attributed to each resale, while the downstream purchasers have an opposite interest. Second, the rebates, as discussed in the pass-through analysis below, were not applied uniformly to the class. Instead, it appears that large fleet and leasing companies may have "received a disproportionate share of rebates such that they offset the alleged overcharge." As result, these class members were not injured by the alleged anti-competitive conduct. (Civ. No. 10-260, D.I. 299, ex. 1 at ¶ 93)

[8] The Third Circuit has also recognized that monopolization and conspiracy claims involve predominantly common issues. *See In re Warfarin*, 391 F.3d at 528 (stating that allegations for violations of § 2 of the Sherman Act "naturally raise several questions of law and fact common to the entire class and which predominate over any issues related to individual class members, including the unlawfulness of [Eaton's] conduct under federal antitrust laws as well as state law, the causal linkage between [Eaton's] conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled."; *In re Linerboard*, 305 F.3d at 152 (finding violation of Sherman Act's § 1 conspiracy claim would predominantly involve common issues of fact and law, where the inquiry focused on defendants' actions, not individual class members).

13

framed for situations 'in which class-action treatment is not as clearly called for.'" *Wal-Mart Stores, Inc. v. Dukes*, – U.S. –, 131 S. Ct. 2541, 2558 (2011) (quoting *Amchem*, 521 U.S. at 625 (citing advisory committee's notes, 28 U.S.C. app., at 697 (1994 ed.))).

Rule 23(b)(3)'s predominance element requires that common issues predominate over issues affecting only individuals, and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *See Amchem*, 521 U.S. at 623; *In re Warfarin*, 391 F.3d at 527. Significantly, the predominance requirement "is far more demanding" than the commonality requirement of Rule 23(a), which it incorporates. *In re Warfarin*, 391 F.3d at 527. Although common issues must predominate over individual inquiries, the existence of an individual inquiry does not preclude class certification, especially where all members face the necessity of proving the same fraudulent scheme. *See In re Community Bank of Northern Virginia*, 418 F.3d 277, 306 (3d Cir. 2005) (discussing *Amchem*, 521 U.S. at 625). Similarly, individualized damages calculations do not defeat a Rule 23(b)(3) certification if the predominance requirement is otherwise met. *Id.* at 305-06; *Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004).

"The essential inquiry for predominance is whether the proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *In re Intel*, 2014 WL 6601941, at *13 (citing *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, – U.S. –,133 S. Ct. 1184, 1196 (2013)). The Third Circuit has further instructed that "[c]lass certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 309 (3d Cir. 2008) (quoting *Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147,

161 (1982)). Additionally, "actual, not presumed, conformance with Rule 23 requirements is essential." *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 591 (3d Cir. 2012). "Expert opinion with respect to class certification, like any matter relevant to a Rule 23 requirement" compels rigorous analysis. *Hydrogen Peroxide*, 552 F.3d at 323. "Weighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands." *Id*.

Generally, plaintiffs contend that the common issues regarding the proposed IPP class' allegations of a conspiracy predominate over the possibility of individualized damages. (D.I. 233 at 28) Specifically, plaintiffs' assertion of common issues that predominate this action include: (1) whether defendants engaged in a conspiracy to fix, raise, stabilize, and maintain the prices of Class 8 transmissions; (2) whether defendants monopolized or engaged in a conspiracy to monopolize trade and commerce in the market for Class 8 transmissions sold to consumers in the United States; and (3) whether defendants' conduct caused the prices of Class 8 transmissions to be maintained at higher levels than would exist in a competitive market. (D.I. 185 at 28) Defendants argue that plaintiffs have failed to meet their burden; specifically, that plaintiffs are unable to show through common proof that direct purchasers paid an overcharge. Defendants also contend that proof of pass-through requires an individualized, transaction-by-transaction, reseller-by-reseller analysis, and that litigation as a class action is unmanageable due to state law variances. (D.I. 233 at 14, 25)

The Third Circuit has pointed out that in antitrust cases, the element of "impact often is critically important for the purpose of evaluation of Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for

individual, as opposed to common proof." *In re Intel*, 2014 WL 6601941, at *13 (citing *Hydrogen Peroxide*, 552 F.3d at 311). While plaintiffs need not prove common impact at the class certification stage, they must at least

> demonstrate that the element of antitrust impact is capable of proof at trial
> through evidence that is common to the class rather than individual to its
> members. Deciding this issue calls for the district court's rigorous
> assessment of the available evidence and the method or methods by
> which plaintiffs propose to use the evidence to prove impact at trial.

*Id.*

At this stage, the court does not question plaintiffs' proposition that defendants' anticompetitive conduct "could, in theory, impact the entire class despite a [resultant] decrease in prices for some customers in parts of the class period, and despite some divergence in the prices different plaintiffs paid." *Hydrogen Peroxide*, 552 F.3d at 325. However, "the question at [the] class certification stage is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class." *Id.* The threshold issue of predominance, then, is whether plaintiffs have established common proof to show that all or nearly all class members suffered antitrust injury, and that any benefits received by certain purchasers as a result of defendants' anticompetitive payments are exceeded by the overcharges imposed that were subsequently passed on to end purchasers. *Id.* Based on the record before it and as discussed below, plaintiffs have failed to meet this common evidence burden.

### 1. Overcharge analysis

Both parties agree that class certification requires plaintiffs to demonstrate the ability to show through common proof that (1) Eaton assessed an overcharge on all of its transmission sales to all of the OEMs; (2) each of the OEMs passed on the alleged

16

overcharge to substantially all of its direct purchasers; and (3) each of the many hundreds of direct purchasers passed on part of that alleged overcharge to substantially all of the thousands of indirect purchasers. (D.I. 233 at 14) Generally, plaintiffs rely on Dr. Lamb's expert report and testimony in support of the overcharge propositions as related to the direct purchasers. Defendants ask the court to deny class certification because "both direct plaintiffs and Dr. Lamb can show neither antitrust impact nor damages with proof common to the putative class of 'direct' purchasers." (Id.)

As noted above, class certification requires plaintiffs to establish that reliable, common evidence can be used to prove that all or nearly all of the proposed class members paid a higher price than they would have absent the alleged conspiracy. Hydrogen Peroxide, 552 F.3d at 311. While plaintiffs need not prove antitrust impact at the class certification stage, plaintiffs must show that "impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." Id. at 311-12.

Here, however, plaintiffs' status as indirect purchasers must be taken into account. Eaton did not sell any transmissions directly to any of the plaintiffs. Rather, Eaton sold the transmissions to OEMs who then included the transmissions in Class 8 trucks purchased from defendants' authorized sales agents or dealers. Similar to In re Intel, this case is distinguishable from price-fixing class actions involving alleged overcharges to direct purchasers. In re Intel, 2014 WL 6601941, at *14. Plaintiffs at bar must show that they can prove, through common evidence, that Eaton not only overcharged its OEM customers, but that overcharges were then passed from the OEMs to direct purchasers and eventually to plaintiffs as indirect purchasers. An

17

additional distinction between the instant case and a majority of price-fixing cases is that the "challenged 'conduct is a price **reduction**" that benefitted members of the class. *In re Intel*, 2014 WL 6601941, at \*14 (emphasis in original) (citing *In re Photochromic Lens,* 2014 WL 1338605 at \*11) ("[A] class cannot be certified when some members of the class benefitted from the alleged wrongful conduct.").

Notably, the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977), "established the general rule that only direct purchasers from antitrust violators may recover damages in antitrust suits." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 369 (3d Cir. 2005). Indirect purchasers are generally **not** entitled to recover damages for passed-on overcharges. *Id.* (emphasis added) This is referred to as the "indirect purchaser rule." Three policy reasons justified the Supreme Court's decision to impose this rule:

(1) a risk of duplicative liability for defendants and potentially inconsistent adjudications could arise if courts permitted both direct and indirect purchasers to sue defendants for the same overcharge; (2) the evidentiary complexities and uncertainties involved in ascertaining the portion of the overcharge that the direct purchasers had passed on to the various levels of indirect purchasers would place too great a burden on the courts; and (3) permitting direct and indirect purchasers to sue only for the amount of the overcharge they themselves absorbed and did not pass on would cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing the direct purchasers' incentive to sue.

*Id.* at 369-70 (citing *Illinois Brick*, 431 U.S. at 730-35). The threshold issue necessary to predominance, therefore, turns on whether plaintiffs have proffered sufficient common evidence to prove that Eaton overcharged its direct purchasers.

### a. Dr. Lamb's analysis

Dr. Lamb calculated a damages model "using a 'benchmark' model, whereby he determine[d] prices that would have prevailed in a world free of alleged misconduct,

18

called 'but for' prices." (D.I. 185 at 30) According to this report, "Dr. Lamb calculated that 94.2% of the overcharges were passed from direct purchasers to indirect purchasers." (Id. at 31) Dr. Lamb arrived at this conclusion following three separate regressions and a "yardstick approach" to account for the lack of benchmarks in the performance transmission market. (Id.; Civ. No. 10-260, D.I. 397 at 71) Specifically, Dr. Lamb calculated the alleged overcharge on Eaton Class 8 linehaul transmissions to the OEMs (direct purchasers).[9] From this regression, he concluded that during the class period, "prices for Eaton Class 8 Linehaul transmissions were not fully explained by market forces ... Thus, common evidence is available to show that the alleged misconduct inflated Eaton Class 8 transmission[] prices above the level that would have prevailed absent the alleged misconduct." (Civ. No. 10-260, D.I. 232, ex. 1 at ¶¶ 179-90) Dr. Lamb then performed a second regression to measure the damages to direct purchasers, calculating that as a result of pass-through, the direct purchaser class suffered $398.4 million in damages during the class period. (Id. at ¶¶ 192-212) A third regression of that data was utilized to calculate the damages allegedly passed on from the direct purchaser dealers to end user indirect class members whereby Dr. Lamb calculated 94.2% of the overcharges were passed on, resulting in $91,391,262 in damages to the class. (D.I. 187 at ¶¶ 40-51)

## b. Direct purchaser analysis

---

[9] The court notes this analysis relies entirely on Dr. Lamb's report in the related direct purchaser case, Wallach v. Eaton, Corp., Civ. No. 10-260. (D.I. 185 at 31) Dr. Lamb additionally applied the same overcharge percentage calculated from his Eaton linehaul regression in order to calculate the damages on Class 8 performance transmissions. (Civ. No. 10-260, D.I. 232, ex. 1 at ¶ 189) As will be discussed in the next section, this regression assumes a single uniform overcharge to all OEMs across all transmissions. (Id. at ¶¶ 179-90)

19

As noted, plaintiffs are required to show there is common proof that Eaton overcharged the individual class members who purchased Eaton transmissions contained in Class 8 trucks during the Class Period. In support of this proposition, plaintiffs rely entirely on Dr. Lamb's analysis, asserting that his model calculates the overcharge to direct purchasers by analyzing "various data provided by the Defendants." (D.I. 185 at 31) Defendants assert, and the court agrees, however, that Dr. Lamb's model analyzes only a "small slice of data." (Civ. No. 10-260, D.I. 397 at 42:13-14) Dr. Lamb's report additionally assumes, rather than analyzes, several important points. First, Dr. Lamb reached his conclusions by applying "the same overcharge percentage calculated from [the] Eaton Linehaul regression to Eaton's sales in order to calculate the damages on Class 8 Performance Transmissions." (Civ. No. 10-260, D.I. 232, ex. 1 at ¶ 189) In other words, Dr. Lamb ignored performance transmissions, basing his conclusions solely on a portion of linehaul transmission data.[10] Notably, defendants' expert, Dr. Johnson, concluded that performance transmissions comprise "nearly half of Eaton's transmissions sold during the relevant period." (Civ. No. 10-260, D.I. 299, ex. 1 at ¶ 20) By basing his analysis solely on linehaul transmission data, Dr. Lamb has excluded half of the data he proffers as common evidence that direct purchasers paid an overcharge. Moreover, Dr. Lamb's model excludes data from Daimler and Freightliner, comprising "over 40 percent of the linehaul trucks in this case." (Id. at 42:12-17) It appears, then, that Dr. Lamb's analysis

---

[10] Dr. Lamb argues this is appropriate because, but for Eaton's anti-competitive conduct, "ZF Meritor would have entered the Class 8 performance Transmission market." (Civ. No. 10-260, D.I. 232, ex. 1 at ¶ 189) This is debatable. As defendants assert, "performance truck purchasers must prove at trial that ZF Meritor would have entered the performance market." (D.I. 233 at 24)

is based on less than 60 percent of half of the data. As Dr. Johnson explained, "Dr. Lamb failed to include (a) more than 19,000 transmissions with prices above $7000, (b) all performance transmissions, (c) 47.1% of manual transmissions, (d) 40.5% of Volvo-Mack purchases, (e) 36.9% of Daimler purchases, (f) 33.0% of Navistar purchases, and (g) 64.5% of PACCAR purchases." (D.I. 298 at 31; Civ. No. 10-260, D.I. 299, ex. 1 at ¶ 22) When asked about the most persuasive component of his analysis, Dr. Lamb testified that his analysis "is more credible because it's grounded in the facts of the case." (Civ. No. 10-260, D.I. 397 at 42:13-14) In reality, Dr. Lamb's analysis utilizes assumptions based on a modicum of data not fully representative of Eaton transmission sales during the Class Period, in that he "used less than 55% of the relevant Eaton transmission sales." (D.I. 298 at 31; Civ. No. 10-260, D.I. 299, ex. 1 at ex. 2) Dr. Lamb's "compartmentalized view" of damages does not comprise common proof that Eaton overcharged the direct purchasers. *In re Intel*, 2014 WL 6601941 at \*17. Plaintiffs have not met their burden in this regard. Because plaintiffs have failed to demonstrate that there is common proof showing that direct purchasers paid an overcharge, the indirect purchaser class cannot be certified.[11] Nevertheless, the court will address the parties' arguments regarding pass-through.

## 2. Pass-through analysis

---

[11] The court also acknowledges that indirect purchasers may not have standing as direct purchaser plaintiffs have since been dismissed on this issue. (Civ. No. 10-260, D.I. 393 at 6; D.I. 394). However, the court declines to analyze at this juncture whether indirect purchasers have standing since the issue has not been reasserted since the court denied defendants' motion to dismiss in the instant case. (D.I. 60)

Likewise, plaintiffs have failed to identify common evidence that any alleged overcharges were passed on to the indirect purchasers. As discussed above, class certification requires that plaintiffs show the alleged overcharges were passed on to end purchasers in the form of higher prices to consumers. Defendants assert that the complexity of truck pricing and the indirect purchaser distribution chain make it impossible to identify, much less prove, class-wide injury through common proof. (D.I. 233 at 15) Defendants also assert plaintiffs' reliance on Dr. Lamb's pass-through regression is similarly flawed to his overcharge analysis. (*Id.*)

### a. Truck pricing and the transmission distribution chain

As discussed above, this litigation primarily concerns plaintiffs' allegation that they had to pay higher prices for transmissions and, in turn, for Class 8 trucks as a result of defendants' anti-competitive conduct. Transmissions, of course, comprise only a part of a Class 8 truck transaction. While the Class 8 trucks here have identical transmissions, each truck is unique and highly customized for use in different applications, meaning manufacturing costs for each truck varies by tens of thousands of dollars. (*Id.* at 6) Moreover, some companies do not simply sell Class 8 trucks, but mount a "significant body," such as a concrete boom, cement mixer, tanker, or refuse loader for a garbage truck. (*Id.* at 18) Those companies then sell a complete package, truck and body together. Determining what portion of the alleged overcharge was passed on to a transmission cannot be determined simply by the overall purchase price of the truck. This is particularly true with respect to "significant bodies," as these components have their own costs, at times more costly than the truck itself. (*Id.* at 7) Additionally, as Dr. Johnson explained, "[t]here are multiple possible intermediaries

22

between the OEMs and indirect purchasers of Class 8 trucks, such as dealers, body builders, and other resellers, which yields a number of possible distribution chains." (D.I. 234, ex. 1 at ¶ 19) As defendants assert, the proposed IPP class includes leasing companies as well as resellers, potentially resulting in transmissions that have been sold and then resold with no methodology to account for this occurrence. (D.I. 233 at 6) Overall, the complex distribution chain frustrates the process of determining the amount of pass-through on a transmission based on the price of a truck, and "[t]here has been no effort to correlate transmission ... cost to truck price." (Civ. No. 10-260, D.I. 397 at 311:7-9)

Plaintiffs' allegation of anti-competitive conduct involves Eaton's entry into LTAs in the early 2000s with each of the OEMs. While these LTAs were separately negotiated and distinct, each contained sizable and lucrative rebates from Eaton, operating under the assumption that the OEM would utilize a certain percentage of Eaton transmissions annually. These rebates, among other beneficial terms, also present a significant problem for plaintiffs trying to prove, through common evidence, that the alleged overcharges were passed on.[12] In fact, plaintiffs acknowledge that "[t]ruck dealers and fleet purchasers ... sometimes receive special incentives called 'SPIFFs' ..., which effectively **reduce** the net price." (Civ. No. 10-260, D.I. 232, ex. 1 at ¶ 159) (emphasis added) These rebates complicate the damages issue not only because the rebates benefitted some members of the class through price reduction, but also in terms of individualized transactions and the inability to account for them through

---

[12] According to defendants, "[c]omponent manufacturers give extended warranties, additional product support, and monetary rebates (SPIFFs) to certain customers, typically large fleets, if the customers will spec their component." (D.I. 233 at 15)

common proof.[13] *See In re Intel*, 2014 WL 6601941, at \*14; *In re Photochromic Lens,* 2014 WL 1338605 at \*11) ("[A] class cannot be certified when some members of the class benefitted from the alleged wrongful conduct.")).

As to reduction in Class 8 truck pricing in exchange for choosing an Eaton transmission, defendants assert that not all reductions in truck pricing can be reflected on an invoice. (D.I. 233 at 16) For example, a dealer may increase trade-in value, offer preferred buy-back terms, or provide special financing. (*Id.*) More importantly, defendants provided the following examples where the benefits received exceeded the alleged overcharge:

Cordes, Inc. (Michigan) received a special financing rate from PACCAR in conjunction with one new Class 8 truck purchase. More specifically, Mr. Cordes testified that another customer originally ordered the truck and no longer wanted it, and "they gave me a cheap financing rate on it, because they wanted to dump it. So I can borrow it cheaper than I can borrow money at the bank."

Rodney Jaeger's (Wisconsin) sole new Class 8 truck purchase during the Class Period involved a complicated trade-in transaction including both a used Class 8 truck that he owned and a used Class 8 truck owned by a third party. Mr. Jaeger also purchased the truck under a special sales program that granted a \$3,500 discount provided certain components were selected, including an Eaton transmission.

Meunier Enterprises LLC (Florida and North Carolina) typically traded in used trucks in conjunction with new truck purchases and shopped dealers and brands based on who offered the best trade-in values.

Phillip Nix (Kansas) traded in a used truck in conjunction with all of his truck purchases and aggressively negotiated the trade-in values he received. In one case the trade-in value made up nearly 75% of the price of the new truck.

---

[13] These rebates also present a fundamental intra-class conflict that defeat the adequacy requirement as discussed above.

24

Paul Prosper (Vermont) traded in a used truck in conjunction with Prosper Trucking, Inc.'s only relevant truck purchase. Prosper also financed the purchase through Daimler Trucks' captive finance company.

Purdy Brothers Trucking Co., Inc. (Tennessee) negotiated trade-back terms, meaning that Purdy received a guaranteed future trade-in value on its new truck purchase. Purdy also sold trucks back to Freightliner via a fleet reduction program and financed certain truck purchases through Daimler Trucks' captive finance company.

Ryan Avenarius (Iowa) did not negotiate the price of his sole purchase during the Class Period. After providing the dealer with his preferred specifications, he simply paid the dealer's first quoted price.

(D.I. 233 at 16-17)[14] Given that eight of the 11 proposed state classes contain

examples of unique sales incentives as described above, the court is unpersuaded that

plaintiffs can package the evidence such that an individualized inquiry into each

transaction is unnecessary. In other words, plaintiffs' claims may not "be proven with

evidence common to the class because it fails to account for many of the real-world

facts surrounding this complicated market." *In re Intel*, 2014 WL 6601941, at *15.

Because plaintiffs have failed to show that common evidence can prove antitrust impact

in this complicated truck pricing market without individualized inquiries, class

certification is not proper. *Hydrogen Peroxide*, 552 F.3d at 311-12.

### b. Dr. Lamb's pass-through analysis

Dr. Lamb's pass-through analysis likewise fails to proffer common proof that the

indirect purchasers paid any overcharge. In order to show antitrust impact on the

indirect purchasers, class certification requires plaintiffs to "show that the [alleged]

---

[14] (Citing D.I. 234, ex 23 at 119:20-121:14; ex. 20 at 65:19-67:2, 43:21-48:12; ex. 41 at PACCAR091994; ex. 26 at 52:9-54:19; ex. 27 at 54:11-55:2, 84:3-16, 99:6-100:2; ex. 38 at ex. B (reflecting negotiated trade-in value of $80,000 applied to base purchase price of $107,908); ex. 40 at 56:21-57:16, 44:13-19; ex. 25 at 30:11-32:18, 29:19-30:10, 45:3-45:21; ex. 39 at 29:1-10)

overcharges are passed on to end purchasers in the form of higher prices to consumers." *In re Intel*, 2014 WL 6601941, at *18. Dr. Lamb calculated that 94.2% of the alleged overcharges were passed-through to indirect purchasers by averaging a fractional amount of data. (D.I. 185 at 31; D.I. 233 at 21) As Dr. Johnson asserts, Dr. Lamb only analyzed 1,833 out of 235,868 truck sales during the relevant Class Period. (D.I. 234, ex. 1 at ¶ 32) Dr. Lamb then applied the rate attained from that regression across the entire proposed IPP class, "based on the assumption that the pass-through rate for the transmission alone is the same as that for the entire truck." (*Id.* at ¶ 37) This amounts to an analysis utilizing less than **one percent** of the relevant truck sale data and fails to account for transmission price in the sale of a truck as a whole. In no way does an analysis of one percent compel the conclusion that plaintiffs can proffer sufficient common evidence to prove the alleged overcharges were passed through to indirect purchasers. Dr. Lamb's analysis merely includes data from two dealers in California, thereby excluding ten of the 11 states for which plaintiffs seek class certification. (D.I. 233 at 21) Dr. Lamb further fails to account for additional factors that can affect the relationship between transmission and truck price as discussed above. As the Supreme Court noted in *Comcast*, "[t]here is no question that the model failed to measure damages resulting from the particular antitrust injury on which [defendants'] liability in this action is premised." *Comcast*, – U.S. –, 133 S. Ct. at 1433. For the reasons discussed above, the court finds plaintiffs have not met their burden to prove that common issues predominate. The court, therefore, declines to grant class certification.

## 4. Superiority

The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication. *In re Prudential*, 148 F.3d at 316. Given the court's findings regarding adequacy of class representatives and plaintiffs' failure to show that common issues predominate, class certification under Rule 23(b)(3) would be inappropriate. Hence, the court declines to address this requirement.

## V. CONCLUSION

For the reasons stated above, plaintiffs' class certification motion will be denied. Moreover, because the proposed class lacks representation, the case does not present a case or controversy under Article III. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F .3d 283, 306 (3d Cir. 1998) (holding that "whether an action presents a 'case or controversy' under Article III is determined vis-a-vis the named parties"). Accordingly, the case is dismissed. An order shall issue.